# EXHIBIT A

Page 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF INDIANA
 2                     INDIANAPOLIS DIVISION
                              - - -
 3      RANDY JOHNSON, on        :
        behalf of himself and    :
 4      others similarly         :
        situated,                :
 5                               :CASE NO.  1:15-cv-00716-LJM-MJD
                 Plaintiff,      :
 6                               :
                  vs.            :
 7                               :
        NAVIENT SOLUTIONS,       :
 8      INC., f/k/a SALLIE       :
        MAE, INC.,               :
 9                               :
                 Defendant.      :
10                             - - -
11             Wednesday, January 6, 2016
12                             - - -
13             Oral deposition of PATRICIA PETERSON,
14     taken pursuant to notice at VERITEXT LEGAL
15     SOLUTIONS, 300 Delaware Avenue, Suite 815,
16     Wilmington, Delaware 19801, beginning at
17     9:13 a.m., before Alicia Fortin, a Professional
18     Reporter and a Notary Public in and for the
19     Commonwealth of Pennsylvania.
20                             - - -
21
22
23
                       VERITEXT LEGAL SOLUTIONS
24
25
```

Page 2

1  APPEARANCES:
2
3  GREENWALD DAVIDSON RADBIL, PLLC
   BY:  AARON RADBIL, ESQUIRE
4  106 East Sixth Street
   Austin, Texas 33431
5  512.322.3912
   aradbil@gdrlawfirm.com
6       - and -
   GREENWALD DAVIDSON RADBIL, PLLC
7  BY:  MICHAEL L. GREENWALD, ESQUIRE
   5550 Glades Road
8  Suite 500
   Boca Raton, Florida 33431
9  561.826.5477
   mgreenwald@gdrlawfirm.com
10      -and-
   GREENWALD DAVIDSON RADBIL, PLLC
11 BY:  JESSE JOHNSON, ESQUIRE participated via
   Teleconference
12 5550 Glades Road
   Suite 500
13 Boca Raton, Florida 33431
   561.826.5477
14 jjohnson@gdrlawfirm.com
   Representing the Plaintiff, Randy Johnson
15
16 VEDDER PRICE
   BY:  LISA M. SIMONETTI, ESQUIRE
17 1925 Century Park East
   Suite 1900
18 Los Angeles, California 90067
   424.204.7738
19 lsimonetti@vedderprice.com
   Representing the Defendant, Navient Solutions,
20 Inc., f/k/a Sallie Mae, Inc.
21
   NAVIENT SOLUTIONS, INC.
22 BY:  ANNE L. MILEM, ESQUIRE
   2001 Edmund Halley Drive
23 Reston, Virginia 20191
   703.984.6733
24 anne.milem@navient.com
   Representing the Witness, Patricia Peterson
25

Page 3

1        I N D E X
2           - - -
3  Testimony of:  Patricia Peterson
4  By Mr. Radbil................5
5
6           - - -
7        E X H I B I T S
8           - - -
9  EXHIBIT NUMBER   DESCRIPTION         PAGE MARKED
10
11 EXHIBIT 1 Deposition Notice                22
12 EXHIBIT 2 Call Log/NSI 7385-7386           23
13 EXHIBIT 3 Memo/NSI 6230                    63
14 EXHIBIT 4 Document/NSI 1017                65
15 EXHIBIT 5 Document/NSI 0044-0051           70
16 EXHIBIT 6 Document/NSI 0001-0004           86
17 EXHIBIT 7 Document/NSI 0038-0041           88
18 EXHIBIT 8 Document/NSI 4589-4596           92
19 EXHIBIT 9 Document/NSI 4909-4911           99
20 EXHIBIT 10 Document/NSI 4852-4856         103
21 EXHIBIT 11 Sallie Mae Document/NSI 0026-0029  103
22 EXHIBIT 12 TCPA Requirements/NSI 4949-4960    106
23 EXHIBIT 13 Document/NSI 7387-7388         126
24 EXHIBIT 14 Call Log                       135
25 EXHIBIT 15 Interrogatories                176

Page 4

1       DEPOSITION SUPPORT INDEX
2
3  DIRECTION TO WITNESS NOT TO ANSWER
4  Page   Line
5   67    21
6   149   16
7
8  REQUEST FOR PRODUCTION OF DOCUMENTS
9  Page   Line   Description
10 (None)
11
12 STIPULATIONS
13 Page   Line
14  181   23
15
16 QUESTIONS MARKED
17 Page   Line
18 (None)
19
20
21
22
23
24
25

Page 5

1              - - -
2        PATRICIA PETERSON, after having
3  been first duly sworn, was examined and
4  testified as follows:
5              - - -
6           EXAMINATION
7              - - -
8  BY MR. RADBIL:
9     Q.    Good morning.
10    A.    Good morning.
11    Q.    My name is Aaron Radbil.  I
12 represent Randy Johnson who filed a class action
13 lawsuit against Navient Solutions, Incorporated
14 which I will refer to today as Navient --
15       MS. SIMONETTI:  Can we refer to it
16    as other than Navient?  How about NSI,
17    Navient Solutions?
18       MR. RADBIL:  NSI?
19       MS. SIMONETTI:  That works.
20 BY MR. RADBIL:
21    Q.    We're here because NSI designated
22 you as a witness to testify on its behalf and
23 respond to a Notice of Deposition that Mr. Johnson
24 served.
25       I'm going to ask you a series of

2 (Pages 2 - 5)

Page 6

1  questions. The court reporter will transcribe my
2  questions and your answers.
3       So I need you to answer my
4  questions by speaking loudly and clearly as the
5  court reporter cannot take down a nod of the head
6  or a hand gesture. Do you understand that?
7       A.    Yes.
8       Q.    The answers that you give to my
9  questions must be your own. You cannot look to
10 your attorney for any help in answering questions.
11      Similarly, you should not look at
12 a phone or any note unless, of course, I ask you
13 to do so. Do you understand that?
14      A.    Yes.
15      Q.    I'm interested in finding out
16 everything you know about the deposition topics at
17 issue, so I ask that you provide full and complete
18 answers to my questions. Will you do so?
19      A.    Yes.
20      Q.    On occasion, I might ask you a
21 question you don't understand. That will probably
22 be my fault.
23      If you do not understand one of my
24 questions for any reason, don't answer it.
25 Rather, tell me that you don't understand the

Page 7

1  question, or that you'd like me to repeat, or
2  rephrase the question.
3       Because if you do answer my
4  question, I will take your response to mean that
5  you understood the question; is that fair?
6       A.    Yes.
7       Q.    If you need to take a break at any
8  time, just tell me. As long as there's not a
9  question pending, you're free to get up and do
10 whatever it is that you need to do.
11      Can you think of any reason today
12 that would prevent you from fully and completely
13 answering my questions?
14      A.    No.
15      Q.    We're going to talk about a broad
16 set of topics and documents related thereto.
17      So unless I tell you otherwise, my
18 questions today are going to be directed to what
19 I'll call the relevant time period which is
20 May 4th, 2011 through May 4th, 2015; is that fair?
21      A.    Yes.
22      Q.    You agreed to provide testimony
23 under oath. Will you tell me what that means to
24 you?
25      A.    I need to be honest in my answers

Page 8

1  and tell the truth.
2       Q.    A short bit of background. Would
3  you state your full name for the record?
4       A.    Patricia Peterson.
5       Q.    How do you spell your last name?
6       A.    P-E-T-E-R-S-O-N.
7       Q.    And by whom are you currently
8  employed?
9       A.    Navient Solutions, Inc.
10      Q.    What is your job title or job
11 position?
12      A.    Title is senior vice president.
13      Q.    Anything attached to that, senior
14 vice president of something?
15      A.    Operational support services.
16      Q.    And would you tell me, from a high
17 level, what you do as Senior Vice President of
18 Operational Services?
19      A.    I am responsible for the support
20 functions that are associated with our Asset
21 Recovery Divisions of Navient Solutions.
22      That includes operational
23 reporting that we do for the operations teams,
24 managing our autodialer campaigns, training system
25 liaisons for our systems that we use within those

Page 9

1  businesses.
2       Q.    Who are NSI's operational teams?
3       A.    Our customer resolutions services
4  is our Federal Default Prevention Unit and the
5  other team is our private credit collections
6  within the Navient servicing.
7       Q.    The first team is a pre-default
8  team. The second is a post default collection
9  team. Is that fair?
10      A.    Both teams are pre-default.
11      Q.    You mentioned reporting. What
12 general types of reporting do you oversee?
13      A.    Day-to-day operations reporting how
14 the teams are doing towards their goals,
15 individual agent performance, those types of
16 things.
17      Q.    Do you report to anyone?
18      A.    Yes.
19      Q.    Who is that?
20      A.    John Kane (ph.).
21      Q.    Who is John Kane?
22      A.    He's the Executive Vice President
23 of our Business Asset Management Team.
24      Q.    You obviously oversee a group of
25 people. How many people would you say you

Page 10

1  oversee?
2  A. Approximately, 180 people within my
3  area.
4  Q. How many of those people report
5  directly to you?
6  A. I have eight direct reports.
7  Q. Do those eight people hold the same
8  job title, job position?
9  A. No.
10  Q. What are their positions, if you
11  know, offhand?
12  A. They have different positions
13  because of the breadth of what I am oversight of.
14      So I have a person that's
15  responsible for our autodialers --
16  Q. Okay.
17  A. -- a person responsible for our
18  reporting, a person responsible for our
19  strategies -- different collection strategies or
20  default prevention strategies.
21      There's a person responsible for
22  our system integration work that we do, someone
23  over our training, and someone over our back
24  office processing of our private credit
25  collections area.

Page 11

1  Q. When you say system integration
2  work, pretend that I'm ignorant to what that
3  means. You don't have to pretend.
4      What does that word mean?
5  A. Most of the actual development of
6  the system is done by our IT area.
7  Q. Okay.
8  A. So this team is responsible for our
9  liaison work between our business teams so our
10  default prevention area and our IT area.
11  Q. So the IT area is a separate and
12  distinct department or group from your group?
13  A. Correct.
14  Q. And the system integration people
15  communicate between your group and the IT group?
16  A. Yes.
17  Q. So for example, if your group
18  needed something done by the IT group, that's what
19  the system integration people do?
20  A. Yes.
21  Q. Have you ever been deposed before,
22  Ms. Peterson?
23  A. Yes.
24  Q. How many times?
25  A. Approximately, six or seven.

Page 12

1  Q. Well, over what period of time were
2  those six or seven depositions?
3  A. Approximately, last five years.
4  Q. Do you remember the case names of
5  those six or seven depositions?
6  A. No.
7  Q. Do you remember the types of cases?
8  A. Yes.
9  Q. What types of cases were they?
10  A. Collection activity, TCPA cases,
11  and general business practices.
12  Q. In what capacity were you deposed,
13  as the vice president of operations?
14      MS. SIMONETTI: That question is
15  vague. I don't understand.
16  BY MR. RADBIL:
17  Q. Did you hold the same position that
18  you hold today when you were deposed on those six
19  or seven occasions?
20  A. Not for all of them.
21  Q. Tell me how many of them were you
22  in your current position for when you were
23  deposed.
24  A. My title's recently changed so --
25  Q. Okay.

Page 13

1  A. -- none in my current title.
2  Q. I guess my question is, why were
3  you deposed in those cases?
4      MS. SIMONETTI: To the extent you
5  would have to reveal attorney/client
6  communication, you cannot -- he's not
7  actually asking you for that, but just to
8  remind you.
9      I don't think that question works
10  very well. Do you want to know what
11  capacity, 30(b)(6) or individual?
12      MR. RADBIL: That's right.
13      MS. SIMONETTI: All 30(b)(6),
14  except one.
15      MR. RADBIL: That's great, thanks.
16  BY MR. RADBIL:
17  Q. There was a case you weren't
18  deposed as a representative of NSI.
19      In what individual capacity were
20  you deposed there?
21      MS. SIMONETTI: She was deposed in
22  an individual capacity.
23  BY MR. RADBIL:
24  Q. Was that a TCPA case?
25  A. Yes.

Page 14

1  Q.  So you said they were all TCPA
2  cases?
3  A.  No.
4  Q.  How many of them were TCPA cases?
5  A.  All but one or two, and I don't
6  know if it's one or two.
7  Q.  And you certainly don't know the
8  names and case numbers today.
9      But if I were to ask you, would
10 you be able to find out the case names and numbers
11 of those matters --
12     MS. SIMONETTI: We're not doing
13     any research. She's not doing any
14     research. If you have any requests, you
15     should direct them to us.
16     MR. RADBIL: Just to get things
17     moving forward, I would appreciate if Ms.
18     Simonetti would refrain from the speaking
19     objections, but I will certainly direct
20     those questions to you.
21     MS. SIMONETTI: That would be
22     good.
23 BY MR. RADBIL:
24 Q.  Have you ever testified at trial,
25 Ms. Peterson?

Page 15

1  A.  I don't believe so.
2  Q.  What about at an arbitration?
3  A.  Yes -- I think the one that I'm
4  thinking of was an arbitration, not at trial.
5  Q.  Was that as a representative of NSI
6  in a 30(b)(6) capacity, if that makes sense to
7  you?
8  A.  Yes.
9  Q.  Taking a step back, who's the
10 person in charge of your autodialer division or
11 department?
12 A.  Within my organization?
13 Q.  Within your organization, yes.
14 A.  Josh Dries.
15 Q.  How do you spell that last name?
16 A.  D-R-I-E-S.
17 Q.  And when you referred to your
18 autodialer -- I'm sorry. Did you call it a
19 division, a group, an organization? How would you
20 characterize that within your organization?
21 A.  Department.
22 Q.  Your autodialer department, can you
23 tell me how do you characterize your autodialer
24 department?
25 A.  More specific?

Page 16

1  Q.  Sure. If I asked you to describe
2  what your autodialer department was, how would you
3  describe that to me?
4  A.  The teams responsible for setting
5  up and managing the campaigns that each of the
6  business units want to run on a day-to-day
7  basis --
8  Q.  Okay.
9  A.  -- responsible for making changes
10 to our IVRs, our call routing that goes along with
11 those inbound calls or outbound calls.
12 Q.  What is an IVR?
13 A.  Inbound routing or a way to route
14 calls.
15 Q.  When you refer to autodialer, what
16 are you referring to, as in, the actual piece of
17 equipment that Navient uses?
18 A.  The system we use to make outbound
19 calls --
20 Q.  What --
21 A.  -- and manage.
22 Q.  I apologize. I'll do my best not
23 to speak over you. When we speak over each other,
24 the court reporter can't take down what we say.
25 That is my fault, I apologize.

Page 17

1      MS. SIMONETTI: Also can I just
2      add, this is not the witness for the
3      technology categories, as you know, by
4      agreement.
5      MR. RADBIL: Agreed.
6  BY MR. RADBIL:
7  Q.  But when you say your systems, your
8  autodialer systems, what system is that?
9  A.  Currently, we use Noble Systems and
10 GC dialer for NSI.
11 Q.  Those are the only two systems that
12 you're aware of?
13 A.  Sorry, one additional, Interactive
14 Intelligence.
15 Q.  These systems, it is a Noble, GC,
16 the two letters, GC System and an Interactive
17 Intelligence System?
18 A.  Yes.
19 Q.  All right. Your counsel noted that
20 you are not to reveal any information that you
21 learned from a conversation with her.
22     So I'm not asking you to tell me
23 the substance of any conversations with your
24 attorney, but what did you do to prepare for this
25 deposition?

Page 34

1  occasions on which Ms. Bottoms spoke with NSI?
2     A.   Yes.
3     Q.   Does NSI have any business
4  relationship with Mr. Johnson, Randy Johnson, the
5  plaintiff in this lawsuit?
6     A.   I'm sorry.  Could you repeat that?
7     Q.   Sure.  Does NSI have any
8  relationship with Randy Johnson who is the
9  plaintiff in this lawsuit?
10    A.   No.
11    Q.   Did NSI ever have any relationship
12 with Randy Johnson, the plaintiff in this lawsuit?
13    A.   Not that I'm aware of.
14    Q.   You noted that you believe NSI
15 obtained consent from Ms. Bottoms to use
16 317.664.2476.
17         Did Navient ever obtain Mr.
18 Johnson's consent to use 317.664.2476?
19    A.   Navient Solutions?
20    Q.   Yes.
21    A.   No.
22    Q.   Did Navient solutions ever attempt
23 to obtain Mr. Johnson's consent to make autodialed
24 predictive outcalls or artificial voice calls to
25 317.664.2476?

Page 35

1     A.   No, not that I know of.
2     Q.   Was Navient ever attempting to
3  reach --
4          MS. SIMONETTI:  Can we use NSI?
5          MR. RADBIL:  Yes.  Off the record.
6              - - -
7          (Discussion was held off the
8      record.)
9              - - -
10 BY MR. RADBIL:
11    Q.   Did SAC ever obtain Mr. Johnson's
12 consent to use 317.664.2476?
13    A.   I don't know.
14    Q.   Do you have any reason to believe
15 that any NSI company, related affiliate, or sister
16 entity obtained Mr. Johnson's consent to place
17 telephone calls to 317.664.2476 by using an
18 autodialer, a predictive dialer, or artificial or
19 pre-recorded voice?
20    A.   I did not look at anything other
21 than NSI information.
22    Q.   I understand that.  Again, the
23 question is, do you have any reason to believe
24 that any NSI affiliate, sister corporation, or
25 related entity obtained consent from Mr. Johnson

Page 36

1  to place autodial, pre-recorded calls, or
2  predictive dialer calls to 317.664.2476?
3     A.   Again, I don't know if he has an
4  account with any other affiliate to say that
5  number was given a consent.
6     Q.   I understand that.  Do you have any
7  reason to believe, have you seen any information
8  that makes you believe that any NSI company
9  related entity or affiliate had consent to place
10 calls to 317.664.2476 by using an autodialer,
11 predictive dialer, or artificial, or pre-recorded
12 voice?
13    A.   I don't feel like I can answer that
14 question without having looked to see if Mr.
15 Johnson has an account in any of our other
16 systems.
17    Q.   But you don't, sitting here today,
18 have any information that makes you believe that
19 any of those accounts or systems include a consent
20 designation to make calls to Mr. Johnson's
21 telephone number?
22         MS. SIMONETTI:  I think you're
23     kind of badgering her at this point.  This
24     is the third time.  Try again.
25 BY MR. RADBIL:

Page 37

1     Q.   As we sit here today, do you have
2  any reason to believe that NSI, a related company,
3  a sister, or an affiliate obtained Mr. Johnson's
4  consent to place telephone calls to 317.664.2476
5  by using automatic telephone dialing system, a
6  predictive dialer, or an artificial or
7  pre-recorded voice?
8     A.   Mr. -- I do not know if Mr. Johnson
9  has an account to be able to say if he provided
10 that number in association with his account.
11    Q.   But you don't have any reason to
12 believe that Mr. Johnson did provide consent in
13 association with any accounts?
14    A.   I don't know if he has an account
15 to give an answer to that.
16    Q.   Have you seen any evidence
17 suggesting that Mr. Johnson gave consent to NSI or
18 a related entity?
19    A.   I only researched NSI information.
20    Q.   I understand that.  But you haven't
21 seen any evidence suggesting that Mr. Johnson
22 provided consent regarding his telephone number?
23         MS. SIMONETTI:  For NSI?
24         THE WITNESS:  For NSI, no.
25 BY MR. RADBIL:

10 (Pages 34 - 37)

Page 42

1  numbers.
2     Q.   Removing of bad numbers, was this
3  number removed as a bad number?
4     A.   I don't know by looking at this
5  call log.
6     Q.   Take a look at row number -- so
7  date of call log in the third row is 9-11-2014.
8  Take a look at Row 13 -- well, how about Row 18?
9          That's a date after this wrong
10 number code was entered and this appears to
11 reflect a call that was made to Randy Johnson's
12 cell phone number which is 317.664.2476, right?
13    A.   Yes.
14    Q.   So does that lead you to believe
15 one way or the other that this number or account
16 was marked as invalid after Randy Johnson notified
17 someone at NSI that that number was a wrong number
18 on 9-11-2014?
19    A.   It -- it doesn't tell me that it
20 wasn't added either.  So I can see -- it's
21 possible that that number was removed and re-added
22 between 9-11 and 9-16.
23    Q.   You'd be able to figure that out by
24 looking at what documents?
25    A.   The account notes for Marie.

Page 43

1     Q.   I guess I'm not understanding.  On
2  9-11-2014, NSI indicated that Mr. Johnson informed
3  it that 317.664.2476 was a wrong number.
4          Yet it continued to place calls to
5  Mr. Johnson after that date; why?
6     A.   Without seeing all of the notes,
7  again, I can't tell you for sure if a phone number
8  was added back in.
9          I don't know who told us on 9-11
10 based on these notes that this number was invalid.
11    Q.   Someone at NSI marked the number
12 invalid or did it mark it -- sorry.
13         Invalid, I don't see any invalid.
14 Please tell me what you mean by invalid.
15    A.   Someone did a dialer status that
16 said the phone number was wrong on 9-11.
17    Q.   So tell me what does Navient
18 typically do with respect to an account with the
19 related phone number when someone tells Navient
20 it's a wrong number?
21    A.   Typically, removes the number from
22 system of record and marks the dialer with a wrong
23 number.
24    Q.   And how would someone at NSI remove
25 the number from the system?

Page 44

1     A.   Go into the account record and
2  clear out the number.
3     Q.   And you don't know if that happened
4  in this particular case?
5     A.   Not without looking at the Marie
6  Bottoms notes on 9-11.
7     Q.   Tell me what effect does the wrong
8  number code have on the way Navient's system
9  functions with respect to calls made after the
10 wrong number code is entered?
11    A.   This wrong number status is on the
12 dialer.  That dialer activity alone just -- when
13 we just put it on the dialer, it stops calls for
14 the rest of the day.
15    Q.   If a wrong number code is put on
16 the dialer -- strike that.
17         When you say wrong number code is
18 put on the dialer, is that what happened here,
19 this wrong number code was put on the dialer?
20    A.   Yes.
21    Q.   And the wrong number code put on
22 the dialer stops calls for that day?
23    A.   Yes.
24    Q.   Does it do anything except stop
25 calls for that day?

Page 45

1     A.   When put on the dialer, no.
2     Q.   So the calls would continue the
3  next day despite the wrong number code being
4  entered on the system?
5     A.   Unless they also updated the system
6  of record as a wrong number.
7     Q.   How does one update a system of
8  record as a wrong number?
9     A.   That's the removal of the number.
10    Q.   So it seems like there's a two-step
11 process to stopping calls after Navient receives a
12 wrong number indication.
13         The first step is including a
14 wrong number code on the dialer which is what we
15 see on this, Exhibit-2.
16         That stops the calls just for the
17 day, right?
18    A.   Yes.
19    Q.   And the second step to the process
20 would be somebody actually removing the number
21 from the system which would, obviously, take the
22 number out of the system?
23    A.   Yes.
24    Q.   So if, in fact, only step one was
25 completed and the wrong number code was put on the

12 (Pages 42 - 45)

Page 54

1 And then they're going into the
2 dialer, putting a status code of wrong number, and
3 then they're ready to move on to their next call.
4 Q. So as I understand it, Navient's
5 policy is that, if an individual tells an NSI
6 agent that it's calling a wrong number, NSI
7 shouldn't call that number anymore?
8 A. Correct.
9 Q. Why?
10 MS. SIMONETTI: Can you read those
11 two back?
12 - - -
13 (Whereupon, the court reporter
14 read back the pertinent testimony.)
15 - - -
16 THE WITNESS: Because the person
17 on that call said the number doesn't belong
18 to the person they're trying to reach.
19 BY MR. RADBIL:
20 Q. And because the person said the
21 number doesn't belong to the person they're trying
22 to reach, they simply don't want to be called any
23 more?
24 A. They -- yes.
25 Q. Does an NSI agent have any

Page 55

1 discretion with respect to the policy we just
2 discussed, when a person calls in and tells him or
3 her that this number Navient has been calling is a
4 wrong number?
5 Meaning in greater detail, does an
6 NSI agent have any discretion to not follow the
7 procedure of entering the wrong number code in the
8 dialer and removing the number from the system of
9 record when an individual calls an NSI agent and
10 says you're calling the wrong number?
11 A. Yes.
12 Q. What is that discretion afforded to
13 those agents?
14 A. Depending on the rest of the
15 conversation that may have happened during that
16 call.
17 It may be a situation where they
18 didn't get enough information or the customer
19 didn't -- I guess I'm thinking, if the customer
20 just says wrong number, and hangs up, and we're
21 not able to understand what happened, or why that
22 number might be wrong, they may have discretion
23 there.
24 Q. Is that discretion documented in
25 any sort of written policy or procedure manual?

Page 56

1 A. I'm not sure.
2 Q. How do you know there is that
3 discretion?
4 A. Just experience with questions
5 being asked by agents in the past.
6 Q. Agents ask you questions directly
7 about this sort of wrong number entry?
8 A. Historically, they could've asked
9 me questions, yes.
10 Q. Does Navient -- rather, does NSI
11 provide or conduct -- strike that.
12 Does NSI conduct any sort of audit
13 system or process to determine the number of calls
14 for which a wrong number code is entered into the
15 dialer, but that number is also not removed from
16 the system of record?
17 A. You said something at the start of
18 that question that makes that question fuzzy for
19 me. Would you mind restating it?
20 Q. Sure. Does NSI do anything to
21 determine the number of accounts for which a wrong
22 number entry is included on a dialer, but yet the
23 number isn't also removed from the system of
24 record?
25 A. The number is throwing me off in

Page 57

1 your question.
2 MR. RADBIL: Would you repeat the
3 question, please?
4 - - -
5 (Whereupon, the court reporter
6 read back the pertinent testimony.)
7 - - -
8 BY MR. RADBIL:
9 Q. Let me rephrase that. Does NSI do
10 anything to track accounts for which a wrong
11 number code is entered in a dialer with respect to
12 a particular number, but that number is not also
13 removed from the system of record?
14 A. Yes.
15 Q. What is that?
16 A. We have some compliance testing in
17 place to look for this.
18 Q. What is that compliance testing?
19 MS. SIMONETTI: Hang on. I think
20 you can answer the question at a general
21 level, but this is a process that involves
22 consultation with legal, so we'll have to
23 be careful on that basis.
24 Can you read the question back?
25 - - -

15 (Pages 54 - 57)

Page 66

1  multiple times.
2      So when I'm reading this, it looks
3  like -- well, is a wrong party contact a wrong
4  number code -- a wrong number?
5      A.   I'm not familiar at all with this
6  document. This is the technical document for the
7  Noble system.
8      Q.   If I wanted to know what Navient
9  uses wrong party contact in this document, who
10 would I talk to?
11     A.   Dialer person.
12     Q.   Is that the dialer person in your
13 group or a completely separate dialer team?
14     A.   My group.
15     Q.   Was it Mr. Dries?
16     A.   Yes.
17     Q.   So getting back to the audits and
18 the results of the audits, did Navient discover
19 through the audits that it conducted regarding
20 wrong number entries on a dialer but -- strike
21 that.
22         We talked about audit situations
23 in which wrong number codes were entered and the
24 number associated with that wrong number code
25 wasn't removed from the system of record.

Page 67

1        Did Navient find that that had
2  occurred on at least one instance, I guess?
3      A.   Yes.
4      Q.   So for the last six months, can you
5  tell me the number of instances in which Navient
6  found that a wrong number code existed on the
7  dialer, but yet, the related phone number was not
8  removed from the system of record?
9      A.   No.
10     Q.   Have you ever seen that number?
11     A.   No.
12     Q.   So when you say you looked at the
13 result audits over the past six months, there
14 aren't any numbers in there about the number of
15 accounts for which a wrong number code was entered
16 on a dialer, but the phone number was not removed
17 from the system of record?
18         MS. SIMONETTI: Those audit
19     results and the reports that are generated
20     are privileged.
21         So even if that is reflected, I'm
22     going to instruct her not to answer as to
23     those contents of those documents.
24         I don't even know if you remember,
25     but I'm going to instruct you not to answer

Page 68

1      to those contents.
2          MR. RADBIL: Why are they
3      privileged?
4          MS. SIMONETTI: Because they're
5      done in connection with legal counsel.
6  BY MR. RADBIL:
7      Q.   Did NSI take any steps as a result
8  of the results of the audits that we just talked
9  about?
10     A.   I don't know that I can answer that
11 question, if it's privileged.
12     Q.   I'm asking what steps they took.
13 Did Navient do anything in response to the results
14 of the audit code and the audits that we talked
15 about?
16         MS. SIMONETTI: That's kind of
17     vague. Are you asking whether there was
18     some operational change?
19         MR. RADBIL: Sure, that's better.
20 BY MR. RADBIL:
21     Q.   Did NSI institute any operational
22 change as a result of the audits that we talked
23 about that you reviewed for the past six months or
24 so?
25     A.   I don't know.

Page 69

1      Q.   Your counsel instructed you not to
2  answer a question. Are you going to follow your
3  counsel's instruction not to answer that question?
4      A.   Yes.
5      Q.   At any point from September 11th,
6  2014 through the last date in which NSI placed a
7  call to 317.664.2476, did NSI do anything to
8  confirm that that number belonged to Ms. Bottoms?
9      A.   After what date?
10     Q.   Let's just say the first date on
11 which that number was included in NSI's system.
12     A.   Can you be more specific on --
13     Q.   Sure. You said that from your
14 reading of account notes, which I haven't seen and
15 we don't yet have, you believe that Ms. Bottoms
16 provided 317.664.2476 as a number at which Navient
17 could reach her.
18         After that conversation between
19 Ms. Bottoms and NSI, did NSI do anything to
20 confirm that 317.664.2476 was, in fact, a number
21 that belonged to Ms. Bottoms?
22     A.   No.
23         MS. SIMONETTI: Can we stipulate
24     that every time you say Navient, you mean
25     NSI?

18 (Pages 66 - 69)

Veritext Legal Solutions
800-726-7007                                    305-376-8800

Page 142

1  460,000 number was provided.
2      Q.    All right --
3          MS. SIMONETTI: The cutoff number,
4  by the way, wasn't May 14th, 2015.
5          MR. RADBIL: May 14th, 2015?
6          MS. SIMONETTI: Yeah, you said
7  that's the cutoff, but that's not true.
8          MR. RADBIL: When --
9          MS. SIMONETTI: I don't think
10 that's true, but I can find out what the
11 end date was for the call.
12         THE WITNESS: I don't recall.
13         MR. RADBIL: Was the beginning
14 date May of 2011?
15         MS. SIMONETTI: May of 2011,
16 uh-huh.
17 BY MR. RADBIL:
18     Q.    Well, can you walk me through how
19 Navient made that determination?
20     A.    Yes. That dialer disposition of
21 wrong number was used, so we looked for every time
22 we used a wrong number disposition on the dialer.
23         And then we looked for any calls
24 that were made after that wrong number was marked
25 in the dialer.

Page 143

1      Q.   The number that NSI provided was
2  467,000 and that is -- as I understand it, it is
3  an estimate of people that Navient called after
4  Navient's system included a wrong number notation
5  on the telephone number for that person; is that
6  fair?
7      A.   On the dialer.
8      Q.   On the dialer, so you're saying --
9  all right.
10         If I'm understanding the
11 467,000-person figure that you provided -- that
12 NSI provided is an estimate of the number of
13 people to whom Navient placed a call to a number
14 after Navient's records for that number showed a
15 wrong number code by using an automatic telephone
16 dialing system; is that fair?
17     A.   Yes.
18     Q.   Does that number include only NSI
19 calls as opposed to NSI and SAC calls?
20     A.   Yes.
21     Q.   Were the calls associated with the
22 467,000 people calls to cell phones only?
23     A.   Yes.
24     Q.   The calls at issue to the 467,000
25 people, are those calls made by both the Noble and

Page 144

1  ININ dialers?
2      A.   Yes.
3      Q.   Do those calls include calls made
4  by any dialer, other than this Noble or ININ
5  dialer?
6      A.   I don't believe so.
7      Q.   Does Navient have a record, whether
8  an active or archived form, of all calls placed by
9  a dialer since May of 2011?
10     A.   Yes.
11     Q.   Do you know if those are in active
12 or archived form?
13     A.   I don't know.
14     Q.   For the calls that we just
15 discussed that relate to the 467,000-person
16 figure, would Navient be able to determine the
17 number of persons to whom it placed more than one
18 call following a wrong number entry in its system?
19     A.   Yes.
20     Q.   For those 467,000 persons that we
21 just talked about, is Navient able to determine
22 the number of calls made to those people on the
23 particular telephone number after a wrong number
24 entry was included in Navient's system for the
25 numbers?

Page 145

1          MS. SIMONETTI: Could you read
2  that back?
3              - - -
4          (Whereupon, the court reporter
5  read back the pertinent testimony.)
6              - - -
7          MS. SIMONETTI: Is that different
8  from the other question? It was really
9  long.
10 BY MR. RADBIL:
11     Q.   This is where I'm going --
12         MS. SIMONETTI: Okay.
13 BY MR. RADBIL:
14     Q.   We have the 467,000 people and we
15 have calls made to those people. Navient made
16 calls by an autodialer to a cell phone for which
17 the cell phone had a -- start over. I'll get this
18 right.
19         So the 467,000 people include
20 people to whom Navient placed a call by an
21 autodialer to a cellular telephone number which
22 includes a wrong number designation.
23         The call is being placed after the
24 wrong number designation. Is that somewhat clear?
25 That's not my question. I just --

37 (Pages 142 - 145)

Page 150

1    Q.   For the, approximately, 467,000
2  people noted and that we've been talking about,
3  does NSI have the phone numbers containing the
4  wrong number codes?
5    A.   Yes.
6    Q.   And although I'm not asking you to
7  do this, NSI could produce a list of the phone
8  numbers with those wrong number codes, right?
9    A.   Yes.
10   Q.   Could NSI identify the names of the
11  people that its records associate with those
12  telephone numbers?
13        MS. SIMONETTI: Do you mean just
14     with the telephone numbers -- could you
15     read that one back?
16        - - -
17        (Whereupon, the court reporter
18     read back the pertinent testimony.)
19        - - -
20        MS. SIMONETTI: The people in the
21     system.
22        THE WITNESS: We can see who we
23     were attempting to call.
24  BY MR. RADBIL:
25   Q.   Again, not a trick question.

Page 151

1  NSI -- and not in general -- NSI could put
2  together a list of people that its records
3  associate with the wrong number telephone codes --
4  let me go back.
5        So we have the 467,000 people. We
6  have the numbers associated with those 467,000
7  people. Those numbers are the numbers from which
8  the 467,000 people came because they're the calls
9  after the wrong number codes.
10       So the wrong number codes
11  associated with the telephone numbers for 467,000
12  people, can Navient create a list of the names of
13  people it associates with those numbers?
14   A.   We know who we were attempting to
15  call, but once we learned it was a wrong number,
16  we don't know who the person necessarily is that
17  that number belongs to.
18   Q.   That's right. So Navient has a
19  list of names of people it was attempting to call
20  in connection with the calls with the wrong number
21  codes which resulted in the 467,000 people?
22   A.   That question is confusing to me.
23   Q.   I think we covered it. So we have
24  467,000 people and those are people to whom
25  Navient attempted to reach by making an autodialed

Page 152

1  call to a cell phone number after Navient's
2  records showed a wrong number code for those cell
3  phones.
4        How would Navient put together a
5  list of the people -- the names of the people that
6  it was attempting to reach in connection with
7  those calls?
8    A.   We'd match the dialer records to
9  the account number that we see on the call log.
10   Q.   NSI has that information in its
11  system currently?
12   A.   Yes.
13   Q.   How long would it take NSI to do
14  that?
15   A.   I don't know.
16   Q.   Do you have an estimate? If you
17  don't, just tell me you don't.
18   A.   I don't know how long it would
19  take.
20   Q.   I'm not asking for you to tell me,
21  but are you familiar with the process by which
22  Navient calculated the 467,000-person figure?
23   A.   Yes.
24   Q.   How long did it take Navient to do
25  that?

Page 153

1    A.   I don't know in number of hours
2  that it took.
3    Q.   Do you have an estimate?
4    A.   Not really.
5    Q.   That's fine. How did Navient do
6  it, by an automated process, writing some code?
7  How exactly did it reach that number?
8    A.   Code written to using the autodial
9  records that we have been talking about for the
10  period of time that we requested.
11   Q.   Do you know if it was just one
12  person that wrote the code?
13   A.   I believe only one person was
14  working on it, yes.
15   Q.   Do you happen to know his or her
16  name?
17   A.   Yes.
18   Q.   Very good. Would you tell me his
19  or her name?
20   A.   Matt Gottlieb.
21   Q.   All right. We're back to Exhibit
22  Number 5, please. Take a look at Bates stamp 45.
23       If you look, it's probably
24  two-thirds of the way down. It's a paragraph that
25  begins, in order to update the TCPA flag to Y in

Page 154

1  Artiva.
2      Do you know what it means to
3  update the TCPA flag to Y in Artiva?
4      A.   That we've received consent to
5  autodial.
6      Q.   That's noted in Artiva here.  What
7  other systems is that noted in, if any, the Y flag
8  that is.
9      A.   There's a similar flag in Class
10 Commercial, Class ED and I believe there's one in
11 FDR as well.
12     Q.   And if there's no consent, an N
13 would be entered in that field?
14     A.   No.
15     Q.   No.  What would be entered if
16 there's no consent?
17     A.   It could be a blank because we
18 haven't asked them the question.  It could be no
19 because they told us it's no.
20     Q.   Now, that changes over time for
21 some people, consent that is.
22          Does NSI keep track of changes to
23 consent to call by autodialer for specific
24 numbers?
25     A.   Yes.

Page 155

1      Q.   Do you know how long it's done that
2  for?
3      A.   Not for sure.
4      Q.   So if I asked you for a given
5  number, the dates that Navient had consent and
6  didn't have consent for, let's say the period of
7  the past five years.
8           It could tell me, assuming there
9  were changes, NSI they had consent for this period
10 of time and didn't have consent for a different
11 period of time?
12     A.   Assuming we were tracking it that
13 full time, yes.
14     Q.   Yes.  But the way the system
15 functions is when consent changes, old consent
16 notations aren't simply deleted.
17          Navient is able to go back and say
18 consent existed for a period of time and didn't
19 exist for a period of time, assuming that's the
20 case?
21     A.   Yes.
22     Q.   How does consent affect the way
23 that NSI places calls to people that it wants to
24 reach?
25          MS. SIMONETTI:  That question is

Page 156

1  very vague.  Can you read that back?
2          - - -
3          (Whereupon, the court reporter
4  read back the pertinent testimony.)
5          - - -
6          MR. RADBIL:  I'll ask it in a
7  different way.
8  BY MR. RADBIL:
9      Q.   Is there certain things that --
10 I'll get back to that.  Take a look at Page 48 on
11 that same document.
12          There's an L designation and an
13 autodial consent field in that middle screenshot;
14 do you see where I'm looking?
15     A.   Yes.
16     Q.   That autodial consent, what does
17 that L mean?
18     A.   To never autodial it.
19     Q.   What are the possible entries in
20 that autodial consent field?
21     A.   That's what's listed below -- yes,
22 Y, N, T, L or blank.
23     Q.   What system is this that we're
24 looking at?
25     A.   Artiva.

Page 157

1      Q.   Artiva, okay.  Does NSI use an
2  autodialer to place calls to numbers that don't
3  have an autodial consent designation, a yes
4  autodial consent designation?
5      A.   Can you ask it one more time?
6      Q.   Does NSI use an autodialer, whether
7  it's Noble or Integrated I think is the other one?
8      A.   Interactive Intelligence.
9      Q.   Interactive, to place calls to
10 telephone numbers for which it doesn't have a Y in
11 the autodial consent field?
12     A.   No.
13     Q.   No.  Has that always been NSI's
14 policy?
15     A.   For this period of time, yes.
16     Q.   What period of time?
17     A.   2011.
18     Q.   To 2015?
19     A.   (Witness indicating.)
20     Q.   Sure.  Reading through the
21 documents, and we'll get to them, there appear to
22 be procedures noting flaws in that system in which
23 autodial calls were placed to numbers that didn't
24 have the Y consent.
25          Are you familiar with that?

Page 166

1  Q. And NSI should have all those
2  results stored somewhere, right?
3  A. I believe so.
4  Q. So the next sentence begins as a
5  critical ice control, what is a critical ice
6  control just because I don't understand what that
7  term refers to?
8  A. Ice is our internal control process
9  and it's a control we put in place to make sure we
10 comply with the TCPA.
11 Q. Is that a written policy or is that
12 policy encompassed by a written document?
13 A. Ice?
14 Q. Yes, ice.
15 A. I'm not sure.
16 Q. Who heads up ice?
17 A. Compliance -- corporate compliance.
18 Q. Corporate compliance, okay. I
19 guess I should have read the end of this paragraph
20 before asking all these questions.
21       It says these are stores for
22 historical reference, so I guess that answers my
23 question.
24       These audit files are stored and
25 can be looked at today?

Page 167

1  A. Yes.
2      MS. SIMONETTI: Whenever's a good
3  time to take a break, it's been about an
4  hour.
5      MR. RADBIL: Sure, take a break.
6      - - -
7      (Whereupon, there was a recess in
8  the proceeding from 2:19 p.m. to 2:28 p.m.)
9      - - -
10 BY MR. RADBIL:
11 Q. The audit code process we just
12 talked about, do you happen to know if Mr.
13 Johnson's phone number, which is 317.664.2476, was
14 ever the subject of one of these audit code
15 reports?
16 A. I don't know.
17 Q. Is there a way to find that out?
18 A. Yes.
19 Q. When we talked about the
20 467,000-person figure, the number was the result
21 of persons to whom calls were made after the wrong
22 number code was entered.
23      Did NSI run a search of persons
24 who received audit calls on a number designated as
25 a cell phone before a wrong number code existed in

Page 168

1  the account for that particular number?
2      MS. SIMONETTI: Can you read that
3  back?
4      THE WITNESS: I don't believe so.
5  BY MR. RADBIL:
6  Q. That's certainly fair. Could it do
7  so?
8  A. I think so. I'm still a little
9  confused on --
10 Q. Sure.
11 A. -- the overall question.
12 Q. Sure. Is Mr. Johnson included as a
13 person in the 460,000-person figure?
14 A. No.
15 Q. Why not?
16 A. We never received on an outbound
17 call the fact that it was a wrong number.
18 Q. So why does the inbound versus
19 outbound affect the two-step process of wrong
20 number entry in the dialer code and removing the
21 number from the system?
22 A. It doesn't.
23 Q. It doesn't. So then, I'm not clear
24 why Mr. Johnson is not part of the 467,000-person
25 figure.

Page 169

1      My understanding was we have calls
2  made to persons on cell phones by an autodialer
3  after NSI's records showed a wrong number code.
4      Mr. Johnson fits that bill, so
5  again, I'm not understanding why he wasn't
6  included as one of the 467,000 people.
7  A. So the way the 467 -- the
8  approximate 467,000 was created was, we looked at
9  outbound calls where we coded -- where an agent
10 put wrong number in that dialer status.
11 Q. Is it possible to perform that same
12 function, that same process, that same calculation
13 that you did to reach the 467,000 people for
14 inbound calls where a person informed an agent
15 that Navient was dialing a wrong number?
16 A. There's not always an account
17 number associated on an inbound call.
18 Q. I see. For accounts where there is
19 a number associated with the inbound call, could
20 NSI perform the same process, the same calculation
21 that it did with respect to the way in which it
22 reached these 467,000 people for inbound calls?
23 A. Only if the inbound call came
24 through an autodialer.
25 Q. How can an inbound call come

Page 170

1 through an autodialer?
2     A.    In collections or default
3 prevention, all of the calls come through --
4 inbound and outbound calls come into the
5 autodialer.
6           That -- it just -- every phone
7 number comes through that.
8     Q.    That's fair.  So then, for the
9 inbound calls that come through the autodialer,
10 could Navient perform the same search function in
11 looking for calls made by autodialer to a cell
12 phone where the calls stopped as a result of the
13 wrong number code?
14    A.    Confusing question.  If you're
15 asking if we look at the inbound call --
16    Q.    Uh-huh.
17    A.    -- and it's marked in the dialer as
18 wrong number --
19    Q.    Uh-huh.
20    A.    -- could we identify if we called
21 it again on the outbound side?
22    Q.    Yes, with one exception.  Could you
23 determine whether it ever called it on the
24 outbound side from an autodialer?
25           So not just after the wrong number

Page 171

1 call -- well, let's do it two ways.  One, do it
2 the way that you said.
3           The inbound calls from the dialer
4 where it's marked wrong number, could you perform
5 that process and tell me how many of those numbers
6 the autodialer calls to a cell phone was made by
7 an autodialer after the inbound entry of the wrong
8 number code?
9     A.    Yes, if the inbound call came
10 through the dialer.
11    Q.    So you said Mr. Johnson wasn't part
12 of the 467,000-person figure, but I want to clear
13 one thing up.
14           You would agree with me that Mr.
15 Johnson received a call by an autodialer from NSI
16 on his cell phone after a wrong number code was
17 entered in the system for his cellular telephone
18 number, right?
19    A.    Yes.
20    Q.    And we've talked about inbound
21 calls coming through the dialer and not coming
22 through the dialer.
23           Did Mr. Johnson's inbound call
24 come through the dialer?
25    A.    It's in the call log, yes.

Page 172

1     Q.    It did, okay.  So of the 467,000
2 people to whom NSI made an autodial call to the
3 cell phone after a wrong number entry, is NSI able
4 to determine how many of those calls resulted in
5 NSI leaving a pre-recorded or artificial voice
6 message?
7     A.    Yes.
8     Q.    Has NSI performed that search?
9     A.    Not that I know of.
10    Q.    And then along the same lines but a
11 bit different, could NSI determine the number of
12 pre-recorded messages left in connection with
13 those calls?
14    A.    Yes.
15    Q.    So Mr. Johnson's call came through
16 the dialer, his inbound call.  We know that
17 because you just told me it's on the call log, so
18 that's -- let's start over.
19           You explained that Mr. Johnson's
20 call came through the dialer, his inbound call.
21 You also explained that if an inbound call came
22 through the dialer, NSI could perform the same
23 type of search that it did to get the
24 467,000-person figure.
25           So does that mean that NSI can

Page 173

1 determine the number of people, like Mr. Johnson,
2 whose number came through the inbound dialer and
3 to which Navient placed autodial calls to his cell
4 phone number after the wrong number code existed
5 in its system?
6     A.    I believe so.
7     Q.    Has Navient performed that search?
8     A.    Not in the way you described.
9     Q.    So would you show me which call log
10 I need to look at so I can find the inbound call
11 through the dialer?
12    A.    On the Noble.
13    Q.    So this is Exhibit-14, so where on
14 14 do we see -- because there are three inbound
15 calls, I believe.
16    A.    On the second one from 9-11-2014,
17 that's an example of a wrong number.
18    Q.    That's an example of a wrong number
19 entered as a result of an inbound call through the
20 dialer?
21    A.    Yes.
22    Q.    Great, thank you.  So NSI produced
23 three recordings of conversations.  We talked --
24 well, one of them was with the Sallie Mae
25 representative.

Page 182

1   The transcripts will be provided
2   to Counsel for Defense as well as to the
3   witness.  She'll have 30 days within which
4   to read and make any corrections and sign
5   it.
6   And then the original transcript
7   will be retained by Plaintiff?
8   MR. GREENWALD: That's fine.
9   MS. SIMONETTI: Okay.  That's
10  fine.
11              - - -
12  (Witness excused.)
13              - - -
14  (Deposition concluded at 3:07
15  p.m.)

Page 183

1   C E R T I F I C A T E
2
3   I do hereby certify that I am a Notary
4   Public in good standing, that the aforesaid
5   testimony was taken before me, pursuant to notice,
6   at the time and place indicated; that said
7   deponent was by me duly sworn to tell the truth,
8   the whole truth, and nothing but the truth; that
9   the testimony of said deponent was correctly
10  recorded in machine shorthand by me and thereafter
11  transcribed under my supervision with
12  computer-aided transcription; that the deposition
13  is a true record of the testimony given by the
14  witness; and that I am neither of counsel nor kin
15  to any party in said action, nor interested in the
16  outcome thereof.
17
18  WITNESS my hand and official seal this
19  18th day of JANUARY, 2016.
20
21
22
   _____
23  Alicia Fortin, Reporter
    Notary Public

Page 184

1   INSTRUCTIONS TO WITNESS
2
3   Please read your deposition over carefully
4   and make any necessary corrections.  You should
5   state the reason in the appropriate space on the
6   errata sheet for any corrections that are made.
7   After doing so, please sign the errata
8   sheet and date it.
9   You are signing same subject to the
10  changes you have noted on the errata sheet, which
11  will be attached to your deposition.
12  It is imperative that you return the
13  original errata sheet to the deposing attorney
14  within thirty (30) days of receipt of the
15  deposition transcript by you.  If you fail to do
16  so, the deposition transcript may be deemed to be
17  accurate and may be used in court.

Page 185

1              - - - - -
2            E R R A T A
3              - - - - -
   Case: Johnson v. Navient Solutions Inc.
   Taken: 1/6/2016
4  Deposition of: Patricia Peterson
   Job# 2201098
5
6  PAGE   LINE   CHANGE
7  ___ ___ _____
8  Reason for
9  Change:_____
10 ___ ___ _____
11 Reason for
12 Change:_____
13 ___ ___ _____
14 Reason for Change:
15 _____
16 ___ ___ _____
17 Reason for Change:
18 _____
19 ___ ___ _____
20 Reason for Change:
21 _____
22 ___ ___ _____
23 Reason for Change:
24 _____
25 Assignment # 2201098 - Patricia Peterson

47 (Pages 182 - 185)

```
                                                    Page 186
 1              ACKNOWLEDGMENT OF DEPONENT
 2
 3       I, _____, do hereby
 4   certify that I have read the foregoing pages __ to
 5   ___ and that the same is a correct transcription
 6   of the answers given by me to the questions
 7   therein propounded, except for the corrections or
 8   changes in form or substance, if any, noted in the
 9   attached Errata Sheet.
10
11    _____   _____
12    DATE        SIGNATURE
13
14
15         Subscribed and sworn to before me
16   this _____ day of _____, 2016.
17
18           My commission expires:
19
20             _____
21
22
23   _____
24              Notary Public
25
```

Veritext Legal Solutions
800-726-7007                                          305-376-8800