**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

RANDY JOHNSON, on behalf of himself and
others similarly situated,

      Plaintiff,

v.

NAVIENT SOLUTIONS, INC., f/k/a SALLIE
MAE, INC.,

      Defendant.

Case No. 1:15-cv-0716 LJM-MJD

**<u>DEFENDANT NAVIENT SOLUTIONS, INC.'S OPPOSITION
TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION</u>**

## <u>TABLE OF CONTENTS</u>

I.    Introduction ................................................................................................................ 1

II.   Background ............................................................................................................. 5

     A.    The Parties, The Cell Number And Johnson's Claims ......................................... 5

     B.    NSI's Practice With Respect To Wrong Number Notations ................................ 6

     C.    The Motion And Verkhovskaya's Proposed Methodology ................................... 7

     D.    The Flaws In The Methodology ........................................................................... 8

III.  Argument ............................................................................................................. 11

     A.    Critically, Johnson Fails The Tests Of Typicality Under Rule 23(a)(3) And Of Adequacy Under Rule 23(a)(4) ..................................................................... 12

     B.    Johnson Also Does Not Demonstrate Commonality Under Rule 23(a)(2), Or Predominance Under Rule 23(b)(3) ................................................................ 15

     C.    Likewise, Johnson Does Not Establish Superiority Under Rule 23(b)(3) ........... 18

IV. Conclusion .......................................................................................................... 21

## Cases

Adelson v. U.S. Legal Support, Inc.
  715 F. Supp. 2d 1265 (S.D. Fla. 2010) ..................................................................... 19

Am. Honda Motor Co. v. Allen
  600 F.3d 813 (7th Cir. 2010) ................................................................................... 12

Amchem Prods. Inc. v. Windsor
  521 U.S. 591 (1997) ..................................................................................... 16, 17, 18

Andrews v. Chevy Chase Bank
  545 F.3d 570 (7th Cir. 2008) ............................................................................. 18, 19

Birchmeier, et al. v. Caribbean Cruise Line, Inc., et al.
  Case No. 1:12-cv-04069 (N.D. Ill.) ........................................................................ 20

Campbell-Ewald Co. v. Gomez,
  136 S. Ct. 663 (2016) ..................................................................................... 1, 13, 14

Comcast Corp. v. Behrend
  133 S. Ct. 1426 (2013) ............................................................................................. 11

Davis v. Hutchins
  321 F.3d 641 (7th Cir. 2003) ............................................................................... 2, 11

Eisen v. Carlisle & Jacquelin
  417 U.S. 156 (1974) ................................................................................................. 18

Gen. Tel. Co. of the Sw. v. Falcon,
  457 U.S. 147 (1982) ............................................................................................. 2, 11

Genesis HealthCare Corp. v. Symczyk
  133 S. Ct. 1523 (2013) ............................................................................................. 14

Glazer v. Abercrombie & Kent, Inc.
  Case No. 07 C 2284, 2008 U.S. Dist. LEXIS 91142 (N.D. Ill. Nov. 10, 2008) ...................... 19

Gomez v. St. Vincent Health, Inc.
  649 F.3d 583 (7th Cir. 2011) ................................................................................... 15

Haley v. Kolbe & Kolbe Millwork Co.
  Case No. 14-cv-00099-bbc, 2016 U.S. Dist. LEXIS 39771 (W.D. Wis. Mar. 25, 2016) ......... 12

Jackson v. Nat'l Action Fin. Servs., Inc.
  227 F.R.D. 284 (N.D. Ill. 2005)........................................................................ 18, 19

Jamie S. v. Milwaukee Pub. Schs.
  668 F.3d 481 (7th Cir. 2012) ............................................................................ 11, 16

Johnston v. HBO Film Mgmt. Inc.,
  265 F.3d 178 (3d Cir. 2001)............................................................................... 18

Kartman v. State Farm Mut. Auto. Ins. Co.
  634 F.3d 883 (7th Cir. 2011) ............................................................................. 17

King v. Kansas City Southern Industries, Inc.
  519 F.2d 20, 25 (7th Cir. 1975) ......................................................................... 19, 20

Kohen v. Pacific Inv. Management Co. LLC
  571 F.3d 672 (7th Cir. 2009) ............................................................................. 13

Leech v. Brooks Automation, Inc.
  Civil Action No. 06-11068-RWZ, 2006 U.S. Dist. LEXIS 90153 (D. Mass. Dec. 13, 2006).. 15

Lipton v. Chattem, Inc.
  289 F.R.D. 456 (N.D. Ill. 2013)......................................................................... 13

Mace v. Van Ru Credit Corp.
  109 F.3d 338 (7th Cir. 1997) ............................................................................. 18

Marjanian v. Allied Nev. Gold Corp.
  Case Nos. 3:14-cv-0175-LRH-WGC, 2:14-CV-0650-JCM-VCF, 2015 U.S. Dist. LEXIS 2782
  (D. Nev. Jan. 8, 2015)........................................................................................ 15

May v. Frisbie
  Case No. 2:07-cv-286-LJM-WGH, 2009 U.S. Dist. LEXIS 24787
  (S.D. Ind. Mar. 23, 2009).................................................................................. 16, 17

Mullins v. Direct Digital, LLC
  795 F.3d 654 (7th Cir. 2015) ............................................................................. 4

Oshana v. Coca-Cola Company
  472 F.3d 506 (7th Cir. 2006) ............................................................................. 12

Puffer v. Allstate Ins. Co.
  255 F.R.D. 450 (N.D. Ill. 2009)......................................................................... 19

Retired Chi. Police Ass'n v. City of Chi.
  7 F.3d 584 (7th Cir. 1993) ................................................................................. 12

Rosen Family Chiropractic, S.C. v. Chi-Town Pizza on Div. St., Inc.
    Case No. 11 C 6753, 2015 U.S. Dist. LEXIS 18366 (N.D. Ill. Feb. 13, 2015) ................. 12. 13

Rowe v. Bankers Life & Cas. Co.
    Case No. 09-cv-491, 2012 U.S. Dist. LEXIS 43198 (N.D. Ill. Mar. 29, 2012)....................... 17

Sherman v. Yahoo! Inc.
    Case No. 3:13-cv-0041 (S.D. Cal.) ......................................................................... 20

Shook v. Bd. of County Comm'rs
    543 F.3d 597 (10th Cir. 2008) ................................................................................ 20

Smith v. Family Video Movie Club, Inc.,
    Case No. 11 CV 1773, 2013 U.S. Dist. LEXIS 54512 (N.D. Ill. Apr. 15, 2013).................... 16

Spano v. Boeing Co.
    633 F.3d 574 (7th Cir. 2011) ................................................................................. 13

Szabo v. Bridgeport Machs., Inc.
    249 F.3d 672 (7th Cir. 2001) ........................................................................... 11, 18

Vill. of Bedford Park v. Expedia, Inc. (WA)
    Case No. 13 C 5633, 2015 U.S. Dist. LEXIS 1012 (N.D. Ill. Jan. 6, 2015)........................... 16

Wal-Mart Stores, Inc. v. Dukes
    564 U.S. 338 (2011)....................................................................................... 2, 11, 15

Warren v. Town of Speedway
    Case No. 1:13-cv-1049-JMS-DKL, 2013 U.S. Dist. LEXIS 178273
    (S.D. Ind. Dec. 19, 2013) ..................................................................................... 12

West v. Prudential Sec. Inc.
    282 F.3d 935 (7th Cir. 2002) ................................................................................. 12

Wooden v. Board of Regents of University System of Georgia
    247 F.3d 1262 (11th Cir. 2001) .............................................................................. 13

**Statutes**

47 U.S.C. § 227 (b) (1) ........................................................................................... 1, 6

Fed. R. Civ. P. 23 .................................................................................................. passim

## I.      Introduction

In this action, plaintiff Randy Johnson ("Johnson") asserts claims against defendant

Navient Solutions, Inc. ("NSI") for violation of the Telephone Consumer Protection Act, 47

U.S.C. § 227, et seq. (the "TCPA").  The TCPA prohibits, among other things, making calls to a

cellular telephone through an automatic telephone dialing system without the called party's prior

express consent.  47 U.S.C. § 227(b)(1).  Johnson alleges that NSI called him using an automatic

telephone dialing system after he had informed NSI that it was calling a wrong number.  NSI is a

servicer of student loans, and it makes telephone calls in connection with its servicing efforts.

In his Motion for Class Certification (the "Motion"), Johnson seeks to certify a class

comprised of:

> Each person and entity throughout the United States (1) to whom Navient
> Solutions, Inc. placed one or more telephone calls (2) directed to a number
> assigned to a cellular telephone service, (3) by using an automatic telephone
> dialing system, (4) after the person or entity informed Navient that it was calling
> the wrong telephone number, (5) between May 4, 2011 and March 7, 2016.

(Motion, p. 2.)   According to the Motion, this case is "straightforward" and, thus, suitable for

class treatment.  (Motion, p. 2.)  Put simply, this is not so.

As an initial matter, NSI already has tendered to Johnson the full amount of statutory

damages that he could recover here under the TCPA.  Therefore, as indicated by the recent

decision of the United States Supreme Court in Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663

(2016), he has no standing to sue for himself or the purported class.  Even if he did have

standing, however, and contrary to Johnson's characterization, this case is highly complex.

Because the calls at issue supposedly were made to wrong numbers, Johnson is attempting to

bring claims on behalf of persons who are not known to anyone, and the actual circumstances of

those persons with respect to the calls likewise are not known to anyone — as the facts

pertaining to Johnson himself clearly demonstrate.  Indeed, given the varying and complicated

facts at issue here, the Motion plainly fails the "rigorous analysis" that the Court must apply to a request for certification under Rule 23 of the Federal Rules of Civil Procedure.  See, e.g., Gen. Tel. Co. of the Sw. v. Falcon, 457 U.S. 147, 160 (1982) ("[A]ctual, not presumed, conformance with Rule 23(a) remains . . . indispensable."); Davis v. Hutchins, 321 F.3d 641, 649 (7th Cir. 2003) (emphasizing the importance of the "rigorous analysis"); accord Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351 (2011).  The Court therefore should deny the Motion on multiple grounds.

First, Johnson fails the tests of typicality and adequacy.  In fact, he simply cannot serve as a representative of the proposed class.[1]  It is fundamental that a named class representative must himself have standing in order to serve; here, Johnson lacks standing.  In addition, though, the Motion rests entirely on the notion that the proposed class here can be identified — and the class members' claims can be proven — based on a "reverse lookup" methodology.  Through this methodology, plaintiff's proposed expert, Anya Verkhovskaya ("Verkhovskaya"), would match a list of telephone numbers marked with a wrong number code from NSI's systems to the names of persons associated with those phone numbers in records maintained by data brokers, such as Lexis/Nexis.  Any person who is a match through this process would be deemed a class member, and litigation of the asserted claims would proceed with respect to those class members.

The many flaws in this methodology are detailed below and in the accompanying Declaration of Margaret A. Daley and NSI's Motion to Strike Expert Testimony of Anya Verkhovskaya.  For the moment, however, it suffices to say that, when applied to the telephone number allegedly owned by Johnson during the relevant time period (the "Cell Number") — the

---

[1] Tellingly, Johnson filed a motion for leave to amend his class action complaint to add another plaintiff at the last possible moment before Navient's opposition to class certification was filed.  See Docket Entry 99. Johnson's filing of a motion to amend at 5:00 Eastern on the day he knew Navient would be filing its opposition shows that he is aware of his problems as a class representative.  Navient intends to assert all possible grounds in opposition to Johnson's motion to amend, including, most notably, prejudice.

methodology <u>does not associate that number with Johnson</u>.  Instead, the methodology associates the number with Johnson's former girlfriend, Marie Bottoms ("Bottoms"), who used the Cell Number upon occasion and provided the number to NSI.  Thus, based on the proposed methodology, Johnson himself is not even a member of the class that he would purport to represent.  This fact alone should disqualify this case for class treatment.

<u>Second</u>, it is plain that numerous individual issues of fact exist on the instant claims.  These issues would overwhelm the litigation, and Johnson therefore cannot establish commonality or predominance.  Again, Johnson himself proves the point.  In order for Johnson to pursue his own claim, he would have to establish both:  (1) that NSI called the Cell Number during the relevant time period; and (2) that he was the user of the Cell Number at that time (such that he received the calls).  This, however, would require proof <u>beyond</u> the scope of the methodology, raising highly individualized issues.  In fact, here, Johnson must prove that the asserted TCPA claim is his, and not Bottoms', based on his own testimony and telephone records (and the methodology failed to locate him because users of pre-paid cell phones, like Johnson, are not reflected in the records kept by data brokers like LexisNexis).

Notably, this issue of non-common facts would permeate the proposed class.  For instance, in cases involving family or business calling plans, the users of cell phones frequently differ from the owners (e.g., where a father owns the accounts, but pays for his children's cell phone use).  The methodology would return results based on ownership, not use (and it would return only current ownership anyway).  Thus, the claims necessarily would turn upon unique facts — i.e., who used the particular cell phone and when he/she received the calls at issue.  Moreover, every record marked as a wrong number in NSI's systems is not, in fact, a wrong number.  As noted above, NSI makes the calls at issue to service and collect on student loans.

Some borrowers will falsely claim wrong numbers just to avoid further efforts to collect a valid debt.

Third, Johnson cannot demonstrate that class treatment is the superior method of adjudicating this case, nor that a class case would be manageable. The high value of Johnson's individual claim — nearly $90,000, based on the substantial statutory damages allowed under the TCPA — demonstrates the ample incentive that supposed class members would have to pursue their claims on an individual basis. Class adjudication, on the other hand, would be extremely difficult (if not impossible) given the manageability problems that arise from Verkhovskaya's proposed methodology. Indeed, Verkhovskaya concedes, as she must, that, at some level, her methodology would devolve into a program of serving subpoenas on the many different cell service providers in an effort to obtain user information. Verkhovskaya also concedes, though, that she has never undertaken such a program, so even she cannot predict the results.

Finally, the Court should not entertain any contention from Johnson on Reply that NSI is arguing a lack of ascertainability here, in contradiction of the Seventh Circuit's decision in Mullins v. Direct Digital, LLC, 795 F.3d 654, 658 (7th Cir. 2015), cert. denied, 136 S. Ct. 1161 (2016). NSI understands that the methodology would result in compilation of a group of persons; in other words, that group would be ascertained. The point, however, is that litigation of TCPA claims held by some of those persons (because the group would be both over- and under-inclusive) cannot proceed on a class basis. Mullins did not eliminate any of the requirements of Rule 23, nor could it. Indeed, in Mullins, the Seventh Circuit acknowledged those requirements, including by emphasizing that "[a] court must consider the likely difficulties in managing a class action . . . [and] balance countervailing interests to decide whether a class action is superior to other available methods for fairly and efficiently adjudicating the

controversy." Id. at 658.  Here, very simply, Johnson does not meet the requirements of Rule 23 and, for that reason, the Motion fails.

## II.      Background

### A.      The Parties, The Cell Number And Johnson's Claims

NSI is engaged in the business of servicing student loans, including with respect to loans that are owned or guaranteed by the United States Department of Education.  As part of its servicing function, NSI makes telephone calls to borrowers whose loans are delinquent.  (See Deposition Excerpts of Patricia Peterson ( "Peterson Depo."), attached as Exhibit A,[2] 28:21-29:14; 83:20-25).

NSI made calls to the Cell Number in an effort to reach Bottoms about her federal student loans.  (Peterson Depo., 38:1-3; Exh. 2).  Bottoms was a close friend of Johnson's (and then his girlfriend), and she lived with Johnson periodically.  Over the course of their relationship, Johnson allowed Bottoms to use his cell phone (as he did with other friends and family, as well). (Deposition Excerpts of Randy Johnson ("Johnson Depo."), attached as Exhibit B, 14:2-12; 17:3-23; 22:14-21).  NSI spoke with Bottoms on a few occasions and, during a call on April 18, 2014, she confirmed the Cell Number as her own and provided NSI with consent to call.  (Peterson Depo., 33:2-16; Exh. 14; Motion, pp. 6-7).  On September 11, 2014, Johnson first informed NSI that it supposedly was calling the Cell Number in error.  (Peterson Depo., Exh. 2; Motion, p. 4).

According to Johnson's telephone records (produced by Sprint), he has been the owner of the Cell Number during the alleged class period.  The Sprint records also show that Johnson used a pre-paid Boost Mobile plan — for which he paid $40 per month — but his service was disconnected and reinstated no fewer than 13 times, six of which occurred between September

---

[2] Exhibit A includes Exhibits 2 and 14 to the deposition.  Johnson's cellular telephone number has been redacted from all exhibits.

2014 and the filing of this action.  (See Declaration of Margaret A. Daley ("Daley Declaration"), attached as Exhibit C, ¶ 53, Exh. E).

NSI made, at most, 59 calls to the Cell Number.  (Peterson Depo., Exh. 14).  Fifty-five of those calls were made after Johnson notified NSI that it had the wrong number.  Id.   However, because Johnson's cell phone service was cut off multiple times during the relevant period, the number of connected calls is fewer.  (See Daley Declaration, ¶ 53, Exh. E).  Nevertheless, even if all 59 calls were actionable, the maximum statutory damages award would be $88,500.00.  See 47 U.S.C. § 227(b)(3) (providing for damages of $500 for each violation or up to three times that amount if  the court finds that the defendant acted willfully or knowingly).

Without making any admissions or waiving any defenses, NSI tendered a check to Johnson (through his counsel) on June 7, 2016, in the amount of $90,000.00.  (Declaration of Lisa Simonetti ("Simonetti Decl."), attached as Exhibit D, ¶ 2).  Through this check, NSI provided Johnson with complete, individual relief.

### B.    NSI's Practice With Respect To Wrong Number Notations

NSI has a practice in place to make notations of wrong numbers.  (Peterson Depo., 54:4-24).  When informed of a wrong number, a customer service representative manually enters a code into the autodialer system records.  (Peterson Depo., 38:8-17.)  This notation has the effect of blocking further calls through the autodialer for that day.  In a second step, the representative manually removes the telephone number from the master account record, which is a different database system, to permanently prevent future calls.  (Peterson Depo., 45:13-23.)

Not every notation relates to a true wrong number, however.  For instance, NSI places calls to borrowers whose loans are delinquent.  (Peterson Depo., 170:2-5.)   Some of these borrowers falsely claim that the numbers are wrong so as to avoid further attempts to collect

valid debts.  Further, a representative may select the wrong number code from the dialer's drop-down menu by mistake, or might select the code when failing to connect with the borrower. (Peterson Depo., 138:20-139:20.)

Further, since the filing of the Motion, NSI has discovered that its original estimate of the number of persons to whom calls were made after a wrong number designation was too high. The original estimate was 467,000 (as referenced in the Motion).   The revised estimate is 276,877 (including the inbound calls that Johnson places at issue in footnote 2 of the Motion). (Simonetti Decl., ¶ 3).

### C.  The Motion And Verkhovskaya's Proposed Methodology

Johnson filed the Motion on March 7, 2016, seeking to certify a class of persons who had received calls from Navient "after the person or entity informed [NSI] that it was calling the wrong telephone number."  (Motion, p. 2).  With the Motion, Johnson filed a declaration from Verkhovskaya, setting forth the proposed methodology.   (See Docket Entry 75-8 (the "Verkhovskaya Declaration")).   Verkhovskaya's background is in class action settlement administration.

According to Verkhovskaya, she would start with a list of phone numbers marked with the wrong number designation in NSI's systems.  (Motion, p. 3).  Then, Verkhovskaya would do the following:

(1) Query the wireless reverse directory of a data broker such as LexisNexis to identify the name and address associated with that number at a given moment in time;

(2) Submit subpoenas to the top nine wireless carriers for call detail reports, texts, or bills to obtain personal identifying information relating to the cellular numbers where the data brokers could not identify the historical owner; and

(3) Check the National Change of Address database for each person's current address.

(Verkhovskaya Declaration, ¶¶ 14-19).

This methodology is described on a prospective basis only. Verkhovskaya did not undertake the methodology in advance of submitting her declaration or analysis of any data (indeed, she did not request any data from NSI). Further, Verkhovskaya has never been involved in a program of serving subpoenas for identifying information. She is not aware of the legal requirements, or of any obstacles to production. (Daley Declaration, ¶¶ 113-119).

### D.     The Flaws In The Methodology

As set forth in the detailed Daley Declaration and the Motion to Strike, the proposed methodology is so deeply flawed that it is entirely unreliable and should be rejected. NSI will not reiterate the contents of Daley Declaration and the Motion to Strike here, but the following points are of particular note:

1.     The methodology does not associate the Cell Number with Johnson. Instead, it identifies Bottoms as the "owner" of the phone number for the time period in question. Bottoms is not a class member as her express consent to be contacted is documented and was never revoked. (Daley Declaration, ¶ 1).

2.     The Sprint records for Johnson's prepaid telephone show that his service was disconnected on many occasions during the relevant period, meaning that he likely did not receive many of the calls at issue. Determining when his phone was actually in service is a complicated individualized analysis. (Daley Declaration, ¶ 2).

3.     The methodology should be designed to include all recipients of wrong number calls placed by NSI to cellular telephones during the proposed time frame. Instead, the proposed class: (a) includes persons who never received any calls from NSI; (b) includes borrowers who were misidentified as "wrong numbers;" and (c) excludes many persons who

may have received wrong number calls but are not identified as the owners or users of the cellular numbers (like Johnson).  Verkhovskaya sets forth no mechanism for correcting this problem.  Indeed, the methodology she proposes would necessitate individualized inquiry. (Daley Declaration, ¶ 3).

4. No national directory of cellular telephone users or owners is published by any organization and cellular providers do not make the information readily available.  The data brokers that Verkhovskaya would rely on to identify the class members gather the cellular ownership records from undisclosed sources, the accuracy of which varies widely.  The data brokers do not maintain, nor do they claim to maintain, accurate historical ownership records. (Daley Declaration, ¶ 5).

5. Verkhovskaya's methodology is not capable of distinguishing the users of telephone numbers from owners who pay the bills.  In circumstances where the owner may differ from the user — such as a family plan where a parent or spouse pays the bill for multiple cellular numbers, or an employer who pays on behalf of employees — her methodology will in many instances result in deeming persons as class members when they never received a wrong number call.  Accordingly, assuming the data broker provides the correct historical owner of each cellular telephone number (which assumption is flawed anyway), each such person would have to be queried to determine who actually used the cellular number that received the wrong number calls on the dates they were made.  (Daley Declaration, ¶ 6).

6. Verkhovskaya has no statistical training and has performed no analysis of data from NSI (and did not ask for any such data), but contends that her methodology will be 87-92% accurate.  She claims to rely on "test files," which she did not produce.  Verkhovskaya also does not attempt to show that the numbers in her "test files" resemble the pool of numbers at

issue in this case.  The numbers at issue in this case were called as long ago as 2011.  Comparing the accuracy of a list of current numbers to a list of numbers from five years ago is meaningless.  The accuracy of historical cellular phone records diminishes with age, so it is critical that  the pool of numbers used in Verkhovskaya's "test files" be similar in age to the numbers at issue here.  (Daley Declaration, ¶¶ 8-9).

8.     In testimony in other cases, Verkhovskaya admitted that some of the tests purposefully excluded family plans, prepaid plans and employer plans — in effect, the majority of the cellular phone market.  As opposed to single payer, single line plans (where the same person owns and uses the phone), the excluded plans involve owners who may differ from the users.  Excluding these plans in "accuracy testing" would result in artificially high accuracy rates because information from data brokers is more likely be accurate when the owner and user is the same person.  By eliminating the less accurate sources of data, Verkhovskaya skews the results in her favor and thus, they have no real world application.   (Daley Declaration, ¶ 10).

9.     Wireless carriers, if they comply with subpoenas at all, charge for providing this data.  If the accuracy rate of the database brokers were to be at the 70% range, which is the upper range provided by LexisNexis itself and which is consistent with Daley's sample testing of the data in LexisNexis' databases, the cost of obtaining data from the wireless carriers alone totals between $2.25  and $3 million.  (Daley Declaration, ¶ 14).

10.     NSI's expert Margaret Daley conducted her own reliability testing using 167 cellular telephone numbers for which she already knew the correct current user's name.  These numbers encompassed a range of phone service types, including individually owned single user plans, family plans and employer-owned plans.  Only 68 of those test numbers returned the correct name of the user, representing an accuracy rate of just 41%.  (Daley Declaration, ¶¶ 111-

112).

## III.   Argument

A party seeking to have an action certified as a class action must satisfy the four requirements of Rule 23(a): "(1) The class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims and defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); Dukes, 564 U.S. at 345; see also Jamie S. v. Milwaukee Pub. Schs., 668 F.3d 481, 493 (7th Cir. 2012) ("A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a) — numerosity, commonality, typicality, and adequacy of representation . . . ."). The named plaintiff must also satisfy "through evidentiary proof" at least one of the provisions of Rule 23(b). Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013); see also Jamie S., 668 F.3d at 493 (explaining that class actions must satisfy "one of the conditions of Rule 23(b)"). Here, Johnson seeks certification under Rule 23(b)(3), which requires a finding by the Court that "the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); Comcast, 133 S. Ct. at 1432.

As noted above, a request for class certification is subject to "rigorous analysis." Davis, 321 F.3d at 649; Dukes, 564 U.S. at 351. Indeed, the Seventh Circuit has emphasized that "similarity of claims and situations" between the named plaintiff and putative class members "must be demonstrated rather than assumed." Szabo v. Bridgeport Machs., Inc., 249 F.3d 672, 677 (7th Cir. 2001) (citing Falcon, 457 U.S. at 147). Thus, rather than simply relying on the

allegations of the plaintiff's complaint or the arguments asserted in a motion, "a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied."   Am. Honda Motor Co. v. Allen, 600 F.3d 813, 815 (7th Cir. 2010) (citing Szabo, 249 F.3d at 676); see also West v. Prudential Sec. Inc., 282 F.3d 935, 938 (7th Cir. 2002) ("A district judge may not duck hard questions by observing that each side has some support . . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives."); Haley v. Kolbe & Kolbe Millwork Co., Case No. 14-cv-00099-bbc, 2016 U.S. Dist. LEXIS 39771, *5 (W.D. Wis. Mar. 25, 2016) (citing cases) (stating that "[t]he Court of Appeals for the Seventh Circuit has made it clear that 'a district court must make whatever factual and legal inquiries are necessary to ensure that requirements for class certification are satisfied before deciding whether a class should be certified'").

Here, for the multiple reasons discussed below, Johnson's request for certification cannot withstand this Court's rigorous analysis.  Therefore, the Motion should be denied.

**A.    Critically, Johnson Fails The Tests Of Typicality Under Rule 23(a)(3) And Of Adequacy Under Rule 23(a)(4).**

It is fundamental that the claims of the representative plaintiff must be typical of the claims of the class.  See, e.g., Warren v. Town of Speedway, Case No. 1:13-cv-1049-JMS-DKL, 2013 U.S. Dist. LEXIS 178273, *11 (S.D. Ind. Dec. 19, 2013); Oshana v. Coca-Cola Company, 472 F.3d 506, 514 (7th Cir. 2006) (stating that the typicality requirement is "meant to ensure that the named representative's claims 'have the same essential characteristics as the claims of the class at large'") (citing Retired Chi. Police Ass'n v. City of Chi., 7 F.3d 584, 597 (7th Cir. 1993)).  Put differently, there must be "enough congruence between the named representative's

12

claim and that of the unnamed members of the class to justify allowing the named party to litigate on behalf of the group." Rosen Family Chiropractic, S.C. v. Chi-Town Pizza on Div. St., Inc., Case No. 11 C 6753, 2015 U.S. Dist. LEXIS 18366, *9 (N.D. Ill. Feb. 13, 2015) (citing Spano v. Boeing Co., 633 F.3d 574, 586 (7th Cir. 2011)).   "The presence of even an arguable defense peculiar to the named plaintiff or a small subset of the plaintiff class may destroy the required typicality of the class as well as bring into question the adequacy of the named plaintiff's representation."   Lipton v. Chattem, Inc., 289 F.R.D. 456, 459 (N.D. Ill. 2013). Moreover, the typicality requirement specifically includes individual standing — "[b]efore a class is certified . . . the named plaintiff must have standing." Kohen v. Pacific Inv. Management Co. LLC, 571 F.3d 672, 676 (7th Cir. 2009); see also Wooden v. Board of Regents of University System of Georgia, 247 F.3d 1262, 1287 (11th Cir. 2001) ("[T]here cannot be adequate typicality between a class and a named representative unless the named representative has individual standing to raise the legal claims of the class.").

Here, Johnson cannot establish standing because NSI has already satisfied the entirety of his claim with its $90,000 tender.   Indeed, given the views expressed by the Supreme Court in Campbell-Ewald, the Court should not permit Johnson to go forward.   In Campbell-Ewald, the issue presented was "whether an unaccepted offer [of judgment under Rule 68 of the Federal Rules of Civil Procedure] can moot a plaintiff's claim, thereby depriving federal courts of Article III jurisdiction." Campbell-Ewald, 136 S. Ct. at 669.   In that context, the Supreme Court held that a complaint should not be dismissed as moot based solely on an offer of complete relief. Id. at 672.   But significantly, in explaining its ruling, the majority was primarily concerned with the fact that the plaintiff "remained emptyhanded" when the case was dismissed. Id.   The majority explicitly reserved the issue of  "whether the result would be different if a defendant deposits the

full amount of the plaintiff's individual claim in an account payable to the plaintiff, and the court then enters judgment for the plaintiff in that amount."  Id.

In fact, the dissenting opinions of Chief Justice Roberts and Justices Alito and Scalia note that the majority likely would have reached a different result if the funds had been tendered to the plaintiff: "The majority does not say that payment of complete relief leads to the same result. . . . This Court leaves that question for another day — assuming there are other plaintiffs out there who, like Gomez, won't take 'yes' for an answer."  Id. at 683 (Roberts, C.J., dissenting) (emphasis in original).  Justice Alito further stated: "I am heartened that the Court appears to endorse the proposition that a plaintiff's claim is moot once he has 'received full redress' from the defendant for the injuries he has asserted."  Id. at 685 (Alito, J., dissenting) (emphasis in original).  Moreover, the opinions by Chief Justice Roberts and Justice Alito find support in Justice Kagan's dissent in Genesis HealthCare Corp. v. Symczyk, 133 S. Ct. 1523 (2013), which is adopted by the majority in Campbell-Ewald.  In Genesis, Justice Kagan (joined in her dissent by Justices Ginsburg, Breyer, and Sotomayor) acknowledged that "a court has discretion to halt a lawsuit by entering judgment for the plaintiff when the defendant unconditionally surrenders and only the plaintiff's obstinacy or madness prevents her from accepting total victory."  Genesis, 133 S. Ct. at 1536.

Here, Johnson is not typical of the class because, to the extent he ever had a valid claim, it has now been fully satisfied.  NSI made no more than 59 calls to Johnson's cellular telephone number.  If those calls were actionable and if any violation of the TCPA was deemed to be willful, Johnson would be entitled to maximum damages of $1,500 per call (totaling $88,500.00).  On June 7, 2016, NSI tendered $90,000.00 to Johnson through his counsel, more than enough to satisfy his individual claims, and the Court should find that he now lacks standing to proceed,

14

which renders his claim atypical.

In addition, though, the Court should find that Johnson is not an adequate class representative.  A case cannot proceed as a class action unless "the representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  Thus, a class representative must be an "adequate" class member — i.e., he must have common interests with the putative class.  See, e.g., Gomez v. St. Vincent Health, Inc., 649 F.3d 583, 592 (7th Cir. 2011); see also Lipton, 289 F.R.D. at 462.  Courts frequently measure adequacy by a proposed plaintiff's financial interest in a case.  Indeed, courts recognize a "requirement that lead plaintiff be the party with the 'largest financial interest[,']which] derives from the recognition that '[] class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake.'"  Leech v. Brooks Automation, Inc., Civil Action No. 06-11068-RWZ, 2006 U.S. Dist. LEXIS 90153, *11 (D. Mass. Dec. 13, 2006); accord Marjanian v. Allied Nev. Gold Corp., Case Nos. 3:14-cv-0175-LRH-WGC, 2:14-CV-0650-JCM-VCF, 2015 U.S. Dist. LEXIS 2782 (D. Nev. Jan. 8, 2015).  Here, of course, Johnson has no remaining financial interest and, thus, he is not an adequate class representative.

However, even if NSI had not satisfied Johnson's claim, he fails to meet the requirements of typicality and adequacy for a further reason.  Based on Verkhovskaya's methodology, as discussed above, the Cell Number is associated with Bottoms, not Johnson, during the time period when calls were made.  Thus, it is not at all clear that Johnson himself qualifies as a class member.

**B.**      **Johnson Also Does Not Demonstrate Commonality Under Rule 23(a)(2), Or Predominance Under Rule 23(b)(3).**

"Commonality requires the plaintiff to demonstrate that the class members have suffered

the same injury.  This does not mean merely that they have all suffered a violation of the same provision of law." Dukes, 564 U.S. at 349-50 (internal quotation marks and citation omitted).  The claims must depend upon a common contention, and "[t]hat common contention, moreover, must be of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Id.  "What matters to class certification . . . is not the raising of common 'questions' — even in droves — but, rather the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." Id.; see also Smith v. Family Video Movie Club, Inc., Case No. 11 CV 1773, 2013 U.S. Dist. LEXIS 54512, *9 (N.D. Ill. Apr. 15, 2013) ("Indeed, any competently drafted class complaint literally raises common 'questions.' . . . Reciting these questions is not sufficient to obtain class certification.") (internal citations omitted); Jamie S., 668 F.3d at 497 ("[P]laintiffs must show that they share some question of law or fact that can be answered all at once and that the single answer to that question will resolve a central issue in all class members' claims."); accord Vill. of Bedford Park v. Expedia, Inc. (WA), Case No. 13 C 5633, 2015 U.S. Dist. LEXIS 1012, *7 (N.D. Ill. Jan. 6, 2015).

Moreover, to demonstrate predominance, Johnson must establish that "questions of law or fact common to the class members predominate over any question affecting only individual members." May v. Frisbie, Case No. 2:07-cv-286-LJM-WGH, 2009 U.S. Dist. LEXIS 24787, *13 (S.D. Ind. Mar. 23, 2009) (citing Fed. R. Civ. P. 23(b)(3)).  The Supreme Court has held that, although the predominance requirement of Rule 23(b)(3) overlaps in some ways with the commonality requirement of Rule 23(a), it is "far more demanding" because it "tests whether the

proposed [classes are] sufficiently cohesive to warrant adjudication by representation." Rowe v. Bankers Life & Cas. Co., Case No. 09-cv-491, 2012 U.S. Dist. LEXIS 43198, *18 (N.D. Ill. Mar. 29, 2012) (citing Amchem Prods. Inc. v. Windsor, 521 U.S. 591, 623-24 (1997)). Where liability determinations will be "individual and fact-intensive," predominance cannot be established. Id. (citing Kartman v. State Farm Mut. Auto. Ins. Co., 634 F.3d 883, 891 (7th Cir. 2011)). The court should not certify a class when it "would necessarily have to entertain 'mini-trials' for each prospective plaintiff." Frisbie, 2009 U.S. Dist. LEXIS 24787 at *24.

Here, in his Motion, Johnson posits the following as the operative "common" questions:

- What actions were engaged in by NSI.

- Whether the systems NSI used to place calls constitute an ATDS as defined by the TCPA.

- Whether informing NSI that it was calling the wrong number demonstrates a lack of consent to make a future autodialed call.

- Whether there is a common injury.

(Motion, pp. 12-13). Very simply, Johnson's request for class certification involves far more than these questions, and those questions are subject to proof only through highly individualized facts.

Again, the facts pertaining to Johnson himself provide the best illustration. After applying Verkhovskaya's methodology, the Cell Number is associated with Bottoms, not Johnson. Thus, in order to understand whether Johnson would have any claim, individualized inquiry into his own unique circumstances has to be undertaken. And this assumes, of course, that Johnson ever would have been identified as someone who might have a claim. Importantly, based only on the methodology — and without the knowledge that Johnson is the named plaintiff here — membership in the class would be conferred on Bottoms. As discussed above, this type of highly fact-intensive inquiry would have to be applied to many, if not most, of the persons

17

identified through the methodology.  This would include the persons sharing family and business calling plans, the users of pre-paid phones, the persons who claimed a wrong number in order to avoid collection calls and the persons whose numbers were marked by NSI as wrong, in error.  Against this background, Johnson does not, and cannot, demonstrate commonality or predominance.  Quite to the contrary, Johnson's own claim must be subjected to a mini-trial, along with the claims of many other persons who would be deemed as potential class members.

### C.    Likewise, Johnson Does Not Establish Superiority Under Rule 23(b)(3).

"Superiority" demands more than a suggestion that a class action is one available means for resolving the claims at issue — it must be "the best available method[] for the fair and efficient adjudication of the controversy."  Johnston v. HBO Film Mgmt. Inc., 265 F.3d 178, 194 (3d Cir. 2001); Szabo, 249 F.3d at 676. In assessing superiority, a court should evaluate "the difficulties likely to be encountered in the management of a class action," including "the whole range of practical problems that may render the class action format inappropriate for a particular suit." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 164 (1974).  For instance, a class action is not superior to other means of adjudicating the claim if individual issues predominate.  See Andrews v. Chevy Chase Bank, 545 F.3d 570, 577 (7th Cir. 2008) ("If the class certification only serves to give rise to hundreds or thousands of individual proceedings . . . it is hard to see how common issues predominate or how a class action would be the superior means to adjudicate the claims.").

Further, a class action is superior when potential damages may be too insignificant to provide class members with the incentive to pursue an individual claim.  See Amchem, 521 U.S. at 617 ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action

prosecuting his or her rights.") (quoting <u>Mace v. Van Ru Credit Corp.</u>, 109 F.3d 338, 344 (7th Cir. 1997)); <u>accord</u> <u>Jackson v. Nat'l Action Fin. Servs., Inc.</u>, 227 F.R.D. 284, 290 (N.D. Ill. 2005). In contrast, "[w]hen a class member has a sufficiently large stake in litigation to be able to afford to litigate on his own, this consideration weighs against allowing a suit to proceed as a class action." <u>Puffer v. Allstate Ins. Co.</u>, 255 F.R.D. 450, 473 (N.D. Ill. 2009); <u>see also</u> <u>Glazer v. Abercrombie & Kent, Inc.</u>, Case No. 07 C 2284, 2008 U.S. Dist. LEXIS 91142, *4 (N.D. Ill. Nov. 10, 2008) (denying motion for class certification because large individual damage claims increase plaintiff's interest in individually controlling the prosecution and defense of separate actions). As particularly relevant here, the Seventh Circuit has held that damages as low as $50,000 provide adequate incentive to litigate a claim individually. See <u>Andrews</u>, 545 F.3d at 577-78 (holding that a class action was not superior to an individual Truth In Lending Act rescission action because a prevailing debtor with a typical loan could receive over $50,000).

Here, plainly, this is not a situation where damages are "too insignificant" to proceed with an individual claim. For instance, if litigated, Johnson's potential recovery could be worth as much as $88,500.00 individually, which should provide him with more than enough incentive to pursue his claims on an individual basis. It is possible that other supposed class members would have similar amounts to pursue.

Further, manageability cannot be achieved here due to the many individual issues of fact underlying the purported claims. The consideration of manageability is "committed to the district court's discretion particularly 'because [district courts] "generally [have] a greater familiarity and expertise" with the "practical . . . and primarily . . . factual" problems of administering a lawsuit "than [do the] court[s] of appeals." <u>Adelson v. U.S. Legal Support, Inc.</u>, 715 F. Supp. 2d 1265, 1274 (S.D. Fla. 2010) (denying class certification where it would result in

an unreasonably expensive and time-consuming undertaking to determine individualized circumstances that would burden the court, defendants and third-parties); see also King v. Kansas City Southern Industries, Inc., 519 F.2d 20, 25 (7th Cir. 1975) ("Determination of the manageability of class actions is, once Rule 23 is properly applied, a matter for the trial court's discretion").  "[I]f redressing the class members' injuries requires time-consuming inquiry into individual circumstances or characteristics of class members or groups of class members, 'the suit could become unmanageable and little value would be gained in proceeding as a class action.'"  Shook v. Bd. of County Comm'rs, 543 F.3d 597, 604 (10th Cir. 2008).

In the Motion, Johnson proposes no plan whatsoever for how to handle this matter going forward.  This is a significant omission, in the context of these claims.  As noted above, not only would these claims devolve into mini-trials, but by her own admission, Verkhovskaya's methodology will require serving subpoenas on cell service providers for personal identifying information.  The fact that Verkhovskaya has never undertaken such a program should, in and of itself it, be of great concern.  There is no reason to believe that these carriers quickly or easily would provide private customer information or, frankly, that they would provide it without challenge.  In fact, the process Verkhovskaya proposes appears to be illegal in the state of California.  Courts interpreting California law have held that prior express permission of the telephone subscriber must be obtained before a wireless carrier can produce the requested data.  See, e.g., Birchmeier, et al. v. Caribbean Cruise Line, Inc., et al., Case No. 1:12-cv-04069 (N.D. Ill.) (Docket No. 302); Sherman v. Yahoo! Inc., Case No. 3:13-cv-0041 (S.D. Cal.)  (Docket No. 191) ("In several other cases, cellular carriers have refused to turn over similar records pertaining to California customers in TCPA cases based on the right to privacy established by California Public Utilities Code section 2891(a)(4).").  Moreover, based on her experience in the industry

and the available data, Daley opines that the cost of obtaining data from the wireless carriers alone will total between $2.25 million and $3 million, and the process outlined by Verkhovskaya could take six months or longer to unfold.  (Daley Declaration, ¶¶ 125-126).  Thus, this case could devolve further into expensive and time-consuming discovery disputes.  However, Johnson has not even attempted to address these problems, and the Court should find that the proposed class is not manageable.

## IV.   Conclusion

For the foregoing reasons, NSI respectfully requests that the Court deny the Motion.

Dated: June 24, 2016                                    Respectfully submitted,

/s/ Lisa M. Simonetti
Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T: (424) 204-7700
F: (424) 204-7702
lsimonetti@vedderprice.com

Bryan K. Clark
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: (312) 609-7500
F: (312) 609-5005
bclark@vedderprice.com

Attorneys for Defendant
NAVIENT SOLUTIONS, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that I electronically filed the foregoing **OPPOSITION**

**TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** with the Clerk of the Court

using the CM/ECF system which will send notifications of such filing to all attorneys of record.

On  June 24, 2016                          /s/ Lisa M. Simonetti
                                                    Lisa M. Simonetti