**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | |
|---|---|
| RANDY JOHNSON, on behalf of himself and others similarly situated, | |
| Plaintiff, | |
| v. | Case No. 1:15-cv-0716 LJM-MJD |
| NAVIENT SOLUTIONS, INC., f/k/a SALLIE MAE, INC., | |
| Defendant. | |

**DEFENDANT NAVIENT SOLUTIONS, INC.'S
MOTION TO STRIKE EXPERT DECLARATION OF ANYA VERKHOVSKAYA**

## <u>TABLE OF CONTENTS</u>

I.      Introduction .............................................................................................................. 1

II.     Background ............................................................................................................... 2

III.    The Legal Standard .................................................................................................. 3

IV.     Argument .................................................................................................................. 5

    A.      Verkhovskaya Is Not Qualified To Provide Statistical Analysis ........................... 5

    B.      Even If Verkhovskaya Were Qualified, She States Reliability "Statistics"
        That Are Unprecedented And Wholly Unsupported ............................................. 7

        1.      Verkhovskaya's Methodology Has Not Been Adequately Tested ........... 7

        2.      Verkhovskaya's Results Are Inconsistent With Industry Standards ......... 9

        3.      Verkhovskaya Has Not Applied Her Methodology To The Facts
            Of The Case ........................................................................................... 10

        4.      Verkhovskaya Has Excluded Certain Categories Of Cellular
            Telephone Numbers So As To Skew The Results ................................... 11

    C.      There Is No Reliable Method To Identify The Historical User Or Owner
        Of A Cellular Telephone Number .......................................................................... 13

    D.      Verkhovskaya's Methodology Fails To Include Well-Known Costs And
        Delays ..................................................................................................................... 14

V.      Conclusion ............................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Cases**

American Honda Motor Co., Inc. v. Allen,
    600 F.3d 813 (7th Cir. 2010) ............................................................................ 4, 5, 7

Benzion v. Vivint, Inc,
    Case No. 12-cv-61826 (S.D. Fla.), Deposition Excerpt, 2013 WL 10968344 ......................... 14

Birchmeier v. Caribbean Cruise Line, Inc.,
    Case No. 1:12-cv-04069 (N.D. Ill.) ........................................................................ 15

Bradley v. Brown
    852 F. Supp. 690 (N.D. Ind. 1994) ......................................................................... 5

Clark v. Takata Corp.,
    192 F.3d 750 (7th Cir. 1999) ............................................................................... 4

Cory Horton, et al. v. Cavalry Portfolio Services LLC
    Case No. 13-cv-0307 (S.D. Calif.).......................................................................... 10

Daubert v. Merrell Dow Pharm., Inc.
    509 U.S. 579 (1993)....................................................................................... 3, 4

General Elect. Co. v. Joiner
    522 U.S. 136, 142 (1997)................................................................................... 3

Kumho Tire Co., Ltd. v. Carmichael
    526 U.S. 137, 152 (1999).................................................................................. 3

Loeffel Steel Prods. v. Delta Brands, Inc.,
    387 F. Supp. 2d 794 (N.D. Ill. 2005) ....................................................................... 5

Masters v. Hesston Corporation,
    291 F.3d 985 (7th Cir. 2002) ............................................................................... 5

Patel v. Menard, Inc.
    No. 09-cv-0360-TWP-DML, 2011 U.S. Dist. LEXIS 116219 (S.D. Ind. Oct. 6, 2011) ....... 4, 7

Schultz v. Akzo Nobel Paints, LLC
    721 F.3d 426 (7th Cir. 2013) ............................................................................... 4

SEC v. Lipson
    46 F.Supp.2d 758 (N.D. Ill. 1988) ......................................................................... 5

Shamblin v. Obama for America,
    No. 8:13-cv-02428 (M.D. Fla.) ................................................................. 6

Sherman v. Yahoo
    2015 WL 5604400 (S.D. Cal. Sept. 23, 2015) ........................................ 14, 15, 16

Simstad v. Scheub
    2014 WL 6473264 (N.D. Ind. 2014) ...................................................... 3, 4

Southwell v. Mortgage Investors Corp. of Ohio
    No. C13-1289 MJP, 2014 U.S. Dist. LEXIS 112362 (W.D. Wash. Aug. 12, 2014) ................. 6

Warnick v. Dish Network, L.L.C.,
    No. 1:12-cv-01952 (D. Colo.) ........................................................ 6, 9, 10, 12

**Statutes**

47 U.S.C. § 277 ............................................................................ 3

## I.     Introduction

In this action, plaintiff Randy Johnson ("Johnson") asserts claims against defendant Navient Solutions, Inc. ("NSI") for violation of the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA").  The TCPA prohibits, among other things, making calls to a cellular telephone through an automatic telephone dialing system without the called party's prior express consent.  47 U.S.C. § 277(b)(1).  Johnson alleges that NSI called him using an automatic telephone dialing system after he had informed NSI that it was calling a wrong number.  NSI is a servicer of student loans, and it makes telephone calls in connection with its servicing efforts.

In his pending Motion for Class Certification (the "Motion"), Johnson seeks to certify a class comprised of:

> Each person and entity throughout the United States (1) to whom Navient Solutions, Inc. placed one or more telephone calls (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system, (4) after the person or entity informed Navient that it was calling the wrong telephone number, (5) between May 4, 2011 and March 7, 2016.

(Motion, p. 2).   As explained in NSI's concurrently-filed Opposition to the Motion, Johnson's arguments in support of certification rest entirely on the notion that the proposed class here can be identified — and the class members' claims can be proven — through a "reverse lookup" methodology.  Using this methodology, Verkhovskaya would match a list of telephone numbers marked with a wrong number code from NSI's systems to the names of persons associated with those phone numbers in records maintained by data brokers, such as LexisNexis.  Any person who is a match through this process would be deemed a class member.

Thus, in order to evaluate whether Johnson's claims are appropriate for class treatment, the Court must consider complicated issues related to statistical analysis, investigative practices

and telecommunications.  But Verkhovskaya is not an expert in any of these areas.  Instead, she works for a class action settlement administration company and, through her unsupported and conclusory declaration, Johnson relies only on her testimony to establish that class certification is appropriate here.  (See Declaration of Anya Verkhovskaya, Docket Entry 75-8, attached as Exhibit A (the "Declaration").).

As detailed below, however, the Declaration should be stricken pursuant to Federal Rule of Evidence 702 and Verkhovskaya's testimony should be deemed inadmissible because: (1) Verkhovskaya is not qualified to provide a reliable statistical analysis that is necessary to support her proposed methodology; (2) even if Verkhovskaya were qualified, her methodology is based on reliability "statistics" that are unprecedented and wholly unsupported; (3) there is no reliable method to identify the historical user of a cellular telephone number; and (4) Verkhovskaya's proposal fails to include well-known costs and delays.  Accordingly, NSI requests that the Court enter an Order striking the Declaration and determining that Verkhovskaya's testimony is inadmissible under Rule 702.

## II.    Background

Verkhovskaya is a Partner and Chief Operating Officer with A.B. Data, Ltd.'s Class Action Administration Company, which focuses on "class action notice, claims, and settlement fund administration."  (Declaration, ¶ 1).  Verkhovskaya's stated experience is in "administering class actions," not in investigations, statistics, or telecommunications.  (Id., ¶ 6).

In the Declaration, Verkhovskaya describes a "reverse lookup" methodology that would be performed at some unidentified, future point in this action.  Using a list of telephone numbers that have been marked in NSI's systems with a "wrong number" code, Verkhovskaya would:

(1) Query the wireless reverse directory of a data broker such as LexisNexis to identify the name and address associated with that number at a given moment in time;

(2) Submit subpoenas to the top nine wireless carriers for call detail reports, texts, or bills to obtain personal identifying information relating to the cellular numbers where the data brokers could not identify the historical owner; and

(3) Check the National Change of Address database for each person's current address.

(Id., ¶¶ 14-19).  Any person who was a match through this process would be deemed a class member, having a valid claim under the TCPA, without further analysis.

## III.    The Legal Standard

Pursuant to Federal Rule of Evidence 702, a witness who is qualified as an expert by knowledge, skill, experience, training or education may only testify in the form of an opinion or otherwise if:  (1) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied the principles and methods to the facts of the case.

Therefore, a court plays a "gatekeeping" function to ensure that expert testimony is: reliable, i.e., based on the "methods and procedures of science," rather than on "subjective belief or unsupported speculation;" and truly helpful to the factfinder under the particular circumstances of the case.  Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 590-81 (1993); see also General Elect. Co. v. Joiner, 522 U.S. 136, 142-43 (1997) (trial court's gatekeeping role requires it to screen out unreliable evidence).  The objective is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 152 (1999).

3

Meanwhile, in assessing reliability, a court must determine whether the expert provides testimony that is based on a reliable methodology and whether the expert considered sufficient data.  See, e.g., Simstad v. Scheub, 2014 WL 6473264, *1 (N.D. Ind. 2014); Clark v. Takata Corp., 192 F.3d 750, 756 (7th Cir. 1999).  A court should be concerned with "the soundness and care with which the expert arrived at her opinion."  Schultz v. Akzo Nobel Paints, LLC, 721 F.3d 426, 431 (7th Cir. 2013).  Accordingly, a court must focus "solely on principles and methodology, not on the conclusions that they generate."  Daubert, 509 U.S. at 595.

In Daubert, the United States Supreme Court offered several non-exclusive factors to aid courts in determining whether a particular expert opinion is grounded in a reliable scientific methodology, as follows: (1) whether the proffered theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential rate of error; and (4) whether the relevant scientific community has accepted the theory.  Daubert, 509 U.S. at 581.  The Seventh Circuit also has relied on the 2000 Advisory Committee Notes to Rule 702, which list additional factors, including whether:  (1) the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation; (2) the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (3) the expert has adequately accounted for obvious alternative explanations; (4) the expert is being as careful as she would be in her regular professional work outside of paid litigation consulting; and (5) whether the expert's field of expertise is known to reach reliable results for the type of opinion the expert is giving.  See, e.g., American Honda Motor Co., Inc. v. Allen, 600 F.3d 813, 817 (7th Cir. 2010); Patel v. Menard, Inc., No. 09-cv-0360-TWP-DML, 2011 U.S. Dist. LEXIS 116219, *12 (S.D. Ind. Oct. 6, 2011).

4

None of these factors is, by itself, determinative of reliability, and not all of them will be relevant to every inquiry. Loeffel Steel Prods. v. Delta Brands, Inc., 387 F. Supp. 2d 794, 801 (N.D. Ill. 2005). In addition, the list is not exhaustive; in an appropriate case, other factors may also come into play. American Honda Motor Co., 600 F.3d at 817 ("Daubert sets forth a non-exhaustive list of guideposts . . . ."). At the end of the day, expert testimony grounded in unreliable reasoning or methodology is inadmissible. Masters v. Hesston Corporation, 291 F.3d 985, 992-993 (7th Cir. 2002). Further, it is fundamental that "[t]he proponent of expert testimony bears the burden of establishing its admissibility." SEC v. Lipson, 46 F.Supp.2d 758, 762 (N.D. Ill. 1988); accord Bradley v. Brown, 852 F. Supp. 690, 697 (N.D. Ind. 1994).

## IV.    Argument

### A.    Verkhovskaya Is Not Qualified To Provide Statistical Analysis.

Verkhovskaya's opinions and proposed reverse lookup methodology would be admissible under Rule 702 only if they were based on the reliable application of specialized principles and methods to the facts at hand. Indeed, Verkhovskaya's methodology is only meaningful if reliable and a statistical analysis is needed to make that determination. But, by her own admission, Verkhovskaya is not a statistician and she would not perform any reliability analysis here. (See Deposition of Anya Verkhovskaya ("Verkhovskaya Depo."), attached as Exhibit B, 20:19-21:4). Reliability analysis, to the extent it is performed at all, would be performed by other A.B. Data employees, although Verkhovskaya also cannot state that these employees have any background in statistics. (Verkhovskaya Depo., 28:3-6).

Importantly, this is not simply an area where Verkhovskaya lacks formal training. When questioned at her deposition on basic terminology, she testified as follows:

**Q**.    … What is a biased sample?
**A**.     I don't know.  Can't recall right now the definition.

5

> **Q.** So it's your testimony that you have known a definition at some time and can't remember it now?
> **A.** Correct.
> **Q.** What is selection bias?
> **A.** I can't recall the definition at this time.
> **Q.** What's exclusion bias?
> **A.** I can't recall the definition.
> **Q.** What's a sampling error?
> **A.** I can't recall the definition.
> **Q.** What's a random sample?
> **A.** I can't recall the definition right now.

(Verkhovskaya Depo., 89:19-90:6.)

Given that Verkhovskaya lacks the expertise to engage in this sort of analysis, it is not surprising that at least three courts have expressly rejected her conclusions while also denying class certification.  In <u>Southwell v. Mortgage Investors Corp. of Ohio</u>, No. C13-1289 MJP, 2014 U.S. Dist. LEXIS 112362, *11-12 (W.D. Wash. Aug. 12, 2014), the court criticized a declaration from Verkhovskaya that was very similar to the declaration submitted here, holding that "Ms. Verkhovskaya's declaration is entirely prospective; i.e., it simply describes what she intended to do with the data provided by Plaintiffs."   Similarly, in <u>Warnick v. Dish Network, L.L.C.</u>, Case No. 1:12-cv-01952 (D. Colo.), the court denied class certification despite Verkhovskaya's testimony, finding the plaintiff's class definition "not to be administratively feasible, and thus not ascertainable."  (ECF No. 238 and 262).  Finally, in <u>Shamblin v. Obama for America</u>, No. 8:13-cv-02428 (M.D. Fla.), the court denied class certification and held that, "[w]hile the court declines to exclude the expert reports of Verkhovskaya and Biggerstaff, the [c]ourt disagrees with any of their conclusions tending to suggest that classwide proof is available on these specific issues." (ECF No. 214).

6

**B.    Even If Verkhovskaya Were Qualified, She States Reliability "Statistics" That Are Unprecedented And Wholly Unsupported.**

Even when an expert is qualified, a court is required to do more than simply "tak[e] the expert's word for it."  Fed. R. Evid. 702 Advisory Committee's Note to 2000 Amendments. Instead, a Court must assess the reliability of the expert's opinion and methodology by looking at factors such as whether the proffered theory can be and has been tested, whether the relevant expert community has accepted the theory and whether the testimony relates to matters growing naturally and directly out of research that was conducted independently from the instant litigation.  See American Honda Motor Co., 600 F.3d at 817; Patel, 2011 U.S. Dist. LEXIS 116219 at *12.  Here, Verkhovskaya asserts the reliability of her methodology at a level — 87% to 92% — that is unprecedented in the industry and wholly unsupported.

**1.    Verkhovskaya's Methodology Has Not Been Adequately Tested.**

Verkhovskaya's Declaration rests on the flawed premise that her methodology is extremely accurate.  According to Verkhovskaya, "recent test files resulted in accuracy ranging from approximately 87%-92%."  (Declaration, ¶ 15).  Thus, according to Verkhovskaya, when she applies the methodology at some point in the future based on NSI's data (which she has never seen and has not asked for), she will be able to determine the members of the class with an exceptionally high rate of accuracy.  The problem, however, is that Verkhovskaya provides no data to support her conclusion.  Verkhovskaya has offered only vague and incomplete descriptions of the alleged testing process.  Also, by her own admission, she did not perform the tests herself, but delegated it to staff, who apparently also have no statistical background or expertise.  (Verkhovskaya Depo., 27:19-28:6).  And, although her proposed methodology would involve the potential use of other data brokers (see Declaration, ¶ 11), she admitted that the tests were only run on LexisNexis data.  (Verkhovskaya Depo., 29:13-14).

7

Moreover, and tellingly, in Verkhovskaya's only actual application of the methodology — i.e., to the telephone number at issue in this action that allegedly belonged to Johnson at the relevant time (the "Cell Number") — the methodology failed to associate that number with Johnson. Instead, the methodology associated the number with Johnson's former girlfriend, Marie Bottoms, who used the Cell Number upon occasion. Therefore, the methodology fails to find even the named plaintiff himself.

Indeed, unable to review and analyze Verkhovskaya's actual "test files," because they were not produced, NSI's expert, Margaret Daley ("Daley"), conducted her own reliability testing using 167 cellular telephone numbers for which she already knew the correct current user's name. These numbers encompassed a range of phone service types, including individually owned single-user plans, family plans and employer-owned plans. Only 68 of those test numbers returned the correct name of the user, representing an accuracy rate of just 41%. While this is less than half as accurate as what Verkhovskaya claims, this result is consistent with the accuracy metrics reported by LexisNexis and used in its pricing. (See Declaration of Margaret A. Daley ("Daley"), attached as Exhibit C, ¶ 111)).

But, again, Daley's testing also revealed numerous misidentifications. For instance, Daley searched the LexisNexis Cellular Phone Number Plus lookup service for a cellular telephone number that she had used for a number of years at her prior job, and during the proposed class period here. The number was owned by her prior employer, Duff & Phelps. Daley stopped using the number in April 2015. However, the LexisNexis research associated this number only with the name "William Wartson," presumably the current user or owner of this cellular number. Similarly, LexisNexis identified a cellular number that appears to be used by Verkhovskaya as belonging to a "Svetlana Kalistratova." (Daley, ¶¶ 109-110).

8

These results are not surprising.  In prior cases, Verkhovskaya has given deposition testimony suggesting that any tests were performed on sample data sets that intentionally excluded data types likely to produce errors.  See Warnick v. Dish Network, L.L.C., Case No. 1:12-cv-01952 (D. Colo.), August 26, 2014 Deposition of Anya Verkhovskaya, 2013 WL 8813076.  And she has previously testified to significantly lower rates of accuracy, with no explanation as to why the results of her research in the present case have so significantly improved.  Id.  In short, Verkhovskaya's methodology has not been adequately tested because it does not work, and it therefore should be deemed inadmissible.

### 2.     Verkhovskaya's Results Are Inconsistent With Industry Standards.

Verkhovskaya's supposed "87%-92%" accuracy rates are particularly problematic because they are completely inconsistent with standards in the telecommunications industry. Daley, who has nearly two decades of data analytics and investigations experience, has stated "with a reasonable degree of certainty from [her] professional experience that cellular telephone reverse lookup services are not considered highly reliable in the investigations industry because they are not obtained from [ ] reliable public sources of information."   (Daley, ¶ 75).  In her experience, "these lookup services typically have a 50/50 chance of accurately identifying the current subscriber of a cellular telephone number."  (Daley, ¶ 75).  This 50% accuracy rate will only drop, of course, in a case like this, where Johnson is seeking historical, rather than current, data.  For example, Daley conducted searches using the proposed LexisNexis methodology based on sample data from NSI, and she found that the process only identified the name and address of a person who could be considered a potential class claimant about 30% of the time.  (Daley, ¶ 63).

In fact, data brokers who sell cellular telephone data warn their customers that the information is not reliable, and no data brokers promote accuracy numbers that come anywhere

close to the accuracy rate Verkhovskaya touts here.  For instance, LexisNexis informed Daley that its testing reveals a typical "hit rate" between 60 and 70 percent.  (Daley, ¶ 81).  And LexisNexis bases its pricing on the assumption that only a 40 percent reliability rate will be achieved.  (Daley, ¶ 82).  Notably, LexisNexis is the primary service that Verkhovskaya claims to use to achieve her "87%-92%" accuracy rates.  (See Declaration, ¶ 15).  But, in her deposition, Verkhovskaya stated she was unaware of the publicly-available reliability statistics from LexisNexis.  (See Verkhovskaya Depo., 42:7-13).

There is simply no evidence that any expert in the field has accepted (or would accept) the methodology put forth by Verkhovskaya.  In fact, as recently as August 26, 2013, Verkhovskaya testified that her methodology is subject to a 20 to 30 percent error rate, substantially higher than the 8 to 13 percent error rate she now claims.  Warnick v. Dish Network, L.L.C., Case No. 1:12-cv-01952 (D. Colo.), August 26, 2014 Deposition of Anya Verkhovskaya, 2013 WL 8813076.  In her deposition here, Verkhovskaya declined to acknowledge this difference, instead claiming that the accuracy rate has never meaningfully changed.  (Verkhovskaya Depo., 58:2-7; 87:20-89:8.)

### 3.     Verkhovskaya Has Not Applied Her Methodology To The Facts Of The Case.

Under Rule 702(d), proposed expert testimony must apply the technical principles and methods to the actual facts of the case at hand.  Very simply, Verkhovskaya has not done so here.  Verkhovskaya analyzed no data from NSI, nor did she request any.  In fact, her Declaration appears to be substantially identical to that produced in Cory Horton, et al. v. Cavalry Portfolio Services LLC, Case No. 13-cv-0307 (S.D. Calif.).  Indeed, in her deposition, Verkhovskaya admitted that large portions of the Declaration involved "standard language" reflecting the fact that she has proposed the same methodology in "many of [her] cases."  (See Verkhovskaya

10

Depo., 27:1).  Further, Verkhovskaya stated at her deposition that she estimated $5,000 in fees

for producing her report and providing a deposition.  (Verkhovskaya Depo., 18:23-19:6).  At a

rate of $425 per hour, this estimate suggests that she spent <u>less than 12 hours total</u> to review the

case materials, produce a report and prepare to testify in support of her opinions.  Accordingly,

Verkhovskaya did not even attempt to apply her methodology to the facts of this case.  Rather,

she has adopted a cookie-cutter approach in hopes that her methodology will be adopted without

any real scrutiny.

       **4.**        **Verkhovskaya Has Excluded Certain Categories Of Cellular Telephone Numbers So As To Skew The Results.**

For Verkhovskaya's accuracy numbers to have any meaning at all, her "test files" must

be similar in nature to the pool of cellular telephone numbers at issue here.  Because

Verkhovskaya has not provided any detailed information about her "test files" or the manner in

which she came up with her accuracy numbers, NSI cannot assess their adequacy.  However,

Verkhovskaya's August 2013 deposition testimony in <u>Warnick v. DISH Network</u> indicates that

she, at least at that time, <u>intentionally excluded</u> from her test samples any phone numbers

associated with group plans of various types.

In <u>Warnick</u>, Verkhovskaya offered the following testimony regarding her approach to

testing the accuracy of her database vendors:

> **Q.**    Have you ever looked up your own telephone numbers?
> **A.**    Yes.
> **Q.**    Or used your own telephone numbers and run them through this process to see if it correctly identifies you and your address with the account?
> **A.**    It's part of our standard process. We use seed lists all the time.
> **Q.**    Okay. And a seed list is people whose names and addresses are known to you, and you run that list through this process you're recommending to a court to see if it produces the correct name and address?
> **A.**    Correct.
> **Q.**    Which name and address are you looking for when you do that process? Are you looking for the subscriber of record who pays the bills, or in the

11

|   | example I kept giving, my daughter who lives at a different address who actually uses the phone? |
|---|---|
| **A**. | We have not used family plans as seeds. |
| **Q.** | Have you used employer multiple line plans as seeds? |
| **A.** | No. |
| **Q.** | So the seeds you use are single person, single cell phone line? |
| **A.** | Correct. |
| **Q.** | So there wouldn't generally be a discrepancy between the person paying the bill and the person who uses that phone on a daily basis? |
| **A.** | Correct. |
| **Q.** | Have you seen instances in running those seeds where the person who is getting the bill and identified as the person to whom the bill should be sent is different than the regular user? |
| **A.** | We had one or two instances when that happened. |
| **Q.** | Right.  Are you familiar with instances in which, for example, elderly people might have their bills reviewed and paid by someone else maybe due to their fragility? |
| **A.** | As I said earlier, about 20 to 30 percent of data size fall into those various instances where the identifier is not 100 percent accurate, identifying process is not 100 percent accurate. |

<u>Warnick v. Dish Network, L.L.C.</u>, Case No. 1:12-cv-01952 (D. Colo.), August 26, 2014 Deposition of Anya Verkhovskaya, 2013 WL 8813076 (emphasis added).   Thus, by Verkhovskaya's own admission, at least 20 to 30 percent of cell phone users fall into categories where the "owner" of the phone identified by data brokers is not actually the user of the phone. And the actual number is probably closer to 70%.  (Daley, ¶ 100).  Verkhovskaya deliberately <u>excluded</u> these individuals from her "test sets" so that that these "instances where the identifier is not 100 percent accurate" would not impact her accuracy numbers.

Parsing data sets in this way so as to skew the accuracy numbers is particularly troubling here because Johnson himself is among those that Verkhovskaya likely would exclude from her test.  Johnson is on a prepaid phone plan.  (Daley, ¶ 53).  Verkhovskaya testified that data brokers are unreliable when identifying cellular users on prepaid plans: "[P]repaid phones rarely register name and addresses associated with those phones."  (Verkhovskaya Depo., 55:25-56:2.)

**C.    There Is No Reliable Method To Identify The Historical User Or Owner Of A Cellular Telephone Number.**

In addition to the various problems with the "statistical" reliability numbers, the methodology is inherently flawed because it fails to set forth a reliable method for identifying <u>historical</u> cellular telephone number ownership or use.  The putative class at issue here would be comprised of individuals who were using the numbers that NSI called <u>at the time NSI called them</u>.  Verkhovskaya recognizes this, stating that she would seek to identify "names of the subscribers to the telephone numbers at issue <u>on the dates the defendant placed the calls at issue</u>." (Declaration, ¶ 10) (emphasis added).  During her deposition, however, Verkhovskaya stated that the methodology is <u>not</u> based on this particular analysis.  (Verkhovskaya Depo., 86:14-24).  Instead, Verkhovskaya admitted that she plans only to provide a list of names and addresses that the data brokers associate with the telephone numbers.  (Verkhovskaya Depo., 53:18-54:02).  That list of numbers therefore will be associated only with the current users and/or owners, and in many instances will have no correlation whatsoever to the persons who were using the phone numbers when the actual calls were made (dating back to 2011).

This flaw in Verkhovskaya's methodology is hardly surpsing.  Verkhovskaya is not attempting to provide historical information <u>because there is no reliable way of doing so</u>.  As noted above, LexisNexis expressly warns its customers that its historical records are not accurate.  Experian, another data broker that Verkhovskaya "may" use, does not even offer a reverse lookup for historical data. (Daley, ¶ 78).  Nexxa, another of the data brokers identified in Verkhovskaya's Declaration, also denies that it can provide historical cellular telephone ownership identification.  (Daley, ¶ 79).

Indeed, historical cellular telephone ownership is difficult to obtain due to the high turnover or "churn" rate of the cell phone numbers.  In the case of <u>Sherman v. Yahoo!</u>, the court

denied class certification in a matter involving a proposal to use a cellular telephone reverse number lookup process to identify class claimants. The court agreed with the defendant's argument that "reverse lookup systems are fraught with difficulties and are unlikely to provide accurate contact information two years later." 2015 WL 5604400, *6 (S.D. Cal. Sept. 23, 2015).

But, even assuming for sake of argument that Verkhovskaya's methodology can reliably identify the historical "users" and/or "owners" of cell phone numbers, it cannot determine whether any of those persons actually received phone calls from NSI and hence could be eligible class members. For example, Verkhovskaya's approach could identify the owner, but not the user, of a cell phone number. In many instances, the user, not the owner, will be the recipient of any phone calls. Nowhere in her Declaration does Verkhovskaya address this significant problem. In fact, in previous cases such as Benzion v. Vivint, Inc., Verkhovskaya testified that she had no opinion to offer on whether her methodology was able to distinguish the actual user of a cell phone from the individual name of the subscriber:

> **Q**.   Would it be the subscriber or not necessarily the subscriber?
> **A**.   Not necessarily, but it could be a subscriber. It's very open. We use very open terminology here, because we don't have the specifics.
> **Q**.   Okay. What do you mean when you say "open"?
> **A**.   Well, we say we're owned, because it could be subscriber, it could be not a subscriber; therefore, we are not sure. So that's why we left it open.
> **Q**.   So who would you consider the owner of a phone to be if the phone was on a family shared plan where service is in the name of the head of the household, but there may be three or four or five phones that are carried by a spouse or children?
> **A**.   We have No. opinion on the matter. [sic]

Case No. 12-cv-61826 (S.D. Fla.), Deposition Excerpt, p. 52, 2013 WL 10968344. Thus, Verkhovskaya has not offered any reliable method to identify the historical users or owners of the cellular telephone numbers at issue or determine who was called during the relevant class period.

**D.      Verkhovskaya's Methodology Fails To Include Well-Known Costs And Delays.**

In addition to the numerous analytical problems with Verkhovskaya's proposed methodology, she fails to include significant costs and delays that will transform the work of identifying the class from a "practical and efficient" project that can be done in a matter of weeks, to a potentially multimillion-dollar undertaking that will take months to complete — if it can be completed at all.  For example, the second step of the methodology involves issuing subpoenas to the cell phone service providers so as to obtain personally identifying information for some individuals.  Even though she has not undertaken such work, she assumes that it would be a fast, simple process.  She also admitted in her deposition that the cost projection in her Declaration did not include the costs associated with these subpoenas.  (Verkhovskaya Depo., 62:15-63:8; 63:23-64:1).

Contrary to her assumptions, telecommunications carriers do not simply turn over the personal, private call and billing data of their subscribers without objection, nor are they willing to perform such an undertaking for free.  (Daley, ¶ 115).   Fees quickly become quite substantial when requesting data associated with even tens of thousands of wireless numbers.  Based on the available information about the rates charged by wireless carriers, and using LexisNexis' reported accuracy rates of 60-70% for cellular telephone reverse lookup, the cost of obtaining data from the wireless carriers could be between $2.25 million and $3 million.  (Daley, ¶ 125).[1] Additionally, the process outlined by Verkhovskaya could take six months or longer.  (Daley, ¶ 126).

Verkhovskaya also fails to account for the fact that the subpoena process she proposes

---

[1] Verkhovskaya was requested to produce the records relating to the actual costs associated with the cases where she has applied her proposed methodology but to date she has failed to do so.

15

may be impermissible in some states.  In California, for example, the prior express permission of the telephone subscriber must be obtained before a wireless carrier can produce the requested data.  See Birchmeier v. Caribbean Cruise Line, Inc., Case No. 1:12-cv-04069 (N.D. Ill.) (Docket Entry 302) (holding that California law barred T-Mobile from complying with a subpoena seeking subscriber records for 4,600 customers).  Further, in Sherman, while denying class certification, the United States District Court for the Southern District of California noted:

> Plaintiff's last resort is to issue a subpoena to AT&T for subscriber records. As an initial matter, Plaintiff has not demonstrated that she has any likelihood of success via this route. In several other cases, cellular carriers have refused to turn over similar records pertaining to California customers in TCPA cases based on the right to privacy established by California Public Utilities Code section 2891(a)(4)10 and Plaintiff offers no explanation as to why AT&T will turn over subscriber records here.

2015 WL 5604400 at *6.  These oversights and omissions are further evidence that Verkhovskaya's Declaration is unreliable and should be stricken.

**V.     Conclusion**

For the foregoing reasons, NSI respectfully requests that the Court grant its Motion to Strike, find that Verkhovskaya is not qualified to provide expert testimony in this case, and strike the Declaration.

Dated: June 24, 2016

Respectfully submitted,

/s/ Lisa M. Simonetti
Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T: (424) 204-7700
F: (424) 204-7702
lsimonetti@vedderprice.com

Bryan K. Clark
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: (312) 609-7500
F: (312) 609-5005
bclark@vedderprice.com

Attorneys for Defendant
NAVIENT SOLUTIONS, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that I electronically filed the foregoing **DEFENDANT**

**NAVIENT SOLUTIONS, INC.'S MOTION TO STRIKE EXPERT DECLARATION OF**

**ANYA VERKHOVSKAYA** with the Clerk of the Court using the CM/ECF system which will

send notifications of such filing to all attorneys of record.

On  June 24, 2016                              ___/s/ Lisa M. Simonetti_____
                                                           Lisa M. Simonetti