**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

Randy Johnson, *on behalf of himself*
*and others similarly situated*,

        Plaintiff,

v.                                          Case No. 1:15-cv-00716-LJM-MJD

Navient Solutions Inc.,
f/k/a Sallie Mae, Inc.

        Defendant.


**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR**
**SUMMARY JUDGMENT**

**Table of Contents**

Introduction...................................................................................................................................1

Statement of Facts Not in Dispute .................................................................................................2

    I.    Navient placed fifty-five autodialed calls to Mr. Johnson's cellular telephone number after he
    informed it that it was calling a wrong number. ...........................................................................2

    II.    Navient used an artificial or prerecorded voice to leave eight messages on Mr. Johnson's
    cellular telephone voicemail. ......................................................................................................4

    III.    Navient did not obtain, or even attempt to obtain, permission from Mr. Johnson to place
    autodialed calls to his cellular telephone number, or to leave messages on his cellular telephone
    voicemail by using an artificial or prerecorded voice. .................................................................4

    IV.    Navient placed millions of autodialed calls to hundreds of thousands of cellular telephone
    numbers after it marked the telephone numbers as wrong numbers. .................................................6

    V.    Navient used an artificial or prerecorded voice in connection with autodialed calls it placed to
    over 100,000 class members. ......................................................................................................7

    VI.    Navient knew it was placing autodialed calls to telephone numbers it designated as wrong
    numbers, and was aware it was prohibited from doing so. ...........................................................7

Argument .......................................................................................................................................8

    I.    Navient violated the TCPA by placing autodialed calls to Mr. Johnson's cellular telephone
    number, and by leaving artificial or prerecorded messages on his cellular telephone voicemail. .....8

    II.    Navient did not have prior express consent to place autodialed calls to Mr. Johnson's cellular
    telephone number. ....................................................................................................................9

    III.    The Bipartisan Budget Act of 2015 does not absolve Navient of liability for autodialed calls
    it placed to Mr. Johnson's cellular telephone number in connection with a debt owed to or
    guaranteed by the United States. .............................................................................................11

        A.    The FCC recently made clear that the TCPA's 2015 amendment does not exempt wrong
        number calls, calls placed after the called party asks the caller to stop placing calls to him or her,
        or calls to a non-debtor. ..........................................................................................................11

        B.    Even if the Bipartisan Budget Act of 2015 exempted from the TCPA the calls at issue—it
        does not, as the FCC recently confirmed—the TCPA's 2015 amendment is not retroactive and is
        therefore inapplicable here. .....................................................................................................14

    IV.    Navient's conduct in placing autodialed calls to Mr. Johnson's cellular telephone number
    was willful and knowing. .........................................................................................................19

Conclusion ...................................................................................................................................22

## Table of Authorities

**CASES**

*Alea London Ltd. v. Am. Home Servs., Inc.*,
   638 F.3d 768 (11th Cir. 2011)……………………………...……………………..20

*Arthur v. Sallie Mae, Inc.*,
   Case No. 2:10-cv-00198 (W.D. Wash.)…………………………………………8

*Bowen v. Georgetown Univ. Hosp.*,
   488 U.S. 204 (1988)……………………………….…………………………..14

*Charvat v. Allstate Corp.*,
   29 F. Supp. 3d 1147 (N.D. Ill. 2014)………………….…………………….9

*Charvat v. Ryan*,
   2007-Ohio-6833, 116 Ohio St. 3d 394 (2007)……………………...…………………21

*Cummings v. Sallie Mae, Inc.*,
   Case No. 1:12-cv-9984 (N.D. Ill.)…………………….……………………..8

*Fernandez-Vargas v. Gonzales*,
   548 U.S. 30 (2006)……………………………………………………15

*Gager v. Dell Fin. Servs., LLC*,
   727 F.3d 265 (3d Cir. 2013)…………………….…………………………..10

*Gen. Motors Corp. v. Romein*,
   503 U.S. 181 (1992)………………………….……………………………14

*In re Dynasty Mortg., LLC*,
   22 F.C.C. Rcd. 9453 (May 14, 2007)………………….…………………20

*In re Watkins*,
   810 F.3d 375 (6th Cir. 2015)……………...……………………………16, 17

*INS v. St. Cyr*,
   533 U.S. 289 (2001)…………………….…………………………..15

*Kenro, Inc. v. Fax Daily, Inc.*,
   962 F. Supp. 1162 (S.D. Ind. 1997)……………...………………………19

*Killingsworth v. HSBC Bank Nevada, N.A.*,
   507 F.3d 614 (7th Cir. 2007)……………………...………………………..17, 18

*Landgraf v. USI Film Prods.*,
  511 U.S. 244 (1994)…………………………...……………………………………*passim*

*Lary v. Trinity Physician Fin. & Ins. Servs.*,
  780 F.3d 1101 (11th Cir. 2015)…………………..……………………………………19

*Lee v. Loandepot.com, LLC*,
  No. 14-CV-01084-EFM, 2016 WL 4382786 (D. Kan. Aug. 17, 2016)……..…………..21

*Lindh v. Murphy*,
  521 U.S. 320 (1997)…………………...…………………………………………16

*McCaskill v. Navient Sols., Inc.*,
  No. 8:15-CV-1559-T-33TBM, 2016 WL 1367228 (M.D. Fla. Apr. 6, 2016)…......10, 22, 23

*Miller v. Florida*,
  482 U.S. 423 (1987)…………………...…………………………………………17

*Mims v. Arrow Fin. Servs., LLC*,
  132 S. Ct. 740 (2012)…………………...………………………………………..15, 16

*Murphy v. DCI Biologicals Orlando, LLC*,
  No. 6:12-CV-1459-ORL, 2013 WL 6865772 (M.D. Fla. Dec. 31, 2013)…………………9

*Osorio v. State Farm Bank, F.S.B.*,
  746 F.3d 1242 (11th Cir. 2014)………………..……………………………………9, 10

*Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*,
  442 F.3d 1239 (10th Cir. 2006)………………………...………………………16

*Republic Nat'l Bank of Miami v. United States*,
  506 U.S. 80 (1992)…………………………………………………………………15

*Sengenberger v. Credit Control Servs., Inc.*,
  No. 09C2796, 2010 WL 1791270 (N.D. Ill. May 5, 2010)……………..…………………21

*Smith v. Wade*,
  461 U.S. 30 (1983)…………………………………………………………………20

*Soppet v. Enhanced Recovery Co., LLC*,
  679 F.3d 637 (7th Cir. 2012)………………….………………………………10, 19

*Sullivan v. Stroop*,
  496 U.S. 478 (1990)…………………………...…………………………………20

*Talley v. U.S. Dep't of Agric.*,
    595 F.3d 754 (7th Cir. 2010)…………………………………………………………..22

*United States v. Heth*,
    7 U.S. 399, 413, 2 L. Ed. 479 (1806)………………………...…………………………17

**REGULATIONS**

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 16-72……………………………………………...……………………………16

*In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 16-99…………………………...……………………………11, 12, 13, 22

**STATUTES**

47 U.S.C. § 227(b)(1)(A)(iii) (2015) ……………………….…………………………….9, 17

47 U.S.C. § 227(b)(2)………………………………….…………………………………..11

47 U.S.C. § 227(b)(3)(B)………………………………………………………..………….19

47 U.S.C. § 227(b)(3)(C)………………………………………………………..………….19

47 U.S.C. § 312………………………………………………………………………….20

Budget Act § 301(a)(2) ……………………………………………………………………11

PL 114-74, November 2, 2015, 129 Stat 584 ……………………...……………………………..9, 17

**Introduction**

The Telephone Consumer Protection Act ("TCPA") prohibits any person from placing autodialed, or artificial or prerecorded voice calls, absent prior express consent, to any cellular telephone number. It also permits a plaintiff to bring an action to recover an award of $500 for each violation of the act—an award a court may treble if it finds the defendant acted willfully or knowingly.

Here, Navient Solutions, Inc. ("Navient") placed fifty-nine autodialed calls to Mr. Johnson's cellular telephone number without his prior express consent. It placed fifty-five of those calls after Mr. Johnson notified Navient it was calling the wrong number. And on eight occasions, lacking Mr. Johnson's prior express consent, Navient used an artificial or prerecorded voice to leave messages on his cellular telephone voicemail.

In similar fashion, Navient placed 9,688,533 autodialed calls to 276,874 unique cellular telephone numbers, from May 4, 2011 through May 4, 2015, after its own records included a wrong number designation for each of them. In other words, during a recent four-year period, Navient placed over nine million autodialed calls to over a quarter of a million cellular telephone users or subscribers, each of whom previously informed Navient they did not want to receive calls from it. And during the same time period, Navient used an artificial or prerecorded voice in connection with autodialed calls it placed to 123,371 cellular telephone numbers it earlier labelled as wrong numbers.

Against this backdrop, Mr. Johnson asks this Court to grant summary judgment in his favor, and on behalf of the class this Court certified: "Each person and entity throughout the United States (1) to whom Navient Solutions Inc. placed one or more telephone calls (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system, (4)

1

after the person or entity informed Navient that it was calling the wrong telephone number, (5)

between May 4, 2011 and March 7, 2016." Doc. 122.

<b>Statement of Facts Not in Dispute</b>

**I.   Navient placed fifty-five autodialed calls to Mr. Johnson's cellular telephone number after he informed it that it was calling a wrong number.**

In September 2014, Navient began placing autodialed[1] calls to Mr. Johnson's cellular

telephone number. *See* Doc. 75-3; 75-4; 75-5. Shortly thereafter, Mr. Johnson called Navient and

notified it that his telephone number did not belong to the person Navient intended to reach—a

woman named Marie Bottoms. *See* Exhibit A, Track 1 (NSI0007383), appended on a CD and

mailed to this Court. During this conversation Navient agreed to remove Mr. Johnson's cellular

telephone number from its system. *See id.*

Navient, nonetheless, continued to place autodialed calls to Mr. Johnson's cellular

telephone number. *See* Doc. 75-3; 75-4; 75-5. So Mr. Johnson again called Navient and informed

it that it continued to place calls to his telephone number despite his previous requests that it not

do so. *See* Exhibit A, Track 2 (NSI0007384). During this conversation Navient not only agreed to

---

[1]      Navient concedes, for purposes of this litigation, that it placed the calls at issue—both to Mr. Johnson and the class members—by using an automatic telephone dialing system as defined by the TCPA. To be sure, Navient refers to "the system [it] use[s] to make outbound calls" as an "autodialer." Exhibit B at 3 (16:15-19). Regarding the autodialed calls it placed to Mr. Johnson, Navient explains that it placed them by using a "Noble Systems" dialer and an "Interactive Intelligence" dialer. *Id.* at 4 (17:7-17); *id.* at 22 (130:19-24) ("Q. So why did NSI use a Noble dialer and an ININ dialer to make calls to the same number? A. Marie Bottoms has accounts both on the Class Commercial and the Class ED side and two different dialers were used."); Doc. 75-7 at 5-6 (detailing that "NSI used a Noble dialer system and an ININ dialer system in making certain calls to" Mr. Johnson's cellular telephone number). As for the autodialed calls Navient placed to the class members, it agrees that "those calls [were] made by both the Noble and ININ dialers." Exhibit B at 24-25 (143:24-45; 144:1-2); *see also* Doc. 119-1 at 2 (identifying the number of calls Navient placed to the class members—which includes Mr. Johnson—"by using an automatic telephone dialing system or a predictive dialer or an artificial or prerecorded voice").

2

remove Mr. Johnson's cellular telephone number from its system, but also assured Mr. Johnson that he would not receive any more calls from Navient. *See id*.

In line with Mr. Johnson's conversations with Navient, Navient included a wrong number designation in its account records for his cellular telephone number on three separate occasions. *See* Doc. 75-3 at 2 ("9/11/2014 . . . Inbound . . . Wrong #[;] . . . 10/21/2014 . . . Inbound . . . Wrong #[;] . . . 12/4/2014 . . . Inbound . . . Wrong #"); Doc. 75-5 at 2 ("9/1/2014 WN"); *accord* Exhibit B at 9 (39:9-13) ("Q. So what exactly does wrong number mean as it exists on this document? A. Means that the customer or someone told us that this phone number, 2476, was a wrong number for Marie Bottoms.").

No matter, Navient continued to place autodialed calls to Mr. Johnson's cellular telephone number after labelling it a wrong number. *See* Doc. 75-2 at 15 (171:14-19) ("Q. You would agree with me that Mr. Johnson received a call by an autodialer from NSI on his cell phone after a wrong number code was entered in the system for his cellular telephone number, right? A. Yes."); Exhibit B at 7 (32:4-23) (noting that Navient made and received the calls listed at rows two through five, eleven through eighteen, and sixty-six through sixty-seven, of Doc. 75-3—all but two of which occurred after Navient first included a wrong number designation in its account records for Mr. Johnson's cellular telephone number); *id.* at 20 (127:2-5) (confirming that the calls listed on Doc. 75-4 are different from the calls listed on Doc. 75-3); *id.* at 20-21 (127:23-25; 128:1) (explaining that Navient made each of the fifty outgoing calls to Mr. Johnson's cellular telephone number listed on Doc. 75-5—all of which Navient placed after it included a wrong number designation in its account records for Mr. Johnson's cellular telephone number).

In all, Navient placed fifty-nine autodialed calls to Mr. Johnson's cellular telephone number. Doc. 129-1 at 13. "Fifty-five of those calls were made after Johnson notified Navient that it had the wrong number." *Id*.

## II. Navient used an artificial or prerecorded voice to leave eight messages on Mr. Johnson's cellular telephone voicemail.

Navient repeatedly left messages, specifically intended for Ms. Bottoms, on Mr. Johnson's cellular telephone voicemail, despite that Mr. Johnson's outgoing voicemail message clearly stated: "You've reached the Sprint voicemail box of Randy." *See, e.g.*, Exhibit A, Track 3 (NSI0007389). Navient left eight of these messages by using an artificial or prerecorded voice. *See* Doc. 75-3 at 2 ("IVR message completed"); Exhibit B at 17 (117:3-9) ("Q. . . . [T]he IVR messages, is that a computerized pre-recorded message? A. Yes. Q. It's not a human being leaving that message? A. Correct."); *id*. at 18 (118:25; 119-1-2) ("Q. So all the IVR messages are computer messages? A. Yes."); Doc. 75-5 at 2 ("Success – Recording played to Machine").

## III. Navient did not obtain, or even attempt to obtain, permission from Mr. Johnson to place autodialed calls to his cellular telephone number, or to leave messages on his cellular telephone voicemail by using an artificial or prerecorded voice.

Navient obtained Mr. Johnson's telephone number during an April 18, 2014 conversation with Ms. Bottoms. Doc. 75 at 6. Specifically, early in the more than nine-minute conversation between Navient and Ms. Bottoms, Navient confirmed Ms. Bottom's telephone number as [XXX-XXX]-7570—a number different than Mr. Johnson's cellular telephone number. Near the end of the conversation Navient asked Ms. Bottoms if it could use the number on which she called Navient: "NAVIENT: . . . And we have your phone number, did you want to add an alternative number to the account. MS. BOTTOMS: Um, you can take this one. NAVIENT: Okay, what is this one? MS. BOTTOMS: I really don't know it, I'm just calling on it. NAVIENT: It's the one that we have, the one that you're calling from, okay, its [XXX-XXX]-2476." Doc. 75 at 6-7.

4

Following this conversation Navient did nothing to confirm that Mr. Johnson's cellular telephone number was a telephone number that belonged to Ms. Bottoms. *See* Doc. 75-2 at 10 (69:18-22) "(Q[.] . . . After that conversation between Ms. Bottoms and NSI, did NSI do anything to confirm that [XXX.XXX].2476 was, in fact, a number that belonged to Ms. Bottoms? A[.] No.).

Noteworthy, Ms. Bottoms used Mr. Johnson's cellular telephone number to call Navient, unbeknownst to Mr. Johnson, while she stayed with Mr. Johnson for a few weeks to avoid her abusive ex-husband. *See* Doc. 75-6 at 8 (22:14-21) ("She just really needed a place to—a place of refuge."). And although Mr. Johnson allowed Ms. Bottoms to use his cellular telephone on occasion, he neither knew that Ms. Bottoms used his cellular telephone to call Navient, nor was he even aware that Ms. Bottoms owed money toward a student loan debt, until he started to receive calls from Navient looking for Ms. Bottoms. *See id.* (24:14-17) ("Q[.] Do you have an understanding that Ms. Bottoms has outstanding student loans? A[.] I didn't know it until I started getting calls from Navient/Sallie Mae.).

Given this, Navient concedes that it did not have a business relationship with Mr. Johnson. *See* Doc. 75-2 at 7 (34:7-13) ("Q. . . . Does NSI have any relationship with Randy Johnson who is the plaintiff in this lawsuit? A. No. Q. Did NSI ever have any relationship with Randy Johnson, the plaintiff in this lawsuit? A. Not that I'm aware of."); *accord* Exhibit A, Track 2 (recording of conversation during which Mr. Johnson states that he never went to college, let alone took out a loan to attend college).

Navient also admits that at no point did it ever obtain, or even attempt to obtain, permission from Mr. Johnson to place autodialed calls to his cellular telephone number. *See* Doc. 75-2 at 7 (34:17-25; 35:1) ("Q. Did Navient ever obtain Mr. Johnson's consent to use [XXX.XXX].2476? A. Navient Solutions? Q. Yes. A. No. Q. Did Navient solutions ever attempt to obtain Mr.

Johnson's consent to make autodialed predictive outcalls or artificial voice calls to [XXX.XXX].2476? A. No, not that I know of.").

In fact, Navient acknowledges it never intended to reach Mr. Johnson when placing calls to his cellular telephone number. *See* Exhibit B at 8 (38:1-7) ("Q. Okay. Who was NSI attempting to reach when it made the calls to [XXX.XXX].2476? A. Marie Bottoms. Q. Was it ever attempting to reach anyone other than Marie Bottoms when making calls to [XXX.XXX].2476? A. No.").[2]

In sum, Navient captured Mr. Johnson's cellular telephone number from a caller identification device while speaking with Ms. Bottoms, chose not to do anything at all to independently confirm it belonged to Ms. Bottoms, and then repeatedly placed autodialed calls to it even after Mr. Johnson asked Navient to stop doing so. *See supra*, Statement of Facts, Section I.[3]

## IV. Navient placed millions of autodialed calls to hundreds of thousands of cellular telephone numbers after it marked the telephone numbers as wrong numbers.

Navient estimates that from May 4, 2011 through May 4, 2015 it placed 9,688,533 autodialed calls to approximately 276,877 cellular telephone numbers after a date on which its system included a wrong number code for each of the telephone numbers. Doc. 119-1 at 2.[4]

---

[2]    Mr. Johnson confirmed that he is the subscriber to XXX.XXX.2476—his cellular telephone number. *See* Doc. 75-6 at 5-6 (13:20-25; 1).

[3]    Ms. Bottoms has "multiple loans" about which Navient placed autodialed calls to Mr. Johnson's cellular telephone number. Exhibit B at 23 (131:13-18); *accord id*. at 22 (130:22-24) ("Marie Bottoms has accounts both on the Class Commercial and the Class ED side and two different dialers were used."). The "Class Commercial" loans are "Navient's own debt or managed debt," *id*. at 13 (73:17-24), and Navient services the "Class ED" loans "on behalf of the Department of Education. *Id*. at 13-14 (73:25; 74:1-2).

[4]    Navient has not, to date, disclosed the number of unique cellular telephone numbers to which it placed autodialed calls, after its records designated them as a wrong numbers, for the remainder of the class period, which runs through March 7, 2016.

**V.    Navient used an artificial or prerecorded voice in connection with autodialed calls it placed to over 100,000 class members.**

Navient used an artificial or prerecorded voice in connection with at least one autodialed call it placed to no less than 123,371 class members. Exhibit C at 2.[5]

**VI.   Navient knew it was placing autodialed calls to telephone numbers it designated as wrong numbers, and was aware it was prohibited from doing so.**

Navient understood that it should not place autodialed calls to wrong numbers. *See* Doc. 75-2 at 9 (54:4-8) ("Q. So as I understand it, Navient's policy is that, if an individual tells an NSI agent that its calling a wrong number, NSI shouldn't call that number anymore? A. Correct. Q. Why? . . . THE WITNESS: Because the person on that call said the number doesn't belong to the person they're trying to reach. BY MR. RADBIL: Q. And because the person said the number doesn't belong to the person they're trying to reach, they simply don't want to be called anymore? A. They—yes."); *accord* Doc. 119-5 at 4 (41:9-14); 8 (126:12-15) (testimony from Navient's proposed expert stating that an individual who informed Navient it was calling a wrong number wanted Navient to stop calling him or her).

Navient was also cognizant that placing autodialed calls to wrong numbers violated the TCPA. *See, e.g.*, Exhibit B at 5 (20:10-11) (discussing "[t]raining procedures regarding TCPA complaints"); *id.* at 6 (21:18-19) (mentioning "TCPA training materials"); *id.* at 15 (87:1-3) (referencing an audit that Navient conducts "hourly to ensure compliance with TCPA guidelines"); *id.* at 16 (106:12-14) (calling attention to "TCPA Autodialer Requirements"); *id.* at 26 (153:25)

---

[5]    Similar to its production regarding autodialed calls, Navient has not, to date, disclosed the number of unique cellular telephone numbers to which it placed prerecorded or artificial voice calls, after its records designated them as a wrong numbers, for all of the class members for the entire class period.

(noting a "TCPA flag" in Navient's system); *id*. at 31 (166:8-10) (outlining a "control [Navient] put into place to make sure [it] compl[ies] with the TCPA").

No matter, Navient knowingly placed autodialed calls to cellular telephone numbers its records listed as wrong numbers. This is evidenced by the fact that Navient regularly sent to its compliance department records it created and maintained regarding many occasions on which it placed autodialed calls to telephone numbers absent prior express consent. *See* Exhibit B at 28-31 (163:25; 164:1-25; 165:1-25; 166:1-3); *id*. at 27 (159:4-14); *id*. at 10 (57:9-25; 58:1-18); *accord id*. at 11-12 (66:22-25; 67:1-3).[6]

## Argument

### I. Navient violated the TCPA by placing autodialed calls to Mr. Johnson's cellular telephone number, and by leaving artificial or prerecorded messages on his cellular telephone voicemail.

The TCPA reads, in relevant part:

> It shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States—
>
> (A) to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) by using any automatic telephone dialing system or an artificial or prerecorded voice—
>
> *  *  *
>
> (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the United States[.]

---

[6]     What's more, prior to the start of the class period in this matter, Navient—formerly known as Sallie Mae, Inc., *see* https://studentaid.ed.gov/sa/about/announcements/sallie-mae—entered into settlement agreements to resolve two unrelated, but similar class actions filed against it under the TCPA. *See Cummings v. Sallie Mae, Inc.*, Case No. 1:12-cv-9984 (N.D. Ill.); *Arthur v. Sallie Mae, Inc.*, Case No. 2:10-cv-00198 (W.D. Wash.).

47 U.S.C. § 227(b)(1)(A)(iii) (2015).[7]

Thus, "[t]here are two elements to an auto-dialer TCPA claim that a plaintiff must [prove]: (1) a call to a cellular telephone; (2) via an automatic telephone dialing system." *Murphy v. DCI Biologicals Orlando, LLC*, No. 6:12-CV-1459-ORL, 2013 WL 6865772, at *4 (M.D. Fla. Dec. 31, 2013) *aff'd*, 797 F.3d 1302 (11th Cir. 2015). "'[P]rior express consent' under the TCPA 'is an affirmative defense on which the defendant bears the burden of proof[.]'" *Charvat v. Allstate Corp.*, 29 F. Supp. 3d 1147, 1149 (N.D. Ill. 2014).

Here, Navient placed fifty-nine autodialed calls to Mr. Johnson's cellular telephone number, *see supra*, Statement of Facts, Section I, without prior express consent. *See id.*, Section III; *see infra*, Argument, Section II. Navient also used an artificial or prerecorded voice to leave eight messages on Mr. Johnson's cellular telephone voicemail, *see supra*, Statement of Facts, Section II, absent prior express consent. *See id.*, Section III; *see infra*, Argument, Section II. Navient, therefore, violated the TCPA both by placing autodialed calls to Mr. Johnson's cellular telephone number, and by leaving artificial or prerecorded voice messages on Mr. Johnson's cellular telephone voicemail, lacking prior express consent.

## II.   Navient did not have prior express consent to place autodialed calls to Mr. Johnson's cellular telephone number.

At no point did Navient have prior express consent to place autodialed calls to Mr. Johnson's cellular telephone. If for no other reason, this is because the only person who could have provided Navient with prior express consent to place autodialed calls to Mr. Johnson's cellular telephone number is Mr. Johnson. *See Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1251-2

---

[7]     The language "unless such call is made solely to collect a debt owed to or guaranteed by the United States" was added to the TCPA by way of the Bipartisan Budget Act of 2015, PL 114-74, November 2, 2015, 129 Stat 584. It did not exist on the date that Mr. Johnson's claim accrued, or on the date that Mr. Johnson filed his class action complaint.

(11th Cir. 2014) ("In tune with Judge Easterbrook's analysis, we believe this really means that Betancourt had no authority to consent in her own right to the debt-collection calls to No. 8626 because one can consent to a call only if one has the authority to do so, and only the subscriber (here, Osorio) can give such consent, either directly or through an authorized agent.") (citing *Soppet v. Enhanced Recovery Co., LLC*, 679 F.3d 637, 640 (7th Cir. 2012)); *accord McCaskill v. Navient Sols., Inc.*, No. 8:15-CV-1559-T-33TBM, 2016 WL 1367228, at *8 (M.D. Fla. Apr. 6, 2016) (rejecting Navient's argument that a daughter—who supposedly "confirmed the [subject telephone] number as her own when she requested a voluntary forbearance on her student loan from Sallie Mae"—could provide prior express consent for Navient to place autodialed calls to her mother's cellular telephone number). And Mr. Johnson never provided Navient prior express consent to place autodialed calls to his cellular telephone number. *See supra*, Statement of Facts, Section III.

No matter, assuming for the sake of argument that Navient, at some point, obtained prior express consent to place autodialed calls to Mr. Johnson's cellular telephone number—it did not— Mr. Johnson revoked any prior express consent Navient obtained before it placed fifty-five autodialed calls to his cellular telephone number. Simply, "the TCPA provides consumers with the right to revoke their prior express consent to be contacted on cellular phones by autodialing systems." *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 272 (3d Cir. 2013). And a consumer may revoke consent orally. *Osorio*, 746 F.3d at 1256.

Here, Mr. Johnson repeatedly informed Navient it was calling the wrong number, and asked it to stop placing calls to his cellular telephone number. *See supra*, Statement of Facts, Section I. In fact, Navient not only recorded Mr. Johnson's (would be) revocation, *see id.*, but memorialized, on three separate occasions, Mr. Johnson's statement that Navient was calling the

10

wrong number. *See id*. Notwithstanding, Navient placed fifty-five autodialed calls to Mr. Johnson's cellular telephone number thereafter. *See id*.

**III.    The Bipartisan Budget Act of 2015 does not absolve Navient of liability for autodialed calls it placed to Mr. Johnson's cellular telephone number in connection with a debt owed to or guaranteed by the United States.**

Navient placed autodialed calls to Mr. Johnson's cellular telephone number in an effort to contact Ms. Bottoms about "multiple loans," some of which Navient owned or managed, and some of which Navient serviced on behalf of the Department of Education. *See supra*, Statement of Facts, Section III n.1. Each of these autodialed calls ran afoul of the TCPA. *See supra*, Argument, Section I. And despite the Bipartisan Budget Act of 2015's amendment to the TCPA, Navient is liable for each of these autodialed calls—even those it placed to Mr. Johnson's cellular telephone number regarding a debt owed to or guaranteed by the United States.

**A.    The FCC recently made clear that the TCPA's 2015 amendment does not exempt wrong number calls, calls placed after the called party asks the caller to stop placing calls to him or her, or calls to a non-debtor.**

As part of the Bipartisan Budget Act of 2015, Congress authorized the FCC to adopt rules to "restrict or limit the number and duration" of any wireless calls "to collect a debt owed to or guaranteed by the United States." Budget Act § 301(a)(2) (amending 47 U.S.C. § 227(b)(2)). On August 2, 2016, the FCC did just that. *See In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 16-99 (adopted August 2, 2016 and released August 11, 2016) ("August 2016 Order")).

Through its rules the FCC made clear that "robocalls to wrong numbers are not covered by the exception created in the Budget Act amendments." August 2016 Order, ¶ 25. "Wrong numbers, as the Commission use[s] the term[,] . . . are 'numbers that are misdialed or entered incorrectly into a dialing system, or that for any other reason result in the caller making a call to a number

where the called party is different from the party the caller intended to reach or the party who gave consent to be called." *Id*. Here, the calls at issue are all wrong number calls. *See supra*, Statement of Facts, Section I. The Bipartisan Budget Act of 2015 does not, therefore, exempt any of them from the TCPA.

In addition, through its rules the FCC reiterated "that consumers have a right to stop the covered autodialed, artificial-voice, and prerecorded-voice servicing and collection calls to wireless numbers at any point the consumer wishes." August 2016 Order, ¶ 38. The FCC continued: "Our rules, therefore, require that zero federal debt collection calls are permitted once a debtor asks the owner of the debt or its contractor to cease federal debt collection calls. This requirement that callers immediately honor a request to stop calls applies even where the caller has previously obtained prior express consent to make federal debt collection calls." *Id*. Thus, because Navient placed fifty-five of its fifty-nine autodialed calls to Mr. Johnson's cellular telephone number after he asked Navient to stop placing calls to him, *see supra*, Statement of Facts, Section I, Navient cannot escape liability for autodialed calls it placed to Mr. Johnson's cellular telephone number regarding a debt owed to or guaranteed by the United States.

As well, through its rules the FCC articulated that "because calls made pursuant to the exception must be made 'solely to collect a debt,' the covered calls may only be made to the debtor or another person legally responsible for paying the debt." August 2016 Order, ¶ 21. In other words, "zero calls are permitted under the Budget Act amendments unless the calls are to the debtor or the person responsible for paying the debt[.]" *Id*., ¶ 44.[8] Here, at no point was Mr. Johnson

---

[8]     This argument stands on its own, as a matter of statutory construction. So even if the FCC never issued its August 2016 order, not one of Navient's autodialed calls to Mr. Johnson is exempted from the TCPA, given the plain language of the Bipartisan Budget Act of 2015's amendment to the TCPA.

responsible for paying any of the debts about which Navient placed calls to his cellular telephone number. *See supra*, Statement of Facts, Section III. As a result, the Bipartisan Budget Act of 2015 offers no protection to Navient for any of the calls at issue.

Worth mentioning, as part of the August 2016 Order, the FCC addressed, and rejected, comments that Navient offered during the rulemaking process that are particularly relevant here:

> Other commenters, however, urge the Commission to permit covered calls to persons other than the debtor. Navient, in particular, comments on the need to call the parents, relatives, and references of a borrower in order to locate the borrower. Navient writes: "[C]alling numbers obtained through skip tracing is sometimes the only way to reach a defaulted borrower." It also notes that the Department of Education requires "lenders to contact every 'endorser, relative, reference, individual, and entity' identified in a delinquent borrower's loan file as part of their due diligence efforts." Navient fails to note, however, that there is no requirement to make these contacts via robocall. Navient also makes clear in its comments that its purpose in calling relatives and references is to locate the debtor, not to collect the debt. Because the language of the Budget Act authorizes the Commission to limit calls "solely to collect a debt," our rules permit covered calls only to persons who are responsible for repaying the debt.

*Id.*, ¶ 22.

Moreover, during a July 12, 2016 hearing before the Subcommittee on Communications and Technology, United States Representative Chis Collins and the Chairman of the FCC, Tom Wheeler, engaged in an exchange during which Chairman Wheeler flatly rejected Representative Collins's interpretation that the TCPA does not apply to entities making autodialed calls on behalf of the federal government:

> *Representative Collins*: Recently the FCC did come out, and I think, took a step in clarifying that if someone is making a call on behalf of the federal government, the TCPA does not apply, other than the normal rules surrounding any call. And the debt collection people just wanted me to ask me you, chairman, kind of a yes or no that, if they're make phone calls collecting on student debt they'd like clarity that the TCPA does not apply to them.

> *Chairman Wheeler*: That's not what we said. We said that the TCPA applies and that there are rules inside that. So the Congress, you all passed a statute saying that federal debt collection should be allowed under the TCPA. Then we said that there are several tests here under that. So for instance, is that the debt needs to be delinquent . . . that there should be a limit on the number of calls that can be made a month . . . its three calls a month . . . that there ought to be a right to request, for the consumer to request, to say, STOP, that's at the core of the TCPA, that I've got the right to say that I don't want to be harassed, and if the consumer wants to say please don't be making these calls anymore that's at the core of the TCPA.

https://energycommerce.house.gov/hearings-and-votes/hearings/oversight-federal-

communications-commission-3 at 3:52:40 - 3:55:55.

The Bipartisan Budget Act of 2015, therefore, provides Navient no relief from liability for

placing autodialed calls to Mr. Johnson's cellular telephone number regarding a debt owed to or

guaranteed by the United States.

**B.   Even if the Bipartisan Budget Act of 2015 exempted from the TCPA the calls at issue—it does not, as the FCC recently confirmed—the TCPA's 2015 amendment is not retroactive and is therefore inapplicable here.**

"[T]he presumption against retroactive legislation is deeply rooted in our jurisprudence,

and embodies a legal doctrine centuries older than our Republic." *Landgraf v. USI Film Prods.*,

511 U.S. 244, 265 (1994). This is, in part, because "[r]etroactive legislation presents problems of

unfairness that are more serious than those posed by prospective legislation, because it can deprive

citizens of legitimate expectations and upset settled transactions." *Gen. Motors Corp. v.

Romein*, 503 U.S. 181 (1992). As such, the "principle that the legal effect of conduct should

ordinarily be assessed under the law that existed when the conduct took place has timeless and

universal appeal." *Landgraf*, 511 U.S. at 265.

Acknowledging this, the Supreme Court made clear that "congressional enactments and

administrative rules will not be construed to have retroactive effect unless their language requires

this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988). The exception to this

rule is the "[a]pplication of a new jurisdiction rule" that "takes away no substantive right but simply changes the tribunal that is to hear the case." *Landgraf*, 511 U.S. at 274. In such a case, "[p]resent law normally governs . . . because jurisdictional statutes 'speak to the power of the court rather than to the rights or obligations of the parties.'" *Id.* (quoting *Republic Nat'l Bank of Miami v. United States*, 506 U.S. 80, 98 (1992)).

But if a statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed," it does not apply retroactively "absent clear congressional intent favoring such a result." *Landgraf*, 511 U.S. at 280. That is, if the application of a statute in a retroactive manner "would have a retroactive consequence in the disfavored sense of 'affecting substantive rights, liabilities, or duties [on the basis of] conduct arising before [its] enactment,'" *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37-38 (2006) (quoting *Landgraf*, 511 U.S. at 278)), "we then apply the presumption against retroactivity by construing the statute as inapplicable to the event or act in question owing to the 'absen[ce of] a clear indication from Congress that it intended such a result.'" *Id.* (quoting *INS v. St. Cyr*, 533 U.S. 289, 316 (2001)).

Here, if applied to pre-enactment conduct, the TCPA's 2015 amendment would nullify Mr. Johnson's substantive right—a right that existed both when Navient placed the telephone calls at issue and when Mr. Johnson filed his class action complaint. Among these would-be-disturbed rights are the right to be left alone, the right to be free from an invasion of privacy, the right to be free from private nuisance, and the right to seclusion.

Indeed, Congress enacted the TCPA to prevent automated and prerecorded calls by companies that escaped state invasion of privacy and nuisance statutes by operating interstate. *Mims v. Arrow Fin. Servs., LLC*, 132 S. Ct. 740, 745 (2012). It did so in response to "[v]oluminous

consumer complaints about abuses of telephone technology," *id*., and after finding that "automated or prerecorded telephone calls made to private residences . . . were rightly regarded by recipients as an invasion of privacy." *Id*. With this in mind, "[c]ourts have consistently held [not only that] the TCPA protects a species of privacy interests in the sense of seclusion," but also that "[i]t is clear that Congress viewed violations of the Act as 'private nuisances' and 'invasions of privacy' under ordinary, lay meanings of these phrases." *Park Univ. Enters., Inc. v. Am. Cas. Co. of Reading, Pa.*, 442 F.3d 1239, 1249 (10th Cir. 2006).

These privacy interests, codified by the TCPA, are substantive rights under the Supreme Court's retroactivity jurisprudence as they constitute actual rights and duties, as opposed to a mere mechanism or steps by which rights and duties may be defined or enforced. *See* 137 Cong. Rec. 16204, 16206 (Nov. 7, 1991) (statement of Sen. Hollings), available at ftp://ftp.fcc.gov/pub/Bureaus/OSEC/library/legislative_histories/1426.pdf (noting, while introducing a bill containing one of the private causes of action codified as part of the TCPA: "I echo Supreme Court Justice Louis Brandeis, who wrote 100 years ago that 'the right to be left alone is the most comprehensive of rights and the one most valued by civilized man.'"); *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, FCC 16-72 (adopted June 8, 2016 and released July 5, 2016) ("In 1991, Congress enacted the TCPA to address certain calling practices that can invade consumer privacy[.]"); *accord Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (explaining that the retroactivity analysis turns on the distinction between "substantive" and "purely procedural" effect); *Landgraf*, 511 U.S. at 290-91 (Scalia, J., concurring) (clarifying that the majority's use of the phrase "vested rights" was employed to differentiate substantive rights from procedural ones, and referring to the "vested rights" test as "substance-*vs.*-procedure"); *In re Watkins*, 810 F.3d 375, 381 (6th Cir. 2015)

(articulating the "substantive versus procedural dichotomy" underlying the Supreme Court's "general principle of nonretroactivity").[9]

Consequently, because neither the text of the TCPA in its current form, 47 U.S.C. § 227, nor the Bipartisan Budget Act of 2015 by which Congress most recently amended the TCPA, PL 114-74, November 2, 2015, 129 Stat 584, includes any language indicating that Congress intended the TCPA's 2015 amendment to apply retroactively—much less "clear, strong, and imperative language requiring retroactive application," *Landgraf*, 511 U.S. at 270 (quoting *United States v. Heth*, 7 U.S. 399, 413, 2 L. Ed. 479 (1806) (Paterson, J.))—the exclusion for telephone calls "made solely to collect a debt owed to or guaranteed by the United States," 47 U.S.C. § 227(b)(1)(A)(iii), cannot apply to Mr. Johnson's claim.

Of note, the Seventh Circuit, in the context of the Fair Credit Reporting Act ("FCRA"), rejected a retroactivity-based argument indistinguishable from that necessary to suggest the TCPA's 2015 amendment applies to Mr. Johnson's claim. Specifically, in *Killingsworth v. HSBC Bank Nevada, N.A.*, the Seventh Circuit considered "whether an amendment to the [FCRA] eliminating private rights of action has an impermissible retroactive effect when applied to FCRA claims that accrued prior to the amendment's effective date." 507 F.3d 614, 616 (7th Cir. 2007). It answered the question in the affirmative.

The facts and procedure underlying *Killingsworth* are as follows: The plaintiff alleged that the defendant violated a provision of the FCRA sometime in August 2004. *Id*. In December 2004, Congress amended the FCRA in a manner that eliminated the ability to enforce the subject

---

[9]     Importantly, the Supreme Court's *Ex Post Facto* Clause jurisprudence, from which the Court's retroactivity test borrows directly, hinges on a substantive-procedural line. *See Miller v. Florida*, 482 U.S. 423, 433 (1987) ("[T]he *ex post facto* prohibition does not restrict legislative control of remedies and modes of procedure which do not affect matters of substance.").

provision by private civil suit. *Id*. The defendant then moved to dismiss the plaintiff's claim based on the December 2004 amendment. The plaintiff responded by arguing that the amendment "impair[ed] rights [she] possessed prior to the new statute's effective date and therefore had an impermissible retroactive effect if applied to [her]. *Id*. at 617. And although the district court dismissed the plaintiff's claim, the Seventh Circuit later adopted the plaintiff's position, and reversed the district court's decision. *Id*.

Beginning its analysis, the Seventh Circuit noted that "[w]hen it is not clear whether a statute is meant to apply retrospectively, prospectivity remains the appropriate default rule." *Id*. It then outlined the question before it as "whether the application of the FACTA amendment eliminating private rights of action would 'impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed.'" *Id*. (quoting *Landgraf*, 511 U.S. at 280)). The Seventh Circuit confirmed it would:

> Killingsworth alleges that Household's FCRA violation occurred prior to August 20, 2004, before the December 1, 2004 effective date of § 1681m(h)(8), when she had a right to a private cause of action for [statutory] damages under the statute. That preexisting substantive right would be impaired if FACTA's amendment eliminating private rights of action were applied retrospectively. The amendment therefore has an impermissible retroactive effect on claims like Killingsworth's that accrued prior to its December 1, 2004 effective date.

*Id*. at 623.

Accordingly, any suggestion that the Bipartisan Budget Act of 2015 provides Navient a defense to Mr. Johnson's claim does not withstand scrutiny—notwithstanding the FCC's clear and recent guidance.

18

IV.     **Navient's conduct in placing autodialed calls to Mr. Johnson's cellular telephone number was willful and knowing.**

The TCPA states that a plaintiff may bring "an action to recover for actual monetary loss from [a violation of the TCPA], or to receive $500 in damages for each such violation, whichever is greater." 47 U.S.C. § 227(b)(3)(B). That means a defendant is liable for no less than $500 in damages for each of its violations of the TCPA. *Kenro, Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1167 (S.D. Ind. 1997) ("§ 227(b)(3)(B) . . . provides for a minimum penalty of § 500 for each violation of the TCPA");[10] *see also Soppet*, 679 F.3d at 639 ("§ 227(b)(3) . . . authorizes an award of actual damages, or $500 per violation, whichever is greater"); *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1105 (11th Cir. 2015) ("In plain terms, the statute allows a person to recover '$500 in damages for each' 'violation of this subsection.' Section 227(b)(1) has no language limiting the recovery to $500 per 'call' or 'fax.'") (internal citations omitted).

The TCPA also permits a court to treble the mandatory $500 per-violation award "[i]f the court finds that the defendant willfully or knowingly violated" the TCPA. 47 U.S.C. § 227(b)(3)(C); *see also Soppet*, 679 F.3d at 639 (explaining that the $500 per violation awards are "trebled for wilful violations"). The operative question is then: What constitutes a knowing and willful violation?

Although the TCPA does not define "willfully," the Communications Act—of which the TCPA is a part—does. It states that "the term willful . . . means the conscious and deliberate commission or omission of such act, irrespective of any intent to violate any provision of this

_____

[10]     Of note, this Court, in *Kenro*, considered and rejected the defendant's argument that a minimum damage award of $500 per violation under the TCPA is so severe and oppressive and wholly disproportional to any related offense that it is obviously unreasonable and violates due process. 962 F. Supp. at 1167 ("For the reasons discussed above, we find that § 227(b)(3)(B), which provides for a minimum penalty of § 500 for each violation of the TCPA, does not violate the Due Process clause of the Fifth Amendment").

chapter." 47 U.S.C. § 312 (emphasis added). Of course, "[i]dentical words used in different parts of the same act are intended to have the same meaning." *Sullivan v. Stroop*, 496 U.S. 478, 484 (1990). It follows, therefore, that a court may treble the TCPA's mandatory $500 per-violation award where a defendant consciously places the autodialed calls at issue—even if the defendant does not specifically intend to violate the TCPA.

This reasoning finds support in Supreme Court precedent. Specifically, in *Smith v. Wade*, the Court made clear that "'willfulness' d[oes] not mean intent to cause injury, but only voluntary action":

> Wilful . . . generally, as used in courts of law, implies nothing blamable, but merely that the person of whose action or default the expression is used is a free agent, and that what has been done arises from the spontaneous action of his will. It amounts to nothing more than this: that he knows what he is doing, and intends to do what he is doing, and is a free agent. And wilfully does not imply that an act done in that spirit was necessarily a malicious act[.]

461 U.S. 30, 41 n.8 (1983) (citation omitted).

It is also in line with the FCC's interpretation—that "[w]illful . . . means that the violator knew that he was doing the act in question . . . . A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance." *In re Dynasty Mortg., LLC*, 22 F.C.C. Rcd. 9453, 9470 n.86 (May 14, 2007).

Moreover, a close look at the term "knowing" mandates the same conclusion—that a court may treble the TCPA's mandatory $500 per-violation award even if a defendant does not know that its conduct violates the TCPA. Stating as much, the Eleventh Circuit explained that "the intent for treble damages [under the TCPA] does not require any malicious or wanton conduct, but rather is satisfied by merely 'knowing' conduct." *Alea London Ltd. v. Am. Home Servs., Inc.*, 638 F.3d 768, 776 (11th Cir. 2011), *cert. denied*, 132 S. Ct. 553 (2011). And courts in the Seventh Circuit

20

have noted the same. For example, in *Sengenberger v. Credit Control Servs., Inc.*, the Northern District of Illinois held that the defendants "knowingly and willfully made the phone calls," based upon nothing more than a finding that they "intentionally made the contested phone calls to Plaintiff." No. 09C2796, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010), *adhered to on reconsideration*, 2010 WL 6373008 (N.D. Ill. June 17, 2010).

As well, the District of Kansas recently held that a willful or knowing violation of the TCPA occurs simply where the defendant's action is intentional:

> This Court chooses to follow the direction of the FCC and those courts who have found that the plaintiff need not prove that the defendant had knowledge of the TCPA's provisions to establish a knowing or willful violation. Rather, the Court finds that "to establish a *knowing* violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of the law."

*Lee v. Loandepot.com, LLC*, No. 14-CV-01084-EFM, 2016 WL 4382786, at *8 (D. Kan. Aug. 17, 2016); *accord Charvat v. Ryan*, 2007-Ohio-6833, 116 Ohio St. 3d 394, 399 (2007) ("[T]o establish a knowing violation of the TCPA for an award of treble damages, a plaintiff must prove only that the defendant knew that it acted or failed to act in a manner that violated the statute, not that the defendant knew that the conduct itself constituted a violation of law.").

Here, whether a willful or knowing violation requires Navient's knowledge that placing autodialed calls to cellular telephone numbers absent prior express consent violated the TCPA is largely academic. This is because Navient knew full well that the TCPA prohibited its intentional autodialed calls to Mr. Johnson's cellular telephone number.

To be sure, Navient does not dispute that it deliberately placed autodialed calls to Mr. Johnson's cellular telephone number. And Navient placed the calls at issue understanding not only that the TCPA prohibited it from placing autodialed calls to wrong numbers, but also that placing

21

autodialed calls to wrong numbers subjected itself to liability under the TCPA. *See supra,* Statement of Facts, Section VI; *see also* August 2016 Order, ¶ 22 (rejecting Navient's request to exempt from the TCPA particular types of autodialed calls). Additionally, Navient has twice agreed to settle class-wide claims that it violated the TCPA on a massive scale. *See supra*, Statement of Facts, Section VI n.4. Nonetheless, Navient willfully and knowingly—by any sense of the terms—placed fifty-five autodialed calls Mr. Johnson's cellular telephone number after its own records designated it as a wrong number, and after it assured Mr. Johnson the calls would stop. *See id.*, Section I.

## Conclusion

"Butting your head against a bureaucratic wall is no fun." *Talley v. U.S. Dep't of Agric.*, 595 F.3d 754, 756 (7th Cir. 2010), *reh'g en banc granted, opinion vacated* (June 10, 2010), *on reh'g en banc*, No. 09-2123, 2010 WL 5887796 (7th Cir. Oct. 1, 2010). But that is exactly what Navient forced Mr. Johnson and hundreds of thousands of class members to do in refusing to stop placing autodialed calls to their cellular telephones after having been made aware that they were wrong numbers.

Specifically, Navient placed fifty-five autodialed calls to Mr. Johnson's cellular telephone number after he informed Navient, on several occasions, that it was calling the wrong number. And Navient placed millions more autodialed calls to hundreds of thousands other class members after memorializing those class members' statements that Navient was calling the wrong number.

Considering this, it is not surprising that the United States District Court for the Middle District of Florida very recently granted summary judgment in favor of a plaintiff on her claims against Navient under the TCPA. *See McCaskill*, 2016 WL 1367228, at *8 ("Plaintiff's Motion for Partial Summary Judgment as to Defendants' liability [for 727 autodialed calls it placed without

22

prior express consent] on the TCPA claims (Counts I and III) is granted."). And pertinent here, the

factual scenario in the *McCaskill* matter is similar to that underlying Mr. Johnson's claim:

> Q. Tell me everything you can remember about the conversation with Heather.
>
> A. Okay. I wrote it down so I could remember. Our conversation was, I received a call. Okay. And she called the cell phone and she was calling for Maretta Newsome.
>
> And I told her that I was sure that she had caller ID and she could see that was not Maretta Newsome's phone number. Okay.
>
> And she said, "I need to give"—she told me, "I need to give Maretta her message." And I told her this was the wrong person and I am not her messenger to deliver her calls. Then Heather asked me if I knew her. I said yes. And I told her, why doesn't she just call Maretta herself. And she gave her phone number, she gave me her phone number, which was [-8617]. And she said—gave me the phone number for Maretta. And then I told her that phone number was correct. And she said, "Maretta does not answer her phone."
>
> And I'm not surprised, because she doesn't. *I asked her not to call my cell phone anymore about a student loan. I told Heather I have never had a student loan in my life and I don't have anything to do with anybody else's loans. Not at all. And the call ended. And then after that I was just bombarded with phone calls.*

*Id.* at *2-3 (emphasis added).

So just as the Middle District of Florida found Navient liable for violations of the TCPA

in the *McCaskill* matter, Navient is liable here to Mr. Johnson and the class members for each call

it placed to their respective cellular telephone numbers after they informed Navient it was calling

the wrong number.[11] And since Navient placed the calls at issue willfully and knowingly, this

Court should award Mr. Johnson and the class members $1,500 per violation.

---

[11]   Navient is able to determine the exact number of autodialed calls it placed to each class member after it designated each class member's respective cellular telephone number as a wrong number. *See* Doc. 119 at 11-12; Doc. 100-4 at 20, ¶¶ 52-53.

Date: September 2, 2016                Respectfully Submitted,

                                       */s/ Aaron D. Radbil*
                                       Aaron D. Radbil
                                       Greenwald Davidson Radbil PLLC
                                       106 East Sixth Street, Suite 913
                                       Austin, Texas 78701
                                       Phone: (512) 322-3912
                                       Fax: (561) 961-5684
                                       aradbil@gdrlawfirm.com

                                       Michael L. Greenwald
                                       James L. Davidson
                                       Jesse S. Johnson (*pro hac vice*)
                                       Greenwald Davidson Radbil PLLC
                                       5550 Glades Road, Suite 500
                                       Boca Raton, Florida 33431
                                       Tel: (561) 826-5477
                                       Fax: (561) 961-5684
                                       mgreenwald@gdrlawfirm.com
                                       jdavidson@gdrlawfirm.com
                                       jjohnson@gdrlawfirm.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was electronically filed on September 2, 2016, via the

Court Clerk's CM/ECF system, which will provide notice to all counsel of record.

                                       */s/ Aaron D. Radbil*
                                       Aaron D. Radbil