**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| RANDY JOHNSON, on behalf of himself and others similarly situated,<br><br>       Plaintiff,<br><br>v.<br><br>NAVIENT SOLUTIONS, INC., f/k/a SALLIE MAE, INC.,<br><br>       Defendant. | Case No. 1:15-cv-0716 LJM-MJD |

**DEFENDANT NAVIENT SOLUTIONS, INC.'S OPPOSITION**
**TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

## I.      Introduction

In his Motion for Summary Judgment (the "Motion"), plaintiff Randy Johnson ("Johnson") asks the Court to impose an unsupported and staggering liability — which could total approximately $14 billion — against defendant Navient Solutions, Inc. ("NSI") under the Telephone Consumer Protection Act, 47 U.S.C. § 227, et seq. (the "TCPA").[1]   The TCPA prohibits, among other things, making calls to a cellular telephone through an automatic telephone dialing system without the called party's prior express consent.   See 47 U.S.C. § 227(b)(1).  Johnson alleges that NSI called him and the members of the class certified on July 27, 2016 using an automatic telephone dialing system after NSI had been informed that it was calling wrong numbers.  NSI is a servicer of student loans, including loans owned or guaranteed by the United States Department of Education (the "Department"), and it makes telephone calls in connection with its servicing efforts.

However, the Court should deny the Motion because essential facts are in dispute, Johnson fails to address governing precedent on fundamental issues (including from the United States Supreme Court), and NSI possesses significant defenses to the asserted TCPA claims. Further, the Motion is premised upon a profoundly flawed assumption and, as a result, Johnson has chosen to present no evidence on the class claims.  As the Court knows from the Motion for Class Certification (the "Certification Motion"), Johnson will attempt to identify the class members by using a "reverse lookup" methodology.  At the conclusion of that process, setting aside the fact that the result will be incorrect in large part (for example, the reverse lookup identifies Johnson's former girlfriend as the user of the cell phone that he contends is his), a list of names will be generated.  In the instant Motion, Johnson assumes that he establishes liability

---

[1]  NSI recognizes that, in the Motion, Johnson does not seek an adjudication of damages. However, he purports to include 9,688,533 supposedly improper calls in the Motion, and seeks a finding that trebled statutory damages — i.e., in the amount of $1,500 — apply to each call.

as to all of the class members by simply pointing to the fact that NSI's records show at least one outbound autodialing attempt to a cell phone number associated with a name on the list after NSI was informed that such number was supposedly wrong.  As explained below, this assumption is very clearly incorrect — there are numerous disputed issues of fact, as well as applicable law that entirely defeats the claims.  Indeed, through the Motion, Johnson fails to prove up his own claims, much less the class claims.

First, Johnson contends that he was the user of the specified cell phone number  (the "Cell Number") from April 18, 2014, to May 5, 2015, when NSI made the challenged calls to that number.  Obviously, proof of these facts is essential to Johnson's own claims; however, the facts are disputed.  During that time, the public records upon which Johnson will rely for the reverse lookup show that the Cell Number was used by Marie Bottoms ("Bottoms"), his former girlfriend.  Those records do not reflect Johnson as the user until December 24, 2015, long after the calls were made.

Further, as fully addressed in NSI's own Motion for Summary Judgment ("NSI's Motion"), NSI has tendered to Johnson the full amount of statutory damages that he could recover here under the TCPA.  Therefore, pursuant to the rationale of the United States Supreme Court in Campbell-Ewald Co. v. Gomez, 136 S. Ct. 663 (2016), he cannot establish Article III standing in this Court.

Moreover, while Johnson purports to establish his claims with respect to fifty-five calls made to the Cell Number, the phone service was turned off for lengthy periods of time and, in other instances, the calls were not connected for various reasons.  In Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1550 (2016), the United States Supreme Court stated the analysis that must be applied to Article III standing in the context of claims for statutory damages (such as the claims

here).  That analysis turns on "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual and imminent, not conjectural or hypothetical.'"  <u>Id.</u> at 1548 (quoting <u>Lujan v. Defenders of Wildlife</u>, 504 US 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)).  Under this standard, obviously, a phone that does not ring is of no consequence at all.  Thus, Johnson does not carry his burden of demonstrating standing even as to the calls that he challenges on his own behalf.

<u>Second</u>, Johnson offers <u>no</u> evidence whatsoever on the class claims.  As an initial matter, Johnson presupposes that every number marked by NSI in its records as a wrong number disposition was, in fact, a wrong number.  But this is not true.  As stated in the Declaration of Patty Peterson ("Peterson Decl."), some numbers that were marked as wrong numbers were changed to the code "RPC" (Right Party Contact) because customer service representatives subsequently talked to the borrowers at those numbers.  (Peterson Decl. at ¶ 7, attached as Exhibit A.)  In addition, Johnson has not introduced <u>any</u> evidence demonstrating that: (1) any class member owned or used a cell phone that NSI called during the class period, which, again, is the fundamental basis of a claim under the TCPA; and (2) the calls were connected to that class member, such that standing exists under <u>Spokeo</u>.

<u>Third,</u> even setting aside the issues above, which are more than enough to defeat the Motion, the instant claims fail as a matter of law.  For instance, NSI is immune from TCPA liability with respect to the loans that NSI services for the Department.  In a July 5, 2016 declaratory ruling, the Federal Communications Commission (the "FCC") made clear that both the federal government and agents working on its behalf are not subject to the TCPA.  Meanwhile, through the enactment of the Bipartisan Budget Act of 2015, Public Law 114-74, § 301(a)(2) (the "Budget Act"), Congress also insulated entities from TCPA liability for calls

made on obligations owned or guaranteed by the federal government.  That enactment applies here to further bar all claims for calls made by NSI on class members' federal loans after November 1, 2015 (the calls to Johnson took place before that time).

Finally, even if Johnson were entitled to summary judgment in any degree here (and, for the reasons stated above, he is not), he could not recover the $1,500 per call award of statutory damages that he seeks.  This award is available only for willful violations and, very simply, Johnson overstates the legal standard applicable to such violations and, further, the calls at issue here resulted from error.  Moreover, Johnson's request for entry of judgment for the class on this wholly inadequate record (to say the least) raises significant and obvious due process concerns, including (1) under the analysis stated in Mullins v. Direct Digital, LLC, 795 F. 3d 654, 669-70 (7th Cir. 2015), which contemplates the presentation of defenses after class certification, and (2) with respect to the potential imposition of annihilating damages.

In sum, this case is not amenable to disposition by summary judgment.  The Court should deny the Motion in its entirety.

## II.   Statement of Material Facts in Dispute

### A.   Disputed Facts Asserted in the Motion[2]

Johnson's Statement of Material Facts (Motion, pp. 2-8) makes a number of assertions that are clearly in dispute and therefore preclude summary judgment:

- "Navient placed fifty-five autodialed calls to Mr. Johnson's cellular telephone number after he informed it that it was calling a wrong number."  (Motion, p. 2.)

  Nature of dispute:  As set forth in greater detail below, NSI does not dispute that it attempted to make 55 calls to the cellular telephone number.  However, there is a genuine

---

[2] Pursuant to Local Rule 56-1(f)(1)(A), NSI will specifically controvert these "facts" with admissible evidence in this Opposition.

issue of materials dispute as to both (1) whether Johnson was the called party, and (2) whether those calls actually connected and rang on any cellular telephone.

- "Navient did not obtain, or even attempt to obtain, permission from Mr. Johnson to place autodialed calls to his cellular telephone number, or to leave messages on his cellular telephone voicemail by using an artificial or prerecorded voice." (Motion, p. 4.)

  Nature of dispute: As set forth in greater detail below, there is a genuine issue of material dispute as to whether Johnson was the owner of the phone from whom consent would be required.

- "Navient knew it was placing autodialed calls to telephone numbers it designated as wrong numbers, and was aware it was prohibited from doing so." (Motion, p. 7.)

  Nature of dispute:  As set forth in greater detail below, there is a genuine issue of material dispute as to whether NSI's alleged conduct was knowing and willful.  Moreover, although Johnson fails to actually allege facts to support a claim of wrong number calls made to the class, NSI disputes in this Opposition that the calls to the class were, in fact, wrong number calls.

## B.   Potentially Determinative Facts Not Addressed in the Motion[3]

### 1.   The TCPA

The TCPA makes it unlawful for "any person within the United States" to place autodialed or prerecorded- or artificial-voice calls to wireless telephone numbers, except with the prior express consent of the called party or in an emergency, or unless the call is solely to collect a debt owed to or guaranteed by the United States."  See 47 U.S.C. § 227(b)(1) (2015.)  The

---

[3] Pursuant to Local Rule 56-1(b), this section and the supporting affidavits present evidence not already in the record that NSI relies on to oppose the Motion.  Under Local Rule 56-1(f)(2), these facts should be assumed true because they are supported by admissible evidence.

underlined language was added through the Budget Act, and was effective as of November 1, 2015.   The term "person," as applicable to the TCPA, "includes an individual, partnership, association, joint-stock company, trust, or corporation."   See Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Broadnet Teleservices LLC Petition for Declaratory Ruling, et. al., CG Docket No. 02-278, Declaratory Ruling at 5, FCC 16-72 (July 5, 2016) (the "Broadnet Ruling"), attached as Exhibit B; see also 47 U.S.C. § 153(39.)

The TCPA was enacted to protect the privacy interests of telephone subscribers through various restrictions on the use of automated telephone equipment.   See S. Rep. No. 102- 178, 102nd Cong., 1st Sess. (1991).   The remedies for a violation of the TCPA are set forth in 47 U.S.C. § 227(b)(3), and include statutory damages of $500 per call for a negligent violation and up to $1,500 per call for a willful violation.   Pursuant to a grant of authority from Congress, the FCC issues rules and regulations interpreting and implementing the TCPA.   See 47 U.S.C. § 227(b)(2).

### 2.      Johnson And The Disputed Calls

NSI made fifty-five calls to the Cell Number between April 18, 2014, and May 5, 2015 in an effort to reach Bottoms about her federal student loans.  (Peterson Decl., ¶ 4.)  Bottoms was a close friend of Johnson's (and then his girlfriend), and she lived with him periodically.  Over the course of their relationship, Johnson acknowledges that he allowed Bottoms to use his cell phone (as he also allowed other friends and family to do, as well).  (Deposition Excerpts of Randy Johnson ("Johnson Depo."), attached as Exhibit C, 14:2-12; 17:3-23; 22:14-21.)  NSI spoke with Bottoms on a few occasions and, during a call on April 18, 2014, she confirmed the Cell Number as her own and provided NSI with consent to call.  (Peterson Decl., ¶ 4; Motion, pp. 6-7.)

On September 11, 2014, Johnson first informed NSI that it supposedly was calling the Cell Number in error.  (Peterson Decl., ¶ 5; Motion, p. 4.)  However, the Cell Number remained

6

associated with Bottoms in public records until December 24, 2015.  (Declaration of Margaret A. Daley ("Daley Decl.," ¶¶55-56, attached as Exhibit D.))  For this reason, as explained below, the Cell Number was re-associated with Bottoms's account several times during skip tracing.

No matter who used the Cell Number, however, Johnson's Sprint records show that he used a pre-paid Boost Mobile plan — for which he paid $40 per month — but his service was disconnected and reinstated no fewer than 13 times, and 6 of those periods of no service occurred between September 2014 and the filing of this action.  (See Daley Decl., ¶ 45.)

NSI made, at most, fifty-nine outbound dial attempts to the Cell Number.  (Motion at p. 1).  Fifty-five of those attempts were made after Johnson notified NSI that it had the wrong number.  Id.  However, because Johnson's cell phone service was cut off multiple times during the relevant period, the number of connected calls is fewer.  (See Daley Decl., ¶ 53, Exh. D; Declaration of Joshua Dries ("Dries Decl.," ¶ 3-4, attached as Exhibit E.))

Nevertheless, even if all fifty-nine calls were actionable, the maximum statutory damages award would be $88,500.00.  See 47 U.S.C. § 227(b)(3) (providing for damages of $500 for each violation or up to three times that amount if the court finds that the defendant acted willfully or knowingly.)  Without making any admissions or waiving any defenses, NSI tendered a check to Johnson (through his counsel) on June 13, 2016, in the amount of $90,000.00.  (Declaration of Lisa Simonetti ("Simonetti Decl."), ¶ 3, attached as Exhibit F)  Through this check, NSI provided Johnson with complete, individual relief.  Johnson has not returned the check.  (Id.)

### 3.    NSI And Its Servicing Of Student Loans

NSI is engaged in the business of servicing student loans, including loans that are owned or guaranteed by the Department.  (See Peterson Decl., ¶ 3.)  Of the approximately 270,000 class members, 90 percent have federal loans.  (Peterson Decl., ¶ 3.)

7

With respect to the servicing of the federal loans, a critical objective is default prevention. As defined by the Department's Office of Federal Student Aid ("FSA"), "default" is the failure to repay a loan according to the terms agreed to in the borrower's promissory note. (Declaration of Kevin Woods ("Woods Decl."), ¶ 6, attached as Exhibit G.)  For most federal student loans, a loan is considered to be in default status if a payment has not been made for more than 270 days.  (Simonetti Decl., ¶ 3.)  As a matter of law, there are significant consequences for borrowers who are more than 270 days delinquent, including the fact that the entire balance and any interest is immediately due and payable.  (Simonetti Decl., ¶ 5.)  Since 2009, the Department has repeatedly approved NSI's use of autodialed calls on federal loans in connection with default prevention.

### 4.   Overview Of Servicing For The Department

The Department, through FSA, contracts with certain, select servicing entities, including NSI (the "Servicers"), to manage the servicing of millions of federal student loans.  The Servicers are responsible for collecting payments, advising borrowers on resources and benefits to better manage their federal loan obligations, responding to customer service inquiries and performing other administrative tasks.  (Woods Decl., ¶ 3; see also Simonetti Decl., ¶ 6)  However, as noted above, a fundamental goal of servicing is default prevention.

As a result, the Department assigns new loan volumes to the Servicers based on a common set of metrics used to measure performance, which turn in large part on default prevention.  (See Woods Decl., ¶ 6; see also Simonetti Decl., ¶ 7.)  For instance, the metrics in place from the quarter ending June 30, 2011, to the quarter ending June 30, 2014, for measuring the success of default prevention efforts used the percentage of borrowers and percentage of dollars in each Servicer's portfolio that went into default.  (Woods Decl., ¶ 6; see, e.g., Simonetti Decl., ¶ 8.)

8

In August 2014, the Department renegotiated the contracts with the Servicers and "strengthened incentives for [the Servicers] to . . . help borrowers stay up-to-date on their payments."  (Woods Decl., ¶ 8; <u>see also</u> Simonetti Decl., ¶ 9.)  The Department explained that "[t]he performance-based contract renegotiations emphasize the importance of helping borrowers stay current on their loans and avoid default, while also incentivizing customer satisfaction." (Simonetti Decl. ¶ 9.)

Under the strengthened incentives, the Department adopted new and weighted metrics. As of the quarter ending September 30, 2014, the metrics measure: the percentage of borrowers that are not more than 5 days delinquent (30% of the overall performance score); the percentage of borrowers that are more than 90 days, but less than 271, days delinquent (15% of the overall performance score); and the percentage of borrowers for whom a delinquency is more than 270 days and less than 361 days (15% of the overall performance score.)  There also are metrics for borrower survey results (35% of the overall performance score) and federal personnel survey results (5% of the overall performance score.)  (Woods Decl., ¶ 9; <u>see also</u> Simonetti Decl., ¶ 10.)

### 5.    NSI's Servicing For The Department

In June 2009, NSI entered into its Indefinite Delivery/Indefinite Quantity contract with FSA, with one 5-year base period and one additional 5-year optional ordering period (the "Department Contract").[4]  (Woods Decl., ¶ 3; Ex. A (Department Contract at § B.13.A at p. 10).)

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

---

[4]    The Department Contract and related documents reference "Sallie Mae."  In May 2014, in connection with a corporate reorganization, Sallie Mae, Inc. changed its name to Navient Solutions, Inc. (i.e., NSI).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

████████████████████████████████████

████████████████████████████████████

█████████████████████████████████████

█████████████████████████████████████

████████████████████████████████

Since that time, the Department also has re-emphasized the importance of default

prevention.   For example, ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

10



        **a.**      **The Department's Approval Of NSI's Autodialing
Practice For Purposes Of Default   Prevention**

Since 2009, the Department has approved NSI's autodialing practice as part of its default

prevention process.



---

[5]   Indeed, the servicing of loans owned or guaranteed by the Department is governed by a complex set of federal regulations.  See 34 C.F.R. §§ 682.400-682.423.  As relevant here: (1) when loans are delinquent, NSI is required to contact the borrowers (34 C.F.R. § 682.411(c)-(f)); and (2) when a servicer cannot reach a borrower with the information in such borrower's records, it must diligently attempt to locate him, including through searches of public records for telephone numbers (34 C.F.R. § 682.411(h)(1).)



At no point in time during contract performance has FSA restricted NSI's use of autodialing as a method of reaching borrowers.

### b. NSI And The Alleged Wrong Numbers

NSI has a practice in place to make notations of wrong numbers. When informed of a wrong number, a customer service representative manually enters a code into the autodialer system records. (Peterson Decl., ¶ 6.) This notation has the effect of blocking further calls to the number through the autodialer for that day. In a second step, the representative manually removes the telephone number from the borrower's master account record, which is housed in a different database system, to permanently prevent future calls. (Id.)

Importantly, though, not every wrong number notation in NSI's system relates to a true wrong number. As explained above, NSI places calls to borrowers whose loans are delinquent. Some of these borrowers falsely claim that the numbers are wrong so as to avoid further attempts to collect valid debts. This is demonstrated by the fact that some numbers marked as wrong numbers were eventually changed to the Right Party Contact ("RPC") code because agents

12

subsequently spoke with the borrowers at those numbers (and further entered codes related to promises to pay, or not, during the conversations – i.e., No Promise to Pay, "NP," or Promise to Pay, "PP").  Further, a representative could select the wrong number code from the dialer's drop-down menu by mistake.  (Peterson Decl., ¶ 7.)

However, since the filing of this action, NSI has discovered certain system flaws that can allow allegedly wrong numbers to be re-added to the autodialing queues.  (Peterson Decl., ¶ 9.) Overall, NSI services three types of student loans: (i) Direct Loans and Federal Family Education Loan program ("FFELP") loans owned by the Department; (ii) federally guaranteed FFELP loans owned by companies related to NSI and by others; and (iii) non-guaranteed private loans owned by companies related to NSI and others.  Pursuant to data handling requirements imposed by the Department, the servicing of federally owned Direct Loans and FFELP Loans and all other types of student loans serviced by NSI are performed on completely different, segregated systems.  (Id.)  At NSI, those systems are known as (i) CLASS ED for the loans owned by the Department; (ii) CLASS Commercial for federally guaranteed FFELP loans owned by companies related to NSI and others; and (iii) FDR for the non-guaranteed private loans owned by companies related to NSI and others.  (Id.)

By contract with the Department, NSI is prohibited from sharing some types of information about borrowers who owe Direct Loans and FFELP loans owned by the Department on the CLASS ED system with the other two systems.  (Peterson Decl., ¶ 10.)  At the same time, though, NSI undertakes skip-tracing for new or additional phone numbers for borrowers who cannot be reached and, in fact, is required under the Higher Education Act to do so on both the Direct Loans and FFELP loans owned by the Department and the federally guaranteed FFELP loans owned by companies related to NSI and others.  (Id.)  NSI also receives data feeds from the

13

Department or various state agencies acting as guarantors on behalf of the Department.  (Id.)
Accordingly, numbers are located through public records by customer service representatives
working on the federal loans or the private loans or received via the data feeds from the
Department or various state agencies, and added to CLASS ED, CLASS Commercial or FDR.
(Id.)

Meanwhile, the system that NSI uses to track consents for autodialing — called "CIS" —
sometimes does not receive the information when a number was removed from CLASS ED,
CLASS Commercial or FDR, but then re-added.  (Peterson Decl., ¶ 11.)  The system operates in
this manner to comply with NSI's data sharing restrictions.  However, an unintended
consequence of that system design was that a number could be removed after a wrong number
claim, and then associated with a borrower through skip-tracing or the data feeds, re-added to
CLASS ED, CLASS Commercial or FDR, and called through the autodialer.  (Id.)

This is what happened with the Cell Number here.  (Peterson Decl., ¶ 12.)  When NSI
was making the disputed calls, public records reflected Bottoms as the user of the Cell Number.
Thus, while Johnson reported a wrong number, NSI repeatedly found the number as Bottoms's
through skip-tracing, and re-added the number to the respective system.  Because CIS showed
consent to call the Cell Number, NSI made the calls.  (Id.)

Since discovering this issue, NSI has commenced a project to create a new database,
called the Bad Number Repository.  Among other systems, this database will be used to
specifically track alleged wrong numbers and prevent future calls to those numbers through the
autodialer.  (Peterson Decl., ¶ 13.)

### 6. The Certification Motion, The Class Claims And The Instant Motion

The Court granted the Certification Motion on July 27, 2016.  The class, as defined,
consists of:

LOS_ANGELES/#20954.2

> Each person and entity throughout the United States (1) to whom Navient Solutions Inc. placed one or more telephone calls (2) directed to a number assigned to a cellular telephone service, (3) by using an automatic telephone dialing system, (4) after the person or entity informed [NSI] that it was calling the wrong telephone number, (5) between May 4, 2011 and March 7, 2016.

There are approximately 270,000 persons in the class.[6]

With the Certification Motion, Johnson filed a declaration from Anya Verkhovskaya, ("Verkhovskaya"), setting forth the proposed methodology for identifying the class members. (See Docket Entry 75-8 (the "Verkhovskaya Declaration").)  Verkhovskaya's background is in class action settlement administration.  According to Verkhovskaya, she will start with the list of phone numbers marked with the wrong number designation in NSI's systems.  (Motion, p. 3.) Then, Verkhovskaya will do the following:

> (1) Query the wireless reverse directory of a data broker such as LexisNexis to identify the name and address associated with that number at a given moment in time;
>
> (2) Submit subpoenas to the top nine wireless carriers for call detail reports, texts, or bills to obtain personal identifying information relating to the cellular numbers where the data brokers could not identify the historical owner; and
>
> (3) Check the National Change of Address database for each person's current address.

(Verkhovskaya Declaration, ¶¶ 14-19.)

This methodology was described in the Certification Motion on a prospective basis only. Verkhovskaya did not undertake the methodology in advance of submitting her declaration, nor did she analyze any data (indeed, she did not request any data from NSI).  Further, Verkhovskaya has never been involved in a program of serving subpoenas for identifying information.  She is not aware of the legal requirements, or of any obstacles to production.

---

[6] This is only an estimate, based on the number of phone numbers in NSI's records marked as wrong numbers.  NSI denies that this is the true composition of any class here.  If NSI's Motion is not granted, it will move for decertification of the class at the appropriate time.

The methodology is highly questionable for, underlined inter alia, the following reasons.  First, as noted above, it does not associate the Cell Number with Johnson when the calls were made; instead, it identifies Bottoms as the owner at that time.  (Daley Decl., ¶ 50.)  Additionally, because historical cell phone ownership and use information is highly unreliable and incomplete, the methodology does not include all recipients of wrong number calls placed by NSI, but does include; (1) persons who did not receive any calls from NSI; (2) borrowers who were misidentified as "wrong numbers;" and (3) persons who may have received wrong number calls but are not identified as the owners or users of the cellular numbers.  (Daley Decl., ¶ 71.)  Finally, and importantly, the methodology is not capable of distinguishing the users of telephone numbers from the owners who pay the bills.  (Id.)

Thus, at this time, none of the class members' identities are known.  However, once the methodology is applied, the class undoubtedly will:  (1) include persons who never received any calls from NSI; (2) include borrowers who were misidentified as "wrong numbers;" and (3) exclude many persons who may have received wrong number calls but are not identified as the owners or users of the cellular numbers (like Johnson.)   For instance, based only on the methodology — and without the knowledge that Johnson is the named plaintiff here — membership in the class would be conferred on Bottoms, not Johnson.

Moreover, and obviously, there is no evidence before the Court on the Motion with respect to any of the class members' claims.  Specifically, Johnson has not demonstrated that: (1) a class member owned or used a cell phone that NSI called during the class period; (2) the class member was not the intended recipient of the call; and (3) the calls were connected to that class member, such that standing exists under Spokeo for the calls at issue.

## III.   Argument

It is fundamental that, on a motion for summary judgment, the moving party bears the burden of meeting a "stringent" standard.  Rudnick v. Sears, Roebuck, & Co., No. 85 C 6202, 1987 U.S. Dist. LEXIS 11357 (N.D. Ill. Dec. 10, 1987.)  "Summary judgment is appropriate when the record shows 'that there is no genuine issue as to any material fact and that [a] moving party is entitled to a judgment as a matter of law.'"  McLaughlin Equip. Co. v. Newcourt Credit Group, Inc., IP98-0127-C-T/G, 2004 U.S. Dist. LEXIS 13939, at *9 (S.D. Ind. Feb. 18, 2004) (citing Fed. R. Civ. P. 56(c).)  The existence of disputed material facts — that is, facts that might affect the outcome of the suit under the governing law — will preclude summary judgment.  Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health, 64 F. Supp. 3d 1235, 1239 (S.D. Ind. Dec. 3, 2014.)  Further, "[a]ny doubt as to the existence of a genuine issue for trial is resolved against the moving party."  Id.  In addition, even where facts are undisputed, the moving party on a motion for summary judgment must show that he is entitled to judgment as a matter of law.  McLaughlin Equip. Co., 2004 U.S. Dist. LEXIS 13939, at *9 (citing Ponsetti v. GE Pension Plan, 614 F.3d 684, 691 (7th Cir. 2010).)

Here, Johnson plainly fails every element of the required showing.  Johnson cannot overcome the issues of disputed facts on his own claims, arising from use of the Cell Number.  Further, he does not offer any evidence at all on the substance of the class members' claims.  Nor does he demonstrate an entitlement to judgment for himself or the class under plainly applicable law.  Indeed, summary judgment is generally inappropriate where the issues at hand are fact-intensive and complex.  See United States v. Southern Indiana Gas & Elec. Co., No. IP 99-1692-C-M/F, 2003 U.S. Dist. LEXIS 6458, at *8 (S.D. Ind. Apr. 17, 2003) (explaining that the "fact-intensive nature" of the analysis made "summary judgment inappropriate"); Doctors Hosp. of

17

<u>Hyde Park, Inc. v. Desnick</u>, 336 B.R. 367 (N.D. Ill. 2005) (stating that summary judgment is "inappropriate when the legal issue is so complex, difficult, or insufficiently highlighted that further facts need to be explained for a prudently considered resolution").  Such is the circumstance here, and the Motion should be denied in its entirety.

> **A.   A Dispute Of Fact Exists As To Johnson's Use Of The Cell Number When The Calls Were Made, And No Evidence Of Use Is Before The Court With Respect To The Class Members.**

In order to establish his claim under the TCPA, Johnson must show that he was using the Cell Number when the calls were made — between April 18, 2014, and May 5, 2015.  However, during this time frame, the publicly available records — ironically, the very records upon which Johnson would rely for the reverse lookup — show Bottoms as the owner/user.  Johnson is associated in those records with the Cell Number only later, on December 24, 2015.  This is a critical issue because it goes to:  (1) whether NSI had consent to make the calls at that time (because Bottoms had given her consent); and (2) whether Johnson was the called party for purposes of the TCPA.

As stated by the FCC in <u>In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991</u>, Declaratory Ruling and Order, FCC 15-72, CG Docket No. 02-278, WC Docket No. 07-135, at ¶ 73 (July 10, 2015) (the "July 10 Order"), attached as Exhibit H, a consent determination is based on the actions of the "called party."  The called party is not necessarily the intended recipient, but rather "the subscriber <u>and</u> customary users." <u>Id.</u> at ¶ 74 (emphasis added).  Here, Bottoms certainly was a "customary user" — i.e., she was given access to the Cell Number, held it out as being her own, and evidently used the number with such frequency that public records associated the number with her rather than Johnson.  Accordingly, there exists a disputed fact as to whether Bottoms or Johnson was the user of the Cell Number and, thus, the called party, when the calls were made.

18

Moreover, and importantly, Johnson could not revoke consent given by Bottoms if she was the "called party" using the Cell Number at the relevant times.  The July 10 Order states that, "when an individual who is not the subscriber or other customary user answers the phone due to his or her proximity to those individuals . . . there is no TCPA violation when the current subscriber or customary user has given the necessary prior express consent for the call."  Id. at ¶ 76.  Here, Bottoms, as the customary user of the cell phone number, provided consent.  Thus, any attempt by Johnson to revoke that consent and/or assert a TCPA claim based on the calls at issue fails if he is not the "called party."  In this regard, Johnson likely will contend that his Sprint records establish that he was the owner of the Cell Number at all relevant times.  This is the very definition of a disputed issue of fact, however.  Between the public records showing Bottoms as the user of the phone and Johnson's phone records, there is a material, disputed factual issue as to whether Johnson was a "called party" under the TCPA, which precludes summary judgment for him.[7]

Meanwhile, with respect to the class, Johnson does not attempt to address this issue. Johnson introduces no evidence as to the use or ownership of any cell number by any class member.  On this basis alone, summary judgment must be denied as to the class members. Furthermore, it is likely that this evidence will never exist because the data brokers that Verkhovskaya proposes to use to identify the class members cannot distinguish between subscribers and users.  "In any situation where the subscriber may differ from the user — such as a family plan where a parent pays the bill on behalf of children, or an employer pays on behalf of employees — the individual who meets the class definition is unlikely to be identified by the

---

[7] Notably, Johnson suggests that the factual scenario in this case is similar to the one in McCaskill v. v. Navient Sols., Inc., No. 8:15-CV-1559-T-33TBM, 2016 WL 1367228 (M.D. Fla. Apr. 6, 2016).  But Johnson does not accurately portray the issues in McCaskill and that case is clearly distinguishable.  In McCaskill, the court resolved the narrow factual issue of whether the plaintiff and/or her daughter, through their actions, had consented to receive phone calls at the relevant number.  Id. at *8.  Thus, McCaskill has no relevance in this case.

reverse lookup process."  (Daley Decl., ¶ 87)  To the contrary, "[n]o data broker identified by [Verkhovskaya] claims to be able to provide the name of a specific <u>user</u> of a telephone at any particular point in time.  Indeed, this service does not appear to be offered by any company." (Daley Decl., ¶ 88) (emphasis in original.)

### B.   Johnson Fails To Establish Standing Under <u>Spokeo</u> For Himself, And Does Not Even Try As To The Class Members.

Article III of the Constitution limits federal courts to deciding "cases" and "controversies."  <u>Lujan</u>, 504 U.S. at 560.  The well-established test for Article III standing requires a plaintiff to demonstrate that he (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.  <u>Id.</u> at 560-61.  As a matter of settled law, plaintiff has the burden of proving standing.  <u>See, e.g.</u>, <u>Johnson v. United States OPM</u>, 783 F.3d 655, 661 (7th Cir. 2015) (citing <u>Kathrein v. City of Evanston, Ill.</u>, 752 F.3d 680, 690 (7th Cir. 2014)); <u>Indianapolis Minority Contrs. Ass'n v. Wiley</u>, No. IP 94-1175-C-T/G, 1998 U.S. Dist. LEXIS 23349, at *142 (S.D. Ind. May 13, 1998) (citing <u>Lujan</u>, 504 U.S. at  561.

In <u>Spokeo</u>, the Supreme Court provided further gloss on the injury-in-fact element.  In the context of claims for statutory damages brought under the Fair Credit Reporting Act, 15 U.S.C. § 1681, <u>et</u> <u>seq.</u>, involving the publication of allegedly inaccurate information about plaintiff by an online service provider, the Supreme Court took up the following issue:  whether a plaintiff has standing to sue in federal court based only on an alleged violation of federal law and a prayer for statutory damages — i.e., without an allegation of actual harm, such as out-of-pocket damages.  <u>Spokeo</u>, 136 S. Ct. at 1544–45.

In its decision, the Supreme Court noted that, "to establish injury in fact on such a claim, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is

concrete and particularized' and 'actual [and] imminent, not conjectural or hypothetical.'" <u>Id.</u> at 1548 (quoting <u>Lujan</u>, 504 U.S. at 555). However, the Supreme Court instructed that a concrete injury is a "real" one; it is "not abstract" and it "actually exist[s]." <u>Spokeo</u>, 136 S.Ct. at 1548. Further, the Supreme Court found that, while Congress may elevate injuries to be legally cognizable by statute, "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right." <u>Id.</u> at 1549. Instead, "Article III standing requires a concrete injury even in the context of a statutory violation." <u>Id.</u>

Since the issuance of <u>Spokeo</u>, numerous courts have recognized that a mere allegation that the defendant violated the TCPA, and that the plaintiff is consequently entitled to statutory damages, is inadequate to establish concrete injury. <u>See</u> <u>Ewing v. SQM US, Inc.</u>, No. 3:16-cv-01609-CAB-JLB (S.D. Cal. Sept. 29, 2016) (attached as Exhibit I); <u>Smith v. Aitima Medical Equipment, Inc.</u>, No. 16-CV-00339, 2016 U.S. Dist. LEXIS 113671 at *10 (C.D.Cal. July 29, 2016); <u>Romero v. Dep't Stores Nat'l Bank</u>, No. 15-CV-0193, 2016 U.S. Dist. LEXIS 110889, at *20-21 (S.D. Cal. Aug. 5, 2016.) Meanwhile, some courts have concluded that "battery drainage, aggravation, and nuisance" and other supposed "concrete" injuries, when resulting from a comparably small number of calls, are "at most de minimus" and consequently not sufficient harms to satisfy the requirement of concreteness. <u>Smith</u>, 2016 U.S. Dist. LEXIS 113671 at *10, *13; <u>Susinno v. Work Out World Inc.</u>, No. 15-CV-5881, 2016 U.S. Dist. LEXIS 113664, at *1 (D.N.J. Aug. 1, 2016) (because the plaintiff had received only a single, one-minute call, the court found that the harm caused by any aggravation or loss of battery life was de minimis and did not amount to the concrete harm needed to confer Article III standing); <u>Olmos v. Bank of Am.</u>, N.A., 15-CV-2786, 2016 U.S. Dist. LEXIS 72329, (S.D. Cal. June 6, 2016)

("loss of battery life and bandwidth" resulting from receipt of two text messages is de minimis and insufficient to confer standing).

Here, for himself, Johnson seeks summary judgment with respect to fifty-five calls.  No matter the legal standard applied he cannot obtain summary judgment for all of those calls based on the record before the Court.  As noted above, the service on the Cell Number was disconnected and reinstated no fewer than 13 times, 6 of which occurred between September 2014 and the filing of this action.  (See Daley Decl., ¶ 45; Dries Decl., ¶ 3-4)  No matter how Spokeo is applied, to the extent that no connection occurred at all, Johnson did not suffer, and could not have suffered, the "concrete and particularized" harm necessary to establish an injury in fact and, therefore, would lack Article III standing.

This conclusion is supported by the decision in Romero.  There, the plaintiff had allegedly received more than 290 telephone calls from the defendant in violation of the TCPA. Romero, 2016 U.S. Dist. LEXIS 110889, at *1.  The court held that "[e]ach alleged violation is a separate claim, meaning that Plaintiff must establish standing for each violation, which in turn means that Plaintiff must establish an injury in fact caused by each individual call.  In other words, for each call Plaintiff must establish an injury in fact as if that was the only TCPA violation alleged in the complaint."  Id. at *7.  The court then dismissed plaintiff's claims, holding that she could not satisfy the standing requirement for any of the calls:

> That Defendants called Plaintiff's cell phone may satisfy the "particular" component, but it does not automatically satisfy the requirement that the injury be "concrete." Although a defendant violates the TCPA by dialing a cell phone with an ATDS, it is possible that the recipient's phone was not turned on or did not ring, that the recipient did not hear the phone ring, or the recipient for whatever reason was unaware that the call occurred. Indeed, some or all of these circumstances occurred here as the number of calls for which Plaintiff seeks damages at trial exceeds the number of calls alleged in the complaint, and in any event only two of the alleged TCPA violations involved calls that Plaintiff

22

answered.  <u>A plaintiff cannot have suffered an injury in fact as a result of a phone call she did know was made.</u>

<u>Id.</u> at *9-*10 (emphasis added).

Moreover, as to the class members, the Motion's failing is clear and repetitive.  Johnson has put no evidence before this Court that a single call attempt ever was connected to a single class member, much less that all were.  Thus, there is no basis upon which to evaluate whether class members suffered an injury in fact sufficient to meet <u>Spokeo</u>'s standard.

> **C.  NSI Was An Agent Of The Department For Purposes Of Making Calls To The Cell Number And Calls On Other Federal Loans And, Thus, It Cannot Incur Liability Under The TCPA For Any Such Calls.**
>
> **1.  The FCC Has Clarified That The TCPA Does Not Apply To Contractors Acting As Agents Of The Federal Government.**

On July 5, 2016, the FCC issued the <u>Broadnet Ruling</u>, which interprets the meaning of the term "person," as used in the TCPA, and clarifies that "the federal government or agents acting within the scope of their agency under common-law principles of agency" are not "persons" as that term is defined in the TCPA.  <u>Broadnet Ruling</u>, p. 5, ¶ 10.  Based on this conclusion that the federal government and its agents are not "persons" under the TCPA, the FCC explained that the TCPA "does not apply to calls made by or on behalf of the federal government in the conduct of official business, except when a call made by a contractor does not comply with the government's instructions."  <u>Id.</u>, p. 1, ¶ 1.

Accordingly, this TCPA immunity, granted to agents of the federal government, exists "where (1) the call [i]s placed pursuant to authority that was 'validly conferred' by the federal government, and (2) the third party complie[s] with the government's instructions and otherwise act[s] within the scope of his or her agency, in accord with federal common-law principles of agency."  <u>Id.</u>, p. 6, ¶ 11.  In the <u>Broadnet Ruling</u>, the FCC discussed its historical application of agency principles to allow for claims of vicarious liability based on calls made <u>by</u> third-party

vendors.  Id., p. 9, ¶ 16 (citing In re DISH Network, LLC, Declaratory Ruling, 28 FCC Rcd 6574, 6587, ¶ 35 (2013) ("DISH Declaratory Ruling"), attached as Exhibit J.)  Such agency principles, the FCC concluded in Broadnet, should apply with equal weight to calls made for the government:

> Indeed, subjecting contractors operating on behalf of the government to liability under the TCPA, even though the federal government itself would not be liable, would be difficult to reconcile with the DISH Declaratory Ruling.  There, the Commission ruled that a principal can be held vicariously liable for telephone calls placed by third-party agents acting within the scope of their actual authority.  If the TCPA applied to contractors calling on behalf of the federal government, this rule would potentially allow the government to be held vicariously liable for the conduct in which the TCPA allows the government to engage.  That would be an untenable result.

Id.

The FCC thus determined that, based on the federal common law of agency, "a government contractor who places calls on behalf of the federal government will be able to invoke the federal government's exception from the TCPA when the contractor has been validly authorized to act as the government's agent and is acting within the scope of its contractual relationship with the government, and the government has delegated to the contractor its prerogative to make autodialed or prerecorded- or artificial-voice calls to communicate with its citizens."  Id., p. 9, ¶ 17.  In reaching this conclusion, the FCC stated its belief that "we have reached the best interpretation of Congress's intent to exempt the federal government from the prohibitions in section 227(b)(1), even if that interpretation might lead to more unwanted calls than would otherwise be the case."  Id., p. 13, ¶ 22.

Importantly, while the Broadnet Ruling was released on July 5, 2016 — four months after the class period in this case — it guides this Court's analysis as a matter of law.  In contrast to agency rules or regulations that change the substance of an existing law, the Broadnet Ruling is interpretive guidance, which "restates what the law according to the agency is and has always

24

been." Clay v. Johnson, 264 F.3d 744, 749 (7th Cir. 2001) (citing Pope v. Shalala, 998 F.2d 473, 483 (7th Cir. 1993)). Such guidance "is no more [improperly] retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand." Pope, 998 F.2d at 483 (quoting Manhattan General Equip. Co. v. Commissioner, 297 U.S. 129, 135 (1936)). Accordingly, courts "give great deference to the promulgating agency's expressed intent as to whether its rule changes the law or merely clarifies it," and courts "will defer to an agency's expressed intent that a regulation is clarifying unless the prior interpretation of the regulation or statute in question is patently inconsistent with the later one." Id.

Here, the Broadnet Ruling is quite clearly interpretive, clarifying the meaning of "person." In fact, through the language of the ruling, the FCC took great pains to explain its clarifying nature:

- "These petitions request clarification of how the Telephone Consumer Protection Act (TCPA) applies to autodialed or prerecorded- or artificial-voice phone calls, including text messages, made by the government and government contractors." Broadnet Ruling, p. 1, ¶ 1.

- "As explained more fully below, we clarify that the TCPA does not apply to calls made by or on behalf of the federal government in the conduct of official government business, except when a call made by a contractor does not comply with the government's instructions." Id.

- "RTI and Broadnet ask the Commission to clarify that the term 'person,' as used in section 227(b)(1), does not include the federal government. We find merit in these requests and therefore clarify that the term 'person' as used in section 227(b)(1) and our rules implementing that provision does not include the federal government or agents acting within the scope of their agency under common-law principles of agency." Id., p. 5, ¶ 10.

- "Our decision to clarify the meaning of 'person' within section 227(b)(1) . . . finds strong support in the Supreme Court's recent decision indicating that both the federal government, as well as contractors lawfully authorized to make calls on behalf of the federal government are immune from TCPA liability and hence are not subject to its prohibitions." Id., p. 11, ¶ 20 (citing Campbell-Ewald, 136 S. Ct. at 673-74).[8]

---

[8] The Campbell-Ewald Court noted that a government contractor may be eligible for derivative immunity under the TCPA when it acts under authority validly conferred on it by the

Furthermore, the courts and the FCC itself have explained that agency declaratory rulings apply retroactively.  For instance, in <u>AT&T v. FCC</u>, 454 F.3d 329, 332 (D.C. Cir. 2006), AT&T sought and obtained a declaratory ruling from the FCC, but disputed that the ruling applied retroactively.  The D.C. Circuit found that the declaratory ruling did so apply, noting that it constituted an adjudication, and that "[r]etroactivity is the norm in agency adjudications no less than in judicial adjudications."  <u>Id.</u> (citation omitted).  As explained by the Supreme Court in <u>SEC v. Chenery Corp.</u>, 332 U.S. 194, 203 (1947), "[e]very case of first impression has a retroactive effect, whether the new principle is announced by a court or by an administrative agency."  Thus, the <u>Broadnet Ruling</u> applies here to the claims asserted by Johnson and the class.

**2.    When Making Calls On The Federal Loans, NSI Plainly Acted As The Department's Agent.**

Under Seventh Circuit precedent, "an agent's authority may be actual or apparent; if it is actual, it may be express or implied."  <u>Moriarty v. Glueckert Funeral Home, Ltd.</u>, 155 F.3d 859, 865-66 (7th Cir. 1998) (citing and quoting Restatement (Second) of Agency).  Here, the Department gave actual authority — both express and implied — to NSI to utilize autodialing as a default prevention tool.  Express actual authority "to do an act can be created by written or spoken words or other conduct of the principal, which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account."  <u>Id.</u> at 866 (quoting Restatement (Second) of Agency); <u>accord</u> <u>Pohl v. United Airlines</u>, 110 F. Supp. 2d 829, 839 (S.D. Ind. 1999).  "Implied authority is that authority which is inherent in an agent's position and is, simply, actual authority proved through circumstantial evidence."  <u>Moriarty</u>, 155 F.3d at 866.  Implied authority is created through the words or conduct of the principal, which, reasonably

---

federal government.  136 S. Ct. at 673.  However, the particular facts of that case involved a government contractor that exceeded the authority granted to it by the government and violated explicit instructions from the government, thus resulting in no immunity for the defendant company.  <u>Id.</u> at 673-74.  Unlike the defendant in <u>Campbell-Ewald</u>, here, NSI acted entirely within the authority granted to it by the Department.

interpreted, cause an agent to believe that the principal consents to have an act done on its behalf. Charvat v. Valente, No. 12 CV 5746, 2015 U.S. Dist. LEXIS 73942, at *5 (N.D. Ill. June 8, 2015). Here, the facts demonstrate that the Department both expressly and impliedly authorized NSI to place autodialed calls with respect to federal loans, and NSI is therefore immune from TCPA liability as an agent of the federal government, as established in the Broadnet Ruling.[9]

As noted above, ███████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[9] An agency relationship also can be established through the doctrine of ratification, which is "the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Charvat v. Valente, No. 12 CV 5746, 2015 U.S. Dist. LEXIS 73942, at *5 (N.D. Ill. June 8, 0215) (citing Restatement (Third) of Agency). "Ratification may be found when the principal, with full knowledge of all material facts, takes a position inconsistent with nonaffirmation. Thus, the principal's acquiescence or failure to repudiate the agent's acts may constitute ratification." Pitt Penn Oil Co. v. Halsted Auto Wreckers, No. 90 C 5750, 1991 U.S. LEXIS 5770, at *10-11 (N.D. Ill. May 1, 1991). The Department was unquestionably aware of NSI's use of autodialing to reach delinquent student loan holders.



See <u>Pohl</u>, 110 F.

Supp. 2d at 839 ("Actual authority is created by written or spoken words of the principal which,

reasonably interpreted, causes the agent to believe that the principal desires him so to act on the

principal's account.") (internal quotations omitted); <u>accord</u> <u>Pulliam v. Mansards Apts.</u>, No. 2:09-

CV-398-PPS, 2011 U.S. Dist. LEXIS 49773, at *4 (N.D. Ind. May 6, 2011) (same).

Furthermore, the Department's actions throughout contract performance likewise demonstrate

the implied authority given to NSI to utilize autodialing.  <u>Charvat</u>, 2015 U.S. Dist. LEXIS 73942,

at *5 ("Implied authority is actual authority that is implied by facts and circumstances and it may

be proved by circumstantial evidence.")

From NSI's point of view, the factual evidence clearly establishes that the Department

conferred actual authority upon NSI to utilize autodialing as a default prevention tool.

Nevertheless, NSI did not seek summary judgment on the agency defense here because the

Seventh Circuit views "determinations regarding the existence and scope of an agency

relationship as questions of fact."  <u>Moriarty</u>, 155 F.3d at 864; <u>see also</u> <u>Savanna Group, Inc. v.</u>

<u>Trynext, Inc.</u>, 2013 U.S. Dist. LEXIS 125090 at *21 (denying summary judgment where there

was a factual question as to agency); <u>Pitt Penn Oil Co. v. Halsted Auto Wreckers</u>, No. 90 C

28

5750, 1991 U.S. LEXIS 5770, at *12 (N.D. Ill. May 1, 1991) ("Unless the relationship of the parties is so clear as to be undisputed, the existence and scope of an agency relationship are questions of fact to be decided by the fact finder."); accord Orix Credit Alliance, Inc. v. Taylor Mach. Works, Inc., 125 F.3d 468, 474 (7th Cir. 1997).  The inquiry is fact-specific because "the relationship of agency does not depend on an express appointment and acceptance thereof, but it may be implied from the circumstances of the particular case."  American Broadcasting Cos. v. Climate Control Corp., 524 F. Supp. 1014, 1017 (N.D. Ill. 1981).  This inquiry applies to Johnson, too, and defeats his Motion.  Where an implied agency relationship is argued, "it is plain that summary judgment cannot be granted [to] either party."  American Broadcasting Cos., 524 F. Supp. at 1017 ("Questions of implied agency are rarely susceptible to summary judgment because such agency must be inferred from actions by a principal, and those actions seldom permit of a single inference.") (emphasis added).

**D.  In Addition, Pursuant To The Budget Act, No TCPA Liability Exists For Any Calls Made By NSI On Federally Owned Or Guaranteed Loans After November 1, 2015.**

On November 2, 2015, the President signed the Budget Act into law.  Section 301 of the Budget Act (the "Amendment") provides that autodialed calls are exempt from the TCPA's prior express consent requirement if they are "made solely to collect a debt owed to or guaranteed by the United States."  47 U.S.C. § 227(b)(1)(A)(iii).  Here, Johnson proposes to recover for autodialed calls made by NSI to class members on federal loans through March 7, 2016.  However, summary judgment must be denied as to any such calls placed by NSI after November 2, 2015, the effective date of the Amendment.  This is the effect of the plain language of the Amendment.

In the Motion, Johnson advances arguments against NSI's supposed effort to apply the Amendment on a retroactive basis — i.e., to the beginning of the class period.  But NSI makes

no such attempt here.  Instead, and very simply, the Amendment applied on its effective date, as does any other enacted statute.  See <u>Krzalic v. Republic Title Co.</u>, 314 F.3d 875, 879-880 (7th Cir. Ill. 2002) ("[W]hen a statutory provision is clear on its face the court stops there, in order to preserve language as an effective medium of communication from legislatures to courts . . . [i]f judges won't defer to clear statutory language, legislators will have difficulty imparting a stable meaning to the statutes they enact.")

Furthermore, this outcome does not change in light of subsequent rulemaking issued by the FCC on August 11, 2016.  The Budget Act directed the FCC to "prescribe regulations to implement the amendments made" by Section 301 within nine months of enactment.  See Budget Act at § 301(b).  The FCC did just that on August 11, 2016, when it released a Report and Order to implement the Amendment.  See <u>In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991</u>, CG Docket No. 02-278, Report and Order, FCC 16-99 (August 11, 2016) (the "August 2016 Order"), attached as Exhibit K.  The August 2016 Order appended the FCC's Final Rules implementing the Amendment; however, the Final Rules are not yet effective.  As the August 2016 Order makes clear, because certain of the Final Rules implicate the Paperwork Reduction Act, as a whole, the rules will not become effective "until 60 days after the Commission publishes a Notice in the Federal Register indicating approval of the information collection by the Office of Management and Budget (OMB)."  See August 2016 Order at 24 at ¶¶ 59-60.  Thus, the Final Rules are not in place and, until they are, the Amendment applies.

### E.   Even If Johnson Had Established Liability Against NSI, Which He Certainly Has Not, There Is No Basis For A Finding Of Willfulness.

In the Motion, Johnson presents the unexamined conclusion that statutory damages can be trebled under the TCPA so long as the defendant "intentionally made the contested phone

calls to Plaintiff." (Motion, p. 21.) The reality, however, is that no clear legal standard exists on trebled damages. For instance, in <u>Lary v. Trinity Physician Fin. & Ins. Servs.</u>, 780 F.3d 1101, 1107 (11th Cir. 2015), the court held that "[t]he requirement of 'willful[ ] or knowing[ ]' conduct requires the violator to know he was performing the conduct that violates the statute." "If we interpreted the statute to require only that the violator knew he was making a 'call' or sending a fax, the statute would have almost no room for violations that are not 'willful[] or knowing[].'" <u>Id.</u> (citing <u>Harris v. World Fin. Network Nat'l Bank</u>, 867 F. Supp. 2d 888, 895 (E.D. Mich. 2012)). Similarly, in <u>Bridgeview Health Care Center Ltd. v. Clark</u>, 2013 WL 1154206, n.8 (N.D. Ill. March 19, 2013), the court acknowledged that "an accidental transmission or a transmission that the sender mistakenly believed to be authorized could violate the TCPA without being 'willful.'" Meanwhile, in <u>Mfrs. Auto Leasing, Inc. v. Autoflex Leasing, Inc.</u>, 139 S.W.3d 342, 346 (Tex. Ct. App. 2004), the court held that "the TCPA is willfully or knowingly violated when the defendant knows of the TCPA's prohibitions, knows he does not have permission to send a fax  . . . and sends it anyway." Further, in <u>Covington & Burling v. International Marketing & Research, Inc.</u>, 2003 WL 21384825, at *8 (D.C. Super. Ct. April 17, 2003), the court found that a defendant's violations of the TCPA fax provision were "willful" only because defendant did not "present[ ] evidence that the faxes to [the plaintiff] were sent in error."

Here, importantly, NSI never had any intention of calling Johnson. As detailed above, when NSI made the calls at issue, it was attempting to reach Bottoms, its borrower on delinquent loans, and the Cell Number was associated in public records with her. Further, as also detailed above, the Cell Number was re-added to Bottoms's account through skip-tracing based on a system flaw that now is being addressed. However, if the Cell Number had not been associated

with Bottoms, that could not have occurred.  These facts, viewed fairly in any sense, describe mere errors.

In addition, and once again, Johnson presents no evidence of willfulness with respect to any class member.  He merely assumes that a single call attempt made after NSI's records reflect a wrong number contention (which itself cannot be trusted) must be interpreted as willful conduct.  The Court should reject this position as extreme on the facts and unsupported by law.

**F.     On The Record Before The Court, A Grant Of Summary Judgment For The Class Would Constitute A Significant Due Process Violation.**

**1.     A Grant Of Summary Judgment For The Class Would Deprive NSI Of Its Right To Present Its Defenses.**

Under the Seventh Circuit's decision in Mullins, 795 F. 3d at 671, "the defendant must be given the opportunity to raise individual defenses and to challenge the calculation of damages awards for particular class members."  See also Lindsey v. Normet, 405 U.S. 56, 66 (U.S. 1972) ("Due process requires that there be an opportunity to present every available defense.")  In Mullins, the Seventh Circuit held that due process considerations were not an appropriate part of the ascertainability analysis at the class certification stage because the defendant would have an opportunity later to challenge the merits of the class members' claims.  Id.; see also Allapattah Servs., Inc. v. Exxon Corp., 333 F. 3d 1248, 1259 (11th Cir. 2003) ("Because Exxon has certain defenses to each dealer's claim, we believe that an adversarial claims process is warranted in this case.  We therefore conclude that Exxon still has a present interest in the claims process, and due process requires that it be allowed to participate in that process.")

In fact, in Mullins, the Seventh Circuit expressly contemplated a claims process to resolve class membership, noting that a court could "rely on self-identifying affidavits, subject as needed to audits and verification procedures and challenges, to identify class members." Mullins, 795 F. 3d at 669.  The Seventh Circuit held that it was only after such identification that

defendant could exercise its "due process right not to pay in excess of its liability and to present individualized defenses if those defenses affect its liability." Id.  While rejecting the notion that due process should be considered at the class certification stage, the Seventh Circuit squarely held that the appropriate question is "whether the defendant will receive a fair opportunity to present its defenses when putative class members actually come forward." Id. at 670 (emphasis added).

Here, Johnson is attempting to circumvent NSI's due process rights by seeking summary judgment before any class members have been identified.  But the due process issue here is substantive, rather than procedural, and a higher standard must be imposed, lest the class certification decision consume the decision on the merits.  See, e.g., Carrera v. Bayer Corp., 727 F.3d 300, 307 (3d Cir. 2013) ("[A] class action cannot be certified in a way that eviscerates this [due process] right or masks individual issues."); Mullins, 795 F.3d at 669-670; Mitchell v. LVNV Funding, LLC, 12-CV-523, 2016 U.S. Dist. LEXIS 7968, *6 (N.D. Ind. Jan. 25, 2016) ("Class members seeking actual damages will be required to prove individual issues of causation and damages, and the Defendants will have a due process right to challenge the Plaintiff's evidence at any stage.").  The due process concern is particularly significant here because Johnson is requesting an adjudication in favor of the class that could be worth as much as $14 billion.

### 2.    Further, If The Court Were To Grant the Motion, Johnson Would Purport To Impose Annihilating Damages.

In the event that the Court rejects all of NSI's arguments in opposition to the Motion and determines to grant summary judgment on liability, it should permit NSI to preserve its due process rights by making a further showing on the effect of such damages before actually considering the damages issue.  Specifically, the Court must consider whether the potential

damages are so large as to violate NSI's due process rights.  See Beringer v. Std. Parking Corp., No. 07 C 5027, 2008 U.S. Dist. LEXIS 72873, at *14-16 (N.D. Ill. Sept. 24, 2008) (recognizing that the "potential . . . for a damages award so large that it violates a defendant's due process rights" should be addressed "if the class is certified and prevails on liability"); Berkman v. Sinclair Oil Corp., 59 F.R.D. 602, 612 (N.D. Ill. 1973) (denying class certification where class damages would be "ruinous and annihilating").

To be clear, NSI does not contend that the TCPA, on its face, violates the Due Process Clause because of its statutory damages provisions.  The potential for such damages arises from the effects of combining a statutory scheme that imposes minimum damages awards on a per-consumer basis with the class action mechanism that aggregates many claims.  See Parker v. Time Warner Entm't Co., Inc., 331 F.3d 13, 22 (2d Cir. 2003).  Such a combination may expand the potential statutory damages so far beyond the actual damages suffered that the statutory damages come to resemble punitive damages, yet are awarded as a matter of strict liability, rather than for the egregious conduct typically necessary to support a punitive damages award. Id.; see also Ratner v. Chemical Bank New York Trust Co., 54 F.R.D. 412, 416 (S.D.N.Y. 1972) (holding that class damages were not appropriate where claims were based on technical violations of disclosure requirements, no claim for actual damages was made, and liquidated damages, if awarded to a huge potential plaintiff class, would result in "horrendous, possibly annihilating punishment, unrelated to any damage to the purported class or to any benefit to defendant").

Indeed, aggregation in a class action of large numbers of statutory damages claims distorts the purpose of both statutory damages and class actions.  Such a distortion would create a potentially enormous aggregate recovery for Johnson and the class, and thus an in terrorem

effect on NSI, which may induce an unfair settlement.  See Blair v. Equifax Check Servs., Inc., 181 F.3d 832, 835 (7th Cir. 1999) (identifying a scenario in which the "stakes are large and the risk of a settlement or other disposition [may] not reflect the merits of the claim").  In a case such as this, the Court should rely upon the Due Process Clause to nullify that effect and reduce the aggregate damage award.  See Murray v. GMAC Mortg. Corp., 434 F.3d 948, 954 (7th Cir. 2006) ("An award that would be unconstitutionally excessive may be reduced."); see also Parker v. Time Warner Entm't Co., Inc., 331 F.3d 13, 22 (2d Cir. 2003) (acknowledging the trial court's "legitimate concern that the potential for a devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class, may raise due process issues").

## IV.   Conclusion

For the foregoing reasons, NSI respectfully requests that the Court deny the Motion in its entirety.

Dated: October 3, 2016

Respectfully submitted,

/s/ Lisa M. Simonetti

Lisa M. Simonetti
Vedder Price (CA), LLP
1925 Century Park East, Suite 1900
Los Angeles, California 90067
T: (424) 204-7700
F: (424) 204-7702
lsimonetti@vedderprice.com

Bryan K. Clark
Andrew Barrios
Vedder Price P.C.
222 North LaSalle Street
Chicago, Illinois 60601
T: (312) 609-7500
F: (312) 609-5005
bclark@vedderprice.com
abarrios@vedderprice.com

Daniel C. Green
Vedder Price P.C.
1633 Broadway , Floor 47
New York, NY 10019
T: (212) 407-7735
F: (212) 407-7799
dgreen@vedderprice.com

Attorneys for Defendant
NAVIENT SOLUTIONS, INC.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I electronically filed the foregoing **OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notifications of such filing to all attorneys of record.

On  October 3, 2016

/s/ Lisa M. Simonetti
Lisa M. Simonetti